



IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

      Plaintiff,              3:02-cr-233(S1)-J-32TEM

vs.                                February 10, 2003

ALGIE MOORE,                       9:00 a.m.

      Defendant.              Courtroom No. 5

_____

(VOLUME I of IV)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

GOVERNMENT COUNSEL:

    **FRANK TALBOT, ESQ.**
    Assistant United States Attorney
    300 North Hogan Street, Suite 700
    Jacksonville, Florida 32202

DEFENSE COUNSEL:

    **DAVID MAKOFKA, ESQ.**
    Makofka & Makofka
    24 North Market Street, Suite 402
    Jacksonville, Florida 32202

COURT REPORTER:

    Shannon M. Bishop, RMR, CRR

(Proceedings reported by microprocessor stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

Government's Opening Argument.....................142
Defendant's Opening Argument.....................151


Page No.

WITNESSES FOR THE GOVERNMENT:

**MICHAEL LYNN BRANSCOM**
DIRECT EXAMINATION..............................162
CROSS-EXAMINATION...............................192
REDIRECT EXAMINATION............................205

**ROBBY BACON**
DIRECT EXAMINATION..............................209
CROSS-EXAMINATION...............................225
REDIRECT EXAMINATION............................234
RECROSS-EXAMINATION.............................238

**TONYA TATOR**
DIRECT EXAMINATION..............................240
CROSS-EXAMINATION...............................265

E X H I B I T S    R E C E I V E D

                                              Page No.

Government's Exhibit 1.........................180
Government's Exhibit 2.........................190
Government's Exhibit 3.........................181
Government's Exhibits 4G, 4H, 4I...............262

P R O C E E D I N G S

February 10, 2003                                    9:24 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Timothy J. Corrigan presiding.  Please be seated.

THE COURT:  Morning.  How is everybody doing?

MR. MAKOFKA:  Morning, Judge.

THE COURT:  United States versus Algie Moore, 3:02-cr-233(S1)-32TEM.  Mr. Talbot for the government. Mr. David Makofka for Mr. Moore.  Mr. Moore is present in the courtroom.

We're here today for trial of this case.  I'm informed that the jury venire is about ten minutes away from being ready to come up.  There are a couple of matters that we need to review before they do.

I have been, this morning -- I've been, this morning, presented with two stipulations.  One is a stipulation concerning a videotape, which is signed by Mr. Makofka, Mr. Moore, and Mr. Talbot, to the effect that a certain videotape of defendant while in police custody, dated August 30, 2002, shall be admissible in evidence without the need for further authentication and may be played during the defendant's case in chief without

1   objection.

2            That stipulation will be made of record and that's

3   fine with me.  I've also been presented another stipulation

4   by the parties concerning the prior felony conviction.

5            Mr. Moore, according to the indictment, it was

6   alleged that he had been convicted of three previous felony

7   convictions.  There was a motion to strike or redact the

8   indictment and preclude proof of more than one felony.  That

9   was Doc 28 filed by Mr. Makofka.

10           That motion and discussion between counsel has

11  resulted in a stipulation that the parties have reached.

12  And the stipulation will be read to the jury.  The

13  stipulation is in writing.  And it's signed by Mr. Moore and

14  Mr. Makofka and Mr. Talbot.  And I'll make that of record.

15           But the written stipulation then asks the Court to

16  read the following stipulation to the jury, that the

17  defendant, Algie Moore, and the United States have reached a

18  stipulation in this case.  You must accept the following

19  stipulation as proven beyond a reasonable doubt because both

20  parties agree that it is true.

21           The defendant, Algie Moore, prior to August 30,

22  2002, was convicted in a court of a crime punishable by

23  imprisonment for a term in excess of one year, that is, a

24  felony offense.  And that stipulation appears to be in

25  order.

1            And I will accept the stipulation and I will read

2    that to the jury upon the request of the government at the

3    appropriate time.   I'll also consider whether it ought to be

4    included in the jury charge that I give to the jury at the

5    end of the case.   So both of those stipulations will be

6    filed of record and will be part of the case.

7            We had an issue that came up the other day that

8    was the subject of an informal telephone conversation -- or

9    kind of status conference with Mr. Talbot and Mr. Makofka

10   the other day and -- which we agreed to carry over until

11   this morning.

12           There are two disciplinary reports involving one

13   of the government's witnesses, an Officer -- is it Dorough?

14   How do you say it?

15           MR. TALBOT:   Keith Dorough.

16           THE COURT:   Dorough.   And the question became

17   whether the government was going to produce evidence of

18   those disciplinary reports.   And the second question was

19   assuming the government produced the actual disciplinary

20   action whether the government was required to produce the

21   underlying documentation.

22           On Friday I received, and I assumed that

23   Mr. Makofka received, the actual disciplinary reports

24   themselves.   One of them was in 1995 and one of them was in

25   1998.

1          And, Mr. Makofka, I take it you've had a chance to

2     review these, sir?

3          MR. MAKOFKA:  The actual reports, yes, Your Honor,

4     we have reviewed these.

5          THE COURT:  All right.  And let me hear your

6     position on the matter at this point.

7          MR. MAKOFKA:  Your Honor, I think -- well, first

8     of all, I can get the Court back up to speed.  After Friday

9     it is in fact true that I was presented with the additional

10    written report that was related to the 1998 incident, if I'm

11    not mistaken.

12         THE COURT:  So you already had the '95?

13         MR. MAKOFKA:  I had the '95 and the '98, both

14    actual disciplinary memorandum that relate to the official

15    findings of the chief of police in relation to those two

16    events.  But supplemental to that, this morning I actually

17    received an additional two packet set of sort of supporting

18    materials that comprise, I guess, the written notes and

19    memoranda and written statements that were taken in relation

20    to the two offenses.

21         Now, I have not had a chance to review those

22    materials, obviously, because they're about 200 pages worth.

23    And my understanding is that --

24         THE COURT:  Let me be clear.  You received the

25    backup to both the disciplinary reports or just the first

1  one?

2       MR. MAKOFKA:  Actually, I'm mistaken.  I believe

3  it's just to the one relating 1995.

4       MR. TALBOT:  Your Honor, I can actually speak to

5  that.  We requested any and all paperwork in Keith Dorough's

6  disciplinary file.  That is the sum total of everything

7  that's in the file.

8       Apparently there is not any additional paperwork

9  on the '98 incident.  That is the complete paperwork on

10  that.  Everything else relates to the '95 incident, which

11  is...

12       THE COURT:  Okay.

13       MR. MAKOFKA:  And I can't ask for more than that,

14  Judge.  I think at this point we're satisfied.  And I just

15  want to further add, for the record, my understanding is the

16  government doesn't intend to call this Officer Dorough

17  today.  So that should give us ample time to review these

18  materials tonight and prepare any objections or requests and

19  what have you.

20       THE COURT:  All right.  Well, I think that's fine.

21  I think we're going to have to take them one -- you know, to

22  the extent that this officer is going to testify and to the

23  extent that you want to use any of this information to

24  impeach the officer, I think we're going to have to have a

25  discussion about that, what you're going to be able to do,

1  what you're not going to be able to do.  And I'll have to

2  hear from the government.  But it probably makes sense for

3  you to look through all that stuff before we have that

4  discussion.

5          MR. MAKOFKA:  That's fine, Judge.  The only

6  thought that I have that's sort of triggered by the Court's

7  comments relates to my ability to remark about these things

8  in an opening statement.  And just to bring the Court up to

9  what I had intended to do was just to briefly gloss over the

10 fact that this officer, we contend, had a critical role in

11 the investigation of the -- well, he participated in the

12 traffic stop, searched the defendant's vehicle.  And we were

13 just going to bring to the jury's attention the fact that

14 this gentleman does have a disciplinary history with his

15 employment agency relating to the issue of his truthfulness.

16          I wasn't going to get into more detail than that,

17 because I had anticipated us having a need for sort of a

18 clarifying meeting on that.

19          THE COURT:  Mr. Talbot, what's your view of that,

20 sir?

21          MR. TALBOT:  Your Honor, I believe that under -- I

22 never really had this come up before, so this is sort of new

23 territory for me as well.  But under Rule 608(b) it does

24 appear that Mr. Makofka on cross-examination would be

25 allowed to explore at least, you know, some area of this

1 incident of untruthfulness with Officer Dorough as to the

2 '95 incident.  It will be the United States' position that

3 the '98 incident does not deal with his credibility or

4 truthfulness.

5           THE COURT:  Right.  And I think that's probably

6 where we'll have to have further discussion about it once

7 Mr. Makofka gets to review the materials.

8           But it seems to me -- if that's as specific as

9 you're going to get, Mr. Makofka, that's probably okay on

10 opening.

11          MR. MAKOFKA:  Well, I don't know that that's the

12 exact language I intend to use, but I wanted to bring it to

13 their attention that it is disturbing and that they're going

14 to hear about it.

15          THE COURT:  Well, I understand that.  But what I

16 hear Mr. Talbot saying, and what I am agreeing with, at the

17 moment is that the '95 incident is probably fair game.  I'm

18 not so sure about the '98 incident.

19          MR. MAKOFKA:  And, frankly, Judge, I have no real

20 intention, after reviewing these materials again at home

21 last night, of even mentioning the '98 incident.  I just --

22          THE COURT:  And even with respect to the '95

23 incident -- obviously, you'll have to look at the paperwork,

24 but the -- you know, you're under an impeachment scenario

25 where the issue is untruthfulness.

1          And I think you're going to be permitted to make

2    whatever appropriate use you can of that.  But I don't

3    intend for us to, for example, go through all 200 pages of

4    this and have essentially a retrial or a regurgitation of

5    this entire incident.

6          So that's the discussion that I think we need to

7    have before you actually impeach.  But for purposes of your

8    opening statement, I think you're able to make reference to

9    the fact that he was disciplined and it was based on

10   untruthfulness and, you know, make an appropriate statement.

11   But I don't want you to -- you know, I don't want you going

12   overboard on it, I guess.

13          MR. MAKOFKA:  I agree, Judge.  And I think they're

14   incidents that relate to just general allegations and police

15   misconduct.  And I certainly would have no intention of

16   delving into those things.

17          I have taken the report.  I've dissected along the

18   lines of 608 and trustworthiness and truthfulness -- I

19   should say, not trustworthiness.  But we're prepared to sort

20   of excise the relevant portions out and we're ready to

21   discuss all this with the Court at the appropriate time,

22   Judge.

23          THE COURT:  Mr. Talbot, do you want to be heard

24   further, sir?

25          MR. TALBOT:  No, sir.

1          THE COURT:  Okay.  Then that's how we'll proceed

2   on that for the opening statement.  And then, Mr. Makofka,

3   you can -- tomorrow morning, or whenever the appropriate

4   time is, we can -- you can signal me that you're ready to

5   have a further discussion about the matter.

6          MR. MAKOFKA:  Thank you, Your Honor.

7          THE COURT:  All right.  We have the -- I don't

8   think the government provided one, but we do have a brief

9   statement of the case that was provided by Mr. Makofka.  And

10  it looked okay to me.

11         But I wanted to -- this is what I would propose to

12  read to the venire, just to give them a brief statement of

13  the case.  And it's the first paragraph of Mr. Makofka's

14  proposed voir dire.  It says, Outline of the indictment.

15         And I'm assuming everybody -- obviously,

16  Mr. Makofka has read it.  But, Mr. Talbot, I assume you've

17  looked at this.

18         The only thing that I was going to do was to take

19  out the part about forfeiture at the bottom, because that's

20  not going to be something the jury is going to be asked to

21  consider, as far as I'm aware, and to put in a statement

22  that Mr. Moore has pleaded not guilty to all of these

23  charges.

24         But other than that, it looked to me like a pretty

25  vanilla statement of what the charges were and just gives

1   the venire a -- you know, a little bit of an idea of what

2   kind of case we're talking about.

3             Mr. Makofka, this is your handiwork.  I assume you

4   don't have any objection to it being read to the venire?

5             MR. MAKOFKA:  No, Your Honor.  Thank you.

6             THE COURT:  Mr. Talbot, is that all right with

7   you?

8             MR. TALBOT:  No objection, Your Honor.

9             THE COURT:  All right.  That's what I'll use as my

10  brief statement to the venire then.

11            All right.  There's a recent Eleventh Circuit case

12  that's just come up that came up in a case I had with

13  Mr. Henry and Mr. Stone.  And it's been the subject of some

14  internal discussion as to how it ought to be handled.  It's

15  a case called United States versus Charles.  And it's an

16  Eleventh Circuit.  It's 313 F.3d 1278.

17            And it has to do with a situation where tapes are

18  used in a trial and what the obligation of the court

19  reporter is to try to transcribe what she's hearing.

20            It has been previously in this court, as I'm

21  understanding it, the practice of the court reporter to not

22  make the effort to try to transcribe either audio or

23  videotapes, because it's very, very difficult to do

24  accurately, as you all know.

25            And I haven't heard these tapes that we're going

1  to be using.  But most tapes are very difficult to

2  understand.  And it just -- it creates potential for the

3  inconsistency between the tape and what the court reporter

4  is able to discern.

5        However, this Eleventh Circuit case -- it's kind

6  of dicta, but it seems to say that the court reporter ought

7  to be creating a verbatim transcript.  And the alternative

8  or the fall-back position that seems to be acceptable in the

9  case is that so long as the Eleventh Circuit is going to

10  have the record in front of them and is not going to have

11  any trouble figuring out what was read in trial and so forth

12  or played in trial, then that might be all right.

13        In a case I had with Mr. Henry there were a lot of

14  tapes and a lot of excerpts, and we tried to use markers and

15  we had transcripts and we tried to do the best we could to

16  mark everything for the Eleventh Circuit for possible

17  review.  But I wanted to bring it to the parties' attention.

18  I don't know how much we have by way of tape here.  I'm not

19  aware if we have any transcripts or not.

20        But, Mr. Talbot, tell me from the government's

21  standpoint, what do we have by way of tapes in this case?

22        MR. TALBOT:  The tape that the United States

23  intends to play is a very brief video.  And it's video

24  surveillance of the alleged drug deal.  However, the video

25  malfunctions, so we don't get the drug deal even on tape.

1  And --

2         THE COURT:  Is there audio associated with it?

3         MR. TALBOT:  There is audio associated with it.

4  However, it is very limited and is not pertinent or

5  important to the case.  There is no audio of Mr. Moore on

6  the tape.  So if nothing is taken down on the audio, it

7  won't be, you know, an issue for my --

8         THE COURT:  Well, but I guess the problem that the

9  Eleventh Circuit is worried about is what's the jury hearing

10  and how are they going to know and that type of thing.  And

11  is the audio --

12         MR. TALBOT:  Well, a potential solution is to just

13  simply play it without audio.

14         THE COURT:  Mr. Makofka, what do you think?

15         MR. MAKOFKA:  I think, as much as I like to be in

16  agreement with everybody on a Monday morning, I can't agree

17  to that, because I think there are relevant portions of the

18  audio we'd like the jury to hear.

19         Just to give the Court an example, I think there's

20  commentary on the video to the effect that there is a sale

21  of crack cocaine.  So I think we ought to have the audio

22  played.

23         THE COURT:  All right.  Well, how long is the

24  entire tape?

25         MR. TALBOT:  I haven't timed it, Your Honor, but I

1  want to -- it's -- if it's a minute, I'll be surprised.

2           THE COURT:  Okay.

3           MR. TALBOT:  I think it's less than a minute.

4           THE COURT:  All right.  And the tape, I take it,

5  will be -- you're going to introduce the tape in evidence?

6           MR. TALBOT:  Yes.  I'll introduce it through

7  Detective Branscom.

8           THE COURT:  And there's no transcript associated

9  with it, because you're not -- you apparently are not that

10  interested in the audio anyway?

11          MR. TALBOT:  There may be two or three sentences,

12  at best.

13          THE COURT:  Okay.  And, Mr. Makofka, you haven't

14  -- you didn't think it necessary to have your own

15  transcript, so you're just going to let the jury hear it?

16          MR. MAKOFKA:  That would be my intention, Judge.

17          THE COURT:  All right.  Well, if we've only got a

18  minute's worth, I think the Eleventh Circuit can listen to a

19  minute -- you know, can watch their own -- you know, I think

20  the concern in this case was they had a huge amount of tapes

21  and they couldn't -- when they went to do the appeal, they

22  couldn't figure out what parts of the tape had been used and

23  what hadn't and so forth.

24          Well, if you've only got a minute, then I'm not so

25  worried about it.  And, I mean, it is very, very difficult

1  for the court reporter to make heads or tails out of this

2  stuff.

3         And what happens is they make it -- is that they

4  hear parts and they don't hear other parts, and then you've

5  got a transcript that is very difficult to understand.

6         So my inclination is to not require the court

7  reporter to try to transcribe that portion.  Again, I'll

8  hear from Mr. Talbot.

9         What's the government's position?

10        MR. TALBOT:  Your Honor, that's fine.  I think

11 what she'll -- I mean, we can play it and let her hear it

12 now.  It's -- it is very short.  I think it actually is

13 fairly audible.  So she probably wouldn't have any trouble

14 transcribing.

15        MR. MAKOFKA:  If we could just clarify whether or

16 not the government intends -- and I know you and I have had

17 an informal discussion.  I just want to get it on record

18 whether or not you intend to play the audio recording of the

19 CI wearing the wire.

20        MR. TALBOT:  No.  There is a CI wearing a wire.  I

21 do not intend to play the recording.  I can't make it out.

22 So I think it's useless to...

23        MR. MAKOFKA:  I was hoping to be heard, but I

24 didn't want to cut off Mr. Talbot.

25        MR. TALBOT:  No.  That's fine.

1          MR. MAKOFKA:  Judge, we also have a video that we
2    were hoping to play in our case.

3          THE COURT:  I saw that.

4          MR. MAKOFKA:  Somewhat lengthy.  I think -- I
5    haven't timed it out, but I want to say it's around 10
6    minutes, maybe 15 minutes.  And I think it's very audible.

7          The defendant has a conversation with someone else
8    on the video.  And we were hoping that the Court would have
9    a transcription of that.

10          And the only reason why I say this is because
11    recently in our office in a state case, not a federal case,
12    we had a situation come up where there was an issue of
13    authentication.  It was actually -- it went up before the
14    Florida Supreme Court last month.

15          And so everybody in our office is very gung ho
16    about having the court reporter transcribe everything that's
17    on the video and audiotapes to the best of their ability,
18    because in that case it came up where the transcription was
19    critical for whatever issue we were arguing.

20          So I would ask, even though I've never seen the
21    U.S. versus Charles decision, that the Court consider having
22    the court reporter do the best she can with the audio
23    portion.

24          THE COURT:  The problem with doing the best you
25    can is that -- and in this case it may not be as stark or as

1 problematic.

2          But in the other case I just recently had the

3 government had written transcripts, which they had, I'm

4 sure, had somebody go back and forth, back and forth, to try

5 to get a transcript of the thing.

6          So now you've got a written transcript the jury is

7 seeing.  You've got audio that the jury is hearing.  And

8 then you have a court reporter who is trying to write it

9 down.  And what you're -- what inevitably happens is it

10 means you've got three different versions of the same

11 situation.

12          And I think that's one of the things the Court of

13 Appeals isn't too happy about, is when you have three

14 different versions of the same event.

15          Now, obviously, the law is that the -- what the

16 jury hears or sees is the evidence.  The transcript is just

17 supposed to aid them.  And they're so instructed.

18          But, still, you know, when the Court of Appeals

19 gets ready to review it and they're reading the transcript

20 and they look at the transcript and they're totally

21 different, then we don't know what to do, or at least they

22 don't know what to do.  And I can understand it.

23          And so I'm just trying to -- as I said, this issue

24 had never really came up before, as I'm aware.  The policy

25 previously was the court reporters did not try to transcribe

1  these tapes because very often there's audibility issues

2  with them.

3        Given the limited amount of time we have here --

4  and if you're telling me they're audible, I'll consider

5  having her try to do it.  I may, based upon the ability --

6  her ability to do so as reported to me, I may or may not

7  choose to later essentially remove that as part of the

8  transcript, depending on whether I feel like we've got a

9  good record or not.  I think I have that authority.

10       In other words, it's really ultimately, I think,

11 my decision what the record of the case is.  And I'm --

12 since we've only got one minute and ten minutes and you're

13 telling me it's fairly audible, I'm willing to give it a

14 shot.  I'm sure Ms. Bishop is delighted to hear it.

15       But I'm trying to get the word out that this is an

16 issue.  And I know there's a lot of cases that have tapes.

17 And we're going to have to figure out the right way to do

18 this, because, you know -- and, of course, this case is even

19 a little more unusual.

20       It's not usually the defendant that's the

21 proponent of tapes.  And so usually it's the government's

22 problem, not the defendant's problem.  And so I'm going to,

23 right now, rule that Ms. Bishop should make an effort to

24 transcribe these tapes as they're played subject to the

25 Court later deciding based upon her ability to do so,

1  whether we have a good record or not, and then making a

2  decision as to what to do about it.

3          All right.  That's what we'll do.  Anybody else

4  want to be heard on that issue?

5          MR. MAKOFKA:  No, Your Honor.  Thank you.

6          MR. TALBOT:  No, sir.

7          THE COURT:  All right.  I believe other than

8  advising you of the voir dire process that I'm going to use,

9  I believe that's all I had.

10          Mr. Talbot, was there any other matters that you

11  had before we proceed?

12          MR. TALBOT:  No, Your Honor.

13          THE COURT:  Mr. Makofka?

14          MR. MAKOFKA:  No, Your Honor.  Thank you.

15          THE COURT:  All right.  Well, let me -- all right.

16  While the venire is being brought up, I'm going to read into

17  the record, and also for the advice of counsel, how I'm

18  going to proceed on jury selection.

19          A jury panel has been summoned by the jury

20  administrator, who initially screened the hardships and

21  brought any questionable cases to me for a final decision on

22  hardships.

23          The 35 persons who will be in the courtroom have

24  been randomly selected by a computerized process, and they

25  will be seated in the jury box in adjacent areas randomly --

1  and in the randomly selected order.

2        You will be provided with the names of the 35

3  jurors in the randomly selected order.  Jury selection will

4  proceed with those assigned numbers.

5        Thus, if after voir dire there are no challenges

6  at all, jurors No. 1 through 12 on the list would be the

7  jury.  And jurors No. 13 and 14 would be the alternates.

8        I'll begin by briefly explaining the nature of the

9  case and will then conduct a brief general voir dire

10  examination in which I will ask general questions, and,

11  also, those questions provided to me by counsel that I deem

12  proper.

13        After completion of voir dire I will inquire at

14  sidebar as to any objections to the voir dire and

15  anticipated challenges for cause so I can address with the

16  panel any remaining issues.

17        The venire will then be excused and counsel will

18  first be asked to exercise any challenges for cause.  After

19  disposing of any challenges for cause, peremptory challenges

20  will then be exercised in an alternating manner.  The first

21  two by the defendant and then by -- then one by the

22  government.

23        And then we'll go two, one, two, one, two, one,

24  one, one, and one, one.  The defendant will be permitted up

25  to ten peremptory challenges and the government six.

1          Initial challenges shall be directed to the first

2   12 prospective jurors seated in the box.  For example, if

3   the government excuses juror No. 4, juror No. 13 will be

4   deemed substituted in No. 4's place, and so on.

5          The exercise of challenges will thus continue

6   until all challenges are exhausted or the parties both

7   accept the jury.

8          The Court will not restrict a party from striking

9   any juror among those under consideration at a given time

10  regardless of the order in which the party exercised those

11  strikes.

12         If before exhausting its peremptory challenges one

13  party chooses to accept the jury and passes, the other side

14  may also accept the jury and jury selection will be

15  complete.

16         If, however, one side passes and the other side

17  exercises the challenge, the side who passed may still

18  exercise any challenges they have left, but only as to any

19  new juror who has come on to the panel by virtue of the

20  exercise of a peremptory challenge.

21         In other words, once a party passes, it cannot go

22  back and strike any juror who was seated at the time the

23  party passed.

24         Once a jury of 12 has been selected using this

25  method, the Court will select two alternate jurors.  The

1  alternates will be the next two jurors who have not been

2  selected to be on the jury of 12.

3          However, each side may exercise one peremptory

4  challenge to the alternate jurors, beginning with the

5  government.

6          Once the alternates are selected, no attorney or

7  any other person connected with the case should advise the

8  alternates of their status.

9          Mr. Talbot, do you have any questions about how

10  I'm intending to proceed?

11          MR. TALBOT:  Your Honor, just so I'm clear, how --

12  when we first come up, we have the first 12 under

13  consideration?

14          THE COURT:  Yes.  And you actually won't be coming

15  up, because I'm going to dismiss them.  So we'll just do it

16  in open court.

17          In other words, the way I look at it, they're

18  already randomly selected when they come up here.  So I

19  don't pull them out of a hat or anything.  To me the first

20  12 in the box are your jury unless somebody challenges.  And

21  then if you challenge No. 1, then that means No. 13 is on

22  the jury.  And so you always are able to tell what your jury

23  is at any point during the selection.

24          MR. TALBOT:  So when I exercise my first

25  peremptory, would you like me to exercise all peremptories

1   that I have to the first 12, like if I didn't like 5 and 10?

2           THE COURT:  No.  You can do it any way you want,

3   because I allow back-striking.  But you're probably well

4   advised to be using it as to those that are currently

5   members of the jury.

6           MR. TALBOT:  Then I may use more than one

7   challenge?

8           THE COURT:  Yes.

9           MR. TALBOT:  I may say, I don't like 5 and I don't

10  like 10, and then that would mean David looks at 13 and 14?

11          Got you.  Okay.  Thank you.

12          THE COURT:  Mr. Makofka, do you have any questions

13  about how I'm going to do it?

14          MR. MAKOFKA:  None, Your Honor.  Thank you.

15          THE COURT:  Okay.  All right.  If there's nothing

16  else, then I'm going to take a brief recess.  And Ms.

17  Howard, when the jury comes in, will actually arrange them

18  in their order.  And we're going to need to have -- we'll

19  get that done.  And then we'll give you both lists.  And

20  I'll have a list and then we'll get started.  Okay.

21          MR. MAKOFKA:  Thank you.

22          THE COURT:  All right.  We'll be in recess.

23          COURT SECURITY OFFICER:  All rise.  This Honorable

24  Court is now in recess.

25              (Recess, 9:52 a.m. to 10:02 a.m.)

```
 1          COURT SECURITY OFFICER:  All rise.  Hear ye, hear
 2  ye, hear ye.  The United States District Court in and for
 3  the Middle District of Florida is now in session.  All
 4  persons having business before this Court, draw near, give
 5  attention, and you shall be heard.  God save the United
 6  States and this Honorable Court.  Please be seated.
 7          THE COURT:  Good morning, ladies and gentlemen.
 8          VENIRE PANEL:  Good morning.
 9          THE COURT:  The case we have set this morning is
10  United States of America versus Algie Moore.  And that case
11  is numbered 3:02-cr-233(S1)-J-32TEM.
12          And, Mr. Talbot, is the government ready to
13  proceed?
14          MR. TALBOT:  Yes, Your Honor.
15          THE COURT:  Mr. Makofka, is Mr. Moore ready to
16  proceed?
17          MR. MAKOFKA:  He is, Your Honor.  Thank you.
18          THE COURT:  Okay.  Good morning, again, ladies and
19  gentlemen.  My name is Tim Corrigan.  I am a United States
20  District Judge.  And I'll be the judge in this case that
21  we're going to be trying.
22          Today we're going to seat the jury in this case.
23  And you've already been through some initial screening, I
24  know.  And we're going to do a little bit more up in the
25  courtroom today.  Just for your information -- I guess the
```

1  clock is covered up by the screen.  But this process usually

2  takes in the neighborhood of about two hours.  And so what

3  I'm going to try to do is to complete it before we have a

4  lunch break.

5         But sometimes it goes a little longer than we

6  think.  And, if so, I'll still give you your lunch break and

7  then we'll come back and complete it right after lunch.

8         This is a criminal case in which the government

9  has charged Mr. Moore with committing a federal crime.  I'll

10  be getting into this in more detail as the case progresses.

11  But the trial of the criminal case is different from the

12  trial of a civil case.  So if any of you have ever had any

13  experience with a civil case, you'll need to understand

14  those differences.

15         For example, in a criminal case such as this the

16  defendant, Mr. Moore, is presumed to be innocent of the

17  crime that is charged.

18         The government has the burden of proving Mr. Moore

19  guilty.  And they have to prove it beyond a reasonable

20  doubt.  There are other differences, which I'll explain to

21  you as we go along.

22         You're about to participate in one of the most

23  significant responsibilities that you will have as citizens

24  of this country.  Our system of trial by jury is guaranteed

25  in our Constitution and is one of our unique institutions.

1          Indeed, it has frequently been said that

2  fulfilling one's responsibility through jury service is

3  every bit as patriotic as serving in defense of one's

4  country.

5          Sometimes we hear criticism of our justice system.

6  And perhaps you have had occasion yourself to be critical.

7  And I would not disagree with some of that criticism.

8          But you should know now, if you don't already,

9  that with all of its faults the American justice system is

10 universally respected around the world and is considered to

11 be a fair and effective system of justice.

12         While some people look upon jury service as a

13 burden, most people who are actually selected to serve on a

14 jury find the experience to be rewarding and are glad they

15 were selected.

16         Now, the trial of this case is expected to take --

17 Mr. Talbot, would I be safe in saying no more than three

18 days, you think?

19         MR. TALBOT:  Yes, Your Honor.  I think Wednesday

20 would be the latest.

21         THE COURT:  Mr. Makofka, do you agree with that?

22         MR. MAKOFKA:  If I can keep it short, Your Honor,

23 that sounds right.

24         THE COURT:  All right.  Then we'll tell you that

25 -- I always like to tell people longer, and then if it gets

1  done shorter then so much the better.  But we're estimating

2  three days for the trial.

3          And certainly it won't be any longer than this

4  week.  And it probably wouldn't even go into a fourth day.

5  So just for your planning purposes.

6          What we're going to do today is select the jury

7  and then begin with the attorneys' opening statements.  And

8  we're going to get as far as we can in the trial today.

9          We'll stop for today no later than 5 o'clock.

10 Beginning tomorrow the trial will start promptly at 9

11 o'clock and we will go, again, no later than 5 o'clock in

12 the afternoon with appropriate breaks and a lunch break.

13 This will be the schedule we'll follow from today until the

14 trial is completed.

15          When the trial is concluded for the day, you will

16 not be kept together but will be allowed to return to your

17 home.  And we do have -- and I believe the administrator

18 probably told you this.

19          If any of you live farther away than 50 miles, we

20 can make arrangements for you to stay overnight in a hotel,

21 at the clerk's expense, if that's your preference.  But,

22 otherwise, you're obviously free to go to your homes.

23          Now, I'm not going to ask any of you if serving on

24 this jury would be an inconvenience to you.  I'm sure that's

25 true for all of you.  Most of you would rather be elsewhere

1   attending to your job or your home or your other things that

2   you had planned for this time.

3          Each of you has the required qualifications to

4   serve as a juror and no one should seek to avoid fulfilling

5   this responsibility except for the most pressing of

6   circumstances.

7          Even though the jury administrator has already

8   screened you for hardships, I recognize there may be

9   incidences where a service would cause an extraordinary

10  hardship to a particular individual or his or her family.

11         So the question I want to ask you now is this:  If

12  you believe that you will qualify to be excused based on

13  extraordinary hardship, that is a hardship that you believe

14  would persuade a fellow citizen, perhaps the one sitting

15  next to you, that he or she should sit in your place as a

16  juror, I'll now give you an opportunity to make that request

17  by raising your hand.  Anybody?

18         Okay.  Well, very good.  Well, I appreciate your

19  willingness to serve, ladies and gentlemen.

20         Now, what we're going to do is start the process

21  of jury selection.  The questions which I will be asking you

22  in open court are designed to determine your qualifications

23  to serve as a juror in this particular case.

24         Under your oath as a prospective juror, you agree

25  to truthfully answer these questions concerning your

1  qualifications.

2        Please understand that this questioning is not for

3  the purpose of prying into your personal affairs but is only

4  for the purpose of obtaining an impartial jury.

5        If anyone wants to answer a question privately,

6  all you have to do is just let me know that and we'll have a

7  private discussion over here on the sidebar with just the

8  attorneys present, because some of the questions will be

9  potentially about matters that you might prefer to address

10  in private rather than in front of the entire group.  And

11  please feel free to use that option if you would be more

12  comfortable doing so.

13        This jury selection process, which is also called

14  voir dire examination, is for the purpose of determining if

15  your decision in this case would in any way be influenced by

16  opinions which you now hold, or by some personal experience,

17  special knowledge, or relationship which you may have

18  concerning the subject matter to be tried.

19        So the questions that will be asked of you are

20  designed to allow us to get the persons who will impartially

21  try this case upon the evidence presented in court without

22  being influenced by any other factors.

23        If you are excused from serving on the jury,

24  please do not take that personally.  It is all just part of

25  the process designed to get a fair and impartial jury for

1  this case.

2        Now, before we proceed too much further, I want to

3  tell you just briefly what the case is about, so you'll kind

4  of have a sense of what the case is.

5        I'm not going to tell you too much, but just to

6  give you a little bit of an idea so that when you're

7  answering the questions you kind of know what kind of case

8  we're talking about.

9        The indictment in this case -- and the indictment

10 is the formal charge in this case -- charges the defendant,

11 Mr. Moore, with four offenses or violations.

12        In summary, the indictment charges Mr. Moore with

13 one count of distributing cocaine base, in violation of

14 Title 21, United States Code, Section 841(a)(1) and

15 841(b)(1)(C).

16        Additionally, Mr. Moore is charged with one count

17 of possession with intent to distribute cocaine base, in

18 violation of 21, United States Code, Section 841(a)(1) and

19 841(b)(1)(C).

20        Mr. Moore is also charged with one count of

21 possession of a firearm by a convicted felon, in violation

22 of 18, United States Code, Sections 922(g)(1) and 924(a)(2).

23        And, finally, Mr. Moore is charged with one count

24 of possession of a firearm during and in relation to a drug

25 trafficking crime, in violation of 18, United States Code,

1  Section 924(c)(1).

2          Now, Mr. Moore has entered a plea of not guilty to

3  all of these charges.  So that just gives you a really brief

4  understanding of what the case is going to be about.

5  Obviously, if you're selected for the jury you'll get a lot

6  more detail on it.

7          Now, I'm going to begin the process by asking you

8  some general questions.  If you'll please listen carefully

9  and give me a clear and audible response to each question.

10          For this part of the process I'm going to be

11  speaking to all of you at one time.  So I'm just going to

12  have a general question and ask each of you to respond

13  generally.  There will be parts of the process where you'll

14  be asked individual questions.  But let's just begin.

15          And I have explained the general nature of the

16  case.  Do any of you know anything about this case, either

17  through your own personal knowledge or by discussion with

18  anyone else, or by reading or hearing about it in any news

19  media?  Anybody know anything about the case?  Nobody?

20  Okay.

21          Now, Mr. Algie Moore, the gentleman sitting next

22  to Mr. Makofka, is the defendant in the case.  Mr. Talbot is

23  the Assistant United States Attorney.

24          Mr. Talbot, if you'll stand up.  And, Mr. Talbot,

25  would you introduce your case agent.

1          MR. TALBOT:  Yes.  Sitting with me is Sonya

2   Felder.  She's with the Bureau of Alcohol, Tobacco and

3   Firearms, which is now in the Justice Department.

4          THE COURT:  All right.  You may be seated.  And,

5   Mr. Makofka, if you could introduce yourself, please, sir.

6          MR. MAKOFKA:  Yes.  Good morning, ladies and

7   gentlemen.  I'm David Makofka.  I'm defense counsel for

8   Mr. Moore.  He's at my left.  Thank you, folks.

9          THE COURT:  Are any of you related by blood or

10  marriage to any of the people that I've just identified?  Or

11  do any of you have any knowledge of them or know any of them

12  from any business or social relationship?

13          Are any of you related by blood or marriage to any

14  of the attorneys for either side, or any members of their

15  law firms?

16          Now, Mr. Makofka, your firm is Makofka & Makofka;

17  is that correct?

18          MR. MAKOFKA:  That is correct, Your Honor.

19          THE COURT:  And Lester Makofka is also in the

20  firm?

21          MR. MAKOFKA:  That's correct, sir.

22          THE COURT:  And is there anybody else in your

23  firm?

24          MR. MAKOFKA:  No other attorneys, Your Honor.

25          THE COURT:  And, of course, Mr. Talbot, you're

1  with the U. S. Attorney's Office.  And the U. S. Attorney's

2  Office is the office that prosecutes crimes but also

3  represents the government in a lot of other ways.

4          So what I'm asking you, do you -- are any of you

5  related by blood or marriage to any of the attorneys for

6  either side or any members of their law firms or the United

7  States Attorney's Office or the Bureau of Alcohol, Tobacco

8  and Firearms?  Or do any of you know any of the attorneys or

9  paralegals or law enforcement officials from those agencies

10 through any business or social relationship?  Anybody?

11         Yes, sir.  If you could give us your name and

12 stand up, please.

13         PROSPECTIVE JUROR WISNOVSKY:  George Wisnovsky.

14         THE COURT:  Sir.

15         PROSPECTIVE JUROR WISNOVSKY:  I'm retired from the

16 FBI, about eight years.  And I assume there's probably some

17 folks in the U. S. Attorney's Office who I knew, although I

18 don't know any of the folks who are present in the courtroom

19 today.

20         THE COURT:  All right, sir.  Now, you say you're

21 retired FBI.  You've obviously had association with the U.

22 S. Attorney's Office.  Were you actively -- when you were

23 with the FBI, did you handle cases through their office that

24 they were then prosecuted?

25         PROSPECTIVE JUROR WISNOVSKY:  Yes, sir.

1          THE COURT:  So you have a fairly good

2   understanding of that situation?

3          PROSPECTIVE JUROR WISNOVSKY:  Yes, sir.

4          THE COURT:  All right.  Is there anything about

5   that prior service of yours as an FBI agent or your prior

6   association with the U. S. Attorney's Office that you think

7   would make it difficult for you to be fair and impartial in

8   this case?

9          PROSPECTIVE JUROR WISNOVSKY:  No, sir.

10          THE COURT:  Do you think you could put aside any

11   feelings you have based upon your experience as a law

12   enforcement officer and to judge this case fairly and on the

13   merits?

14          PROSPECTIVE JUROR WISNOVSKY:  Yes, sir.

15          THE COURT:  Do you have any doubt about your

16   ability to do that?

17          PROSPECTIVE JUROR WISNOVSKY:  No, sir.

18          THE COURT:  Okay.  Thank you, sir.

19          Anybody else?

20          All right.  I now have a list of potential

21   witnesses in this case.  And I'm just going to read the list

22   and then ask you the same question.  Do you think you know

23   any of these people?

24          And, of course, a lot of people have similar

25   names.  But even if it's -- you don't think it's the same

1  person, if you know somebody with that name, please let me

2  know.

3          The names are Shannon Desmond and Nichlos

4  Cheremeta.  They're both with the Bureau of Alcohol, Tobacco

5  and Firearms.  Matt Robinson, Michael Branscom, Robby Bacon,

6  Tonya Tator, Keith Dorough, Dave McMinn.

7          And all of them are listed as being with the

8  Jacksonville Beach Police Department.  Herbert Appleby and

9  Yvon Wilson are listed as being with the Jacksonville

10  Sheriff's Office -- the City of Jacksonville Sheriff's

11  Office.

12          Allison Harms, Niels Bernstein, Kimberly

13  Lardizobal, David Warniment.  That's W-a-r-n-i-m-e-n-t.

14  Those four individuals are listed as being with the Florida

15  Department of Law Enforcement.

16          Charles Fisette.  Again, Jacksonville Sheriff's

17  Office.  And Tony -- and I don't know how to pronounce it,

18  but it's D-z-i-e-d-z-i-c-k-i, Jacksonville Beach Police

19  Department, those individuals.  And then two other

20  individuals, a Deidre Moore and Joey or Joel Lynch.

21          Do any of you think you know any of those folks?

22  Yes, ma'am.  You've got your hand up.  If you could stand up

23  and give us your name, please.

24          PROSPECTIVE JUROR ELLISON:  My name is Sandra

25  Ellison.  I'm a correctional officer for the Jacksonville

1  Sheriff's Office.  And I think I know Fisette, Officer

2  Fisette.

3           THE COURT:  And that would be -- that's Charles

4  Fisette?

5           PROSPECTIVE JUROR ELLISON:  Yes, sir.

6           THE COURT:  I'm sorry, ma'am.  What's your name?

7           PROSPECTIVE JUROR ELLISON:  Sandra Ellison.

8           THE COURT:  Okay.  All right.  Before I get to

9  your question, we need to make sure we've put you all in the

10 right order here.  We have a -- I have a question in my mind

11 as to whether we've done that.

12          So what I'm going to do is to start over here on

13 the left, in the first row, and make sure that we've got you

14 in the correct order.  The order that I see you sitting in

15 now is Mr. Spencer -- is it McCoin?

16          PROSPECTIVE JUROR MCCOIN:  McCoin, correct.

17          THE COURT:  Ms. McCoin, Ms. Griffin,

18 Mr. Montgomery, Mr. -- is it Crist?

19          PROSPECTIVE JUROR CRIST:  Crist.  Yes, sir.

20          THE COURT:  Crist.  Ms. Watts and Ms. Morin.  Is

21 that correct?

22          PROSPECTIVE JUROR MORIN:  Morin.

23          THE COURT:  Morin.  I'm sorry.  All right.  And

24 then No. 22 should be -- in the second row Ms. Workman,

25 Ms. Garner, Ms. Dreistadt -- Mr. Dreistadt, I'm sorry, and

```
 1  then Mr. Holton.  And I'm not going to be able to pronounce
 2  this next name.
 3            PROSPECTIVE JUROR PRZYBYLOWICZ:  Przybylowicz.
 4            THE COURT:  Okay.  Ms. Taylor.  All right.  And
 5  Mr. Ponder.  All right.  And in the back row would be
 6  Mr. Summerford, Ms. Johnston, then Ms. Ellison, Ms. Wright,
 7  Mr. Belger, Ms. Stilwell, and Mr. Russo.
 8            Okay.  So, Counsel, I think we may have to give
 9  you another chart, because I think we've put them in in the
10  opposite way that we said we were going to.  But we know who
11  the right numbers are.  We just put them in the rows the
12  wrong way.  So when we break we'll give you a new list so
13  you'll make sure everybody is -- that you're looking at the
14  right folks here.  So I apologize for that.
15            All right.  So now let's get back to Ms. Ellison.
16  You were saying that you think you know Mr. Fisette?
17            PROSPECTIVE JUROR ELLISON:  Well, I know an
18  Officer Fisette.  We only address each other with last
19  names.  So I'm not sure what his first name is.
20            THE COURT:  You mean is it just in the course of
21  your duties you know that you've talked to an Officer
22  Fisette?
23            PROSPECTIVE JUROR ELLISON:  Yes, sir.
24            THE COURT:  Are y'all friends or socialize or
25  anything like that?
```

1          PROSPECTIVE JUROR ELLISON:  No.

2          THE COURT:  Do you come into contact with him

3    frequently, or is it just an occasional basis?

4          PROSPECTIVE JUROR ELLISON:  Just occasionally.

5          THE COURT:  Okay.  Now, if he came and testified

6    and it turned out to be the same person, would you be more

7    likely to believe what he said as opposed to another witness

8    on the stand?  Or would you be able to evaluate his

9    testimony just like everybody else's?

10          PROSPECTIVE JUROR ELLISON:  I would be able to

11    evaluate his testimony just as anyone else's.

12          THE COURT:  Do you have any doubt about your

13    ability to do that?

14          PROSPECTIVE JUROR ELLISON:  No, sir.

15          THE COURT:  Now, the fact that you're a

16    corrections officer, obviously, that means you're in law

17    enforcement.  Are you more likely to believe the testimony

18    of law enforcement officers and to give their weight more --

19    give their testimony more weight than you would be another

20    witness?

21          PROSPECTIVE JUROR ELLISON:  Absolutely not.

22          THE COURT:  Do you have any doubt about your

23    ability to fairly and impartially judge the credibility of

24    the witnesses and to impartially judge this case even though

25    you are a correctional officer?

1          PROSPECTIVE JUROR ELLISON:  No, sir.

2          THE COURT:  Okay.  Thank you, ma'am.  Anybody

3  else?  I think we have y'all in the right place here.

4          UNIDENTIFIED PROSPECTIVE JUROR:  Your Honor, I

5  think that this gentleman next to me, we're mixed up.

6          THE COURT:  Okay.  Hold on one second here.  I

7  tell you what we're going to do.  And I apologize, ladies

8  and gentlemen.  I'm going to take a brief recess and we're

9  going to make sure everybody's in the right place, because

10  it is important that everybody be in the right place.  So I

11  apologize.  We'll take a brief recess.

12          COURT SECURITY OFFICER:  All rise.  Court is now

13  in recess.

14          (Recess, 10:23 a.m. to 10:37 a.m.)

15          COURT SECURITY OFFICER:  All rise.  This Honorable

16  Court is now in session.  Please be seated.

17          THE COURT:  I apologize, ladies and gentlemen.

18  It's important that we maintain the random numbers that you

19  were given by the jury administrator.  And, unfortunately,

20  we had you a little bit out of order.  So we just wanted to

21  verify.  And I think we've moved some people around, played

22  a little bit of musical chairs.

23          But you are now in the order in which we were

24  given you by the computer.  And, obviously, when we're

25  picking a jury, we want it to be random, so that there's no

1 -- nobody gets to put somebody in a certain chair or

2 anything like that.  So I appreciate your indulgence for the

3 moment on that.

4          All right.  Now, we were talking about -- and,

5 Counsel, we'll be providing you -- if we haven't already,

6 we'll be providing you with a correct seating chart.

7          We were talking about these witnesses.  Is there

8 anybody else that thinks they know any of these witnesses?

9          Yes, ma'am.  If you'll stand up and give us your

10 name, please.

11          PROSPECTIVE JUROR MIDDLETON:  My name is Sharon

12 Middleton.

13          THE COURT:  Ms. Middleton.

14          PROSPECTIVE JUROR MIDDLETON:  I don't believe I've

15 actually met Officer Matt Robinson with the Jacksonville

16 Police, but I know his wife and the children.  And our

17 children go to school together.

18          THE COURT:  So do you live out in the Beaches

19 area?

20          PROSPECTIVE JUROR MIDDLETON:  Yes.

21          THE COURT:  Okay.  And so you know Officer

22 Robinson's wife.  And your children are the same age or

23 something?

24          PROSPECTIVE JUROR MIDDLETON:  (Nods head

25 affirmatively)

1           THE COURT:  All right.  And you've never met the

2    husband, though?

3           PROSPECTIVE JUROR MIDDLETON:  I don't think I

4    have.

5           THE COURT:  Okay.  Would the fact that you know

6    Ms. Robinson make you more likely to believe the testimony

7    of Officer Robinson?

8           PROSPECTIVE JUROR MIDDLETON:  No.

9           THE COURT:  Would you be able, in your own mind,

10   to put aside the fact that you know Mr. Robinson and the

11   children and to evaluate any testimony of Officer Robinson

12   with the same impartiality that you do with any other

13   witness?

14          PROSPECTIVE JUROR MIDDLETON:  I believe so.

15          THE COURT:  Do you have any doubt about your

16   ability to do that?

17          PROSPECTIVE JUROR MIDDLETON:  No.

18          THE COURT:  Okay.  The fact that you are friends

19   with the wife of a police officer, would that make you more

20   likely to believe the testimony of law enforcement officers,

21   as opposed to some other witness that you might -- that you

22   might see in the courtroom?

23          PROSPECTIVE JUROR MIDDLETON:  No.  We're not close

24   friends.

25          THE COURT:  Okay.  And do you think you can

1  evaluate all the evidence impartially and -- regardless of

2  these relationships that you have?

3           PROSPECTIVE JUROR MIDDLETON:  Yes, sir.

4           THE COURT:  All right.  Thank you very much.

5  Anybody else think they know any of these witnesses that

6  I've read off?

7           Okay.  Thank you.

8           All right.  What I'm going to do now -- I believe

9  y'all have a piece of paper that they gave you.  Is that

10 right?  If you'll pick that up, please.

11          And what we're going to do is I'm going to ask

12 each of you to just stand up when it's your turn and to read

13 -- you don't have to read the -- you don't have to read the

14 "state your name."  But if you'll just stand up and give

15 your name and give your city, all the information that's

16 called for by the piece of paper, rather than me asking you,

17 because then that will make it go more quickly.

18          So let's start down with the bottom front here and

19 then we'll go down the row and then we'll catch the second

20 row and get out to the audience.

21          Go ahead, sir.

22          PROSPECTIVE JUROR ROWE:  David Rowe.  I live in

23 St. Augustine.  I've been there for 15 years.  I've lived in

24 the state of Florida for 15 years.  My level of education,

25 master's degree.  I'm retired.

1          Before I retired I was VP of finance for a

2    manufacturing company.  I'm married.  My wife is retired.

3    She's a legal secretary and schoolteacher.

4          I have three children, ages 41, 40, and 35.  One

5    is a materials manager, one is a housewife, and the other is

6    an ad agency executive.

7          I was in the Army, Army Signal Corps, Teletype

8    operator.  I was on juries in the past.  I was on a criminal

9    case in New York state and a civil case in New York state.

10   And in one case -- in the criminal case we did reach a

11   verdict.  In the civil case it was settled out of court -- I

12   mean, in the court.

13          THE COURT:  And do you understand, sir, that there

14   is a difference between a criminal and civil case?

15          PROSPECTIVE JUROR ROWE:  Yes.

16          THE COURT:  And that the burdens of proof and

17   other things are different?  Do you understand that?

18          PROSPECTIVE JUROR ROWE:  Yes.

19          THE COURT:  And are you able to and willing to

20   follow my instructions to you about how a criminal case, the

21   burdens of proof, and so forth, work, and kind of put aside

22   anything you did in the civil case?

23          PROSPECTIVE JUROR ROWE:  Yes.

24          THE COURT:  Okay.  Have you ever had any grand

25   jury service?

1        PROSPECTIVE JUROR ROWE:  No.

2        THE COURT:  Okay.  Thank you, sir.  Ladies and

3  gentlemen, when you stand up, when it asks about jury

4  service, that would include any grand jury service.  So if

5  you could mention that when you're discussing it.

6        Go ahead, sir.

7        PROSPECTIVE JUROR MATTISON:  My name is John

8  Mattison.  I've lived in Jacksonville for 42 years.  Also in

9  Florida for 42 years.  Level of education, master's degree.

10 I'm currently unemployed, recently laid off from Bank of

11 America as an internal auditor.

12       Married.  My wife is a grant administrator and

13 project manager with JEA at Cecil Commerce Center.  Two

14 children, age 30, who's a benefits programmer, age 26, in

15 retail.  No previous military service.  No previous jury

16 service.

17       THE COURT:  Thank you, sir.

18       PROSPECTIVE JUROR CHAVANA:  My name is Henry

19 Chavana.  I recently moved to St. Augustine -- to

20 Jacksonville.  I've lived in St. Augustine since 1984.  And

21 that's the same time that I've been here in Florida.

22       I have a high school education.  And I'm a

23 laborer.  And I'm married.  And I don't have no children.

24 My wife's occupation, she -- she, right now, is an

25 unemployed factory worker.

1        And never went to the military, never was called.

2   And I had some previous call to jury duty, back in New York

3   City, in the Bronx, where I used to live, but I never got

4   chosen on a trial.  That's all.

5        THE COURT:  Thank you, sir.

6        PROSPECTIVE JUROR LECKENBUSCH:  My name is Peggy

7   Leckenbusch.  I've live in St. Augustine and Florida for

8   four and a half years.  I have a twelfth grade education.

9   I'm an accounts receivable clerk in management and I'm

10  married.  My husband's occasion is managerial.  I have three

11  children,

12  29 --

13        THE COURT:  Managerial in what kind of business?

14        PROSPECTIVE JUROR LECKENBUSCH:  Aerospace.

15        THE COURT:  Okay.

16        PROSPECTIVE JUROR LECKENBUSCH:  Three children, 29

17  years old.  She's a home confinement probation officer in

18  Harrison County, West Virginia.  My 25 year old is in

19  construction.  And my 22 year old is a stock clerk.  I've

20  never been in the military and I've never been on jury duty.

21        THE COURT:  Would the fact that you have a -- it's

22  a daughter that's a probation officer, would that affect

23  your ability to serve as an impartial juror in this case?

24        PROSPECTIVE JUROR LECKENBUSCH:  No.

25        THE COURT:  Do you think that it would make you

1  more likely, say, to favor a law enforcement person who's

2  testifying or to think more likely they're telling the

3  truth, as opposed to some other witness?

4           PROSPECTIVE JUROR LECKENBUSCH:  No.

5           THE COURT:  Do you have any doubt about your

6  ability to judge the matter fairly?

7           PROSPECTIVE JUROR LECKENBUSCH:  No.

8           THE COURT:  Thank you.

9           PROSPECTIVE JUROR BURNS:  My name is Terri Burns.

10 I live in Jacksonville.  I've lived here for 36 years.  I've

11 also lived in Florida for 36 years.  I have a master's

12 degree.  I'm a schoolteacher.  I'm single.  I have one child

13 that is 14 years old.  I've never been in the military nor

14 served on a jury before.

15          THE COURT:  Thank you.  Mr. Beverly I know well.

16 Mr. Beverly and I were former law partners, and so -- and I

17 don't know if counsel is aware of that -- and as a member of

18 the Bedel law firm.

19          And that fact in and of itself does not disqualify

20 him from jury service, but, obviously, I wanted counsel to

21 be aware of it.

22          And, Mr. Beverly, if you'd go ahead and give us

23 your information, sir.

24          PROSPECTIVE JUROR BEVERLY:  I think you've given

25 most of it already.  My name is Tom Beverly.  And I'm

1  virtually a lifetime resident of Jacksonville.  I have a

2  legal degree.  I'm an attorney.  Married.  My wife is a

3  nurse by training but stays home full time right now.

4          We have three children, ages 13, 12, and 10.  I

5  have not served in the military and I have not been

6  previously chosen for a jury.

7          THE COURT:  Thank you, sir.

8          PROSPECTIVE JUROR MILLER:  My name is Wayne

9  Miller.  I've lived in Jacksonville, Florida for nine and a

10 half years and the state of Florida for nine and a half

11 years.  I have two years of college.

12         I work with the operations with the railroad here

13 in Jacksonville.  I'm divorced.  I have five children.  I've

14 had no military service and never been on a jury.

15         THE COURT:  Thank you, sir.  All right.  Let's

16 start up here, please.

17         PROSPECTIVE JUROR MIDDLETON:  My name is Sharon

18 Middleton.  I've lived in Neptune Beach for about 15 years.

19 I've been in Florida for most of the past 29 years.  I have

20 a high school degree.  I'm a glass artist.  I'm married.  My

21 husband is an information systems consultant.  I have one

22 daughter who's nine.  No military service and no jury duty.

23         THE COURT:  Thank you, ma'am.

24         PROSPECTIVE JUROR TOLLEY:  My name is Daniel

25 Tolley.  I live in Jacksonville.  Been here five years.

1  Same for Florida.  High school and technical school.

2  Communications technician.  Single.  No children.  No

3  military.  Never been a juror.

4           THE COURT:  Thank you, sir.

5           PROSPECTIVE JUROR PAGANO:  Angelina Pagano.  I

6  live in Ponte Vedra Beach.  I've been there five years.

7  Been in Florida for five years.  I have an associate's

8  degree.  I'm a payroll tax analyst.  I'm divorced.  Have no

9  children, no military service, and never served on a jury.

10           THE COURT:  Thank you.  If you'll hold on one

11  second, sir.  They're trying to write down some of this

12  information.  I'm going to let them get caught up here.

13  Everybody ready?

14           Okay.  Go ahead, sir.  Thank you.

15           PROSPECTIVE JUROR WISNOVSKY:  George Wisnovsky.

16  I've lived in Ponte Vedra, Florida, about 25 years.  The

17  same length of time lived in Florida.  I have a law degree.

18  As I said, I'm retired from the FBI.  I'm self-employed.

19           I do consulting and investigations for law firms.

20  I also do some contract investigation -- background

21  investigations for the FBI.  I'm married.  I have two

22  children.

23           My wife is primarily a housewife but does some

24  part-time work at the Mayo Clinic.  My two children are

25  twins, age 29.  My daughter works for a division of Johnson

1  and Johnson.  My son works at GNC and is a student.  I have

2  no previous military experience.  And I've never served on a

3  jury before.

4           THE COURT:  Thank you, sir.

5           PROSPECTIVE JUROR SETTING:  My name is Kim

6  Setting.  I've lived in Jacksonville for 22 years.  High

7  school education.  I'm a department manager of retail.  And

8  married.  My husband is a department manager, retired Navy,

9  20 years.

10           I have four kids, 23, 20, 21, and 18.  Surgical

11  tech is the -- a cook and one's in the job corps.  And the

12  youngest is a mom.  And I've not been in the military, but

13  was a military wife.  And have not previously served.

14           THE COURT:  And I'm sorry, ma'am.  I was

15  distracted a moment.  Did you say your spouse is --

16           PROSPECTIVE JUROR SETTING:  Is retail department

17  manager, retired military.

18           THE COURT:  Thank you.  Thank you.

19           PROSPECTIVE JUROR WISDOM:  My name is Tonya

20  Wisdom.  And I've lived in Jacksonville, Florida, for the

21  past eight years.  I have a high school diploma.

22           I work in inside sales for a software company.

23  I'm married and my spouse is a self-employed title setter.

24  I have two children, ages 12 and 15.  I have never been in

25  the military, and I have never served for jury.

 1          THE COURT:  Thank you.

 2          PROSPECTIVE JUROR STAMPER:  My name is James

 3  Stamper.  I've lived in Jacksonville for 17 years.  And I've

 4  been in Florida my entire 20 years.

 5          Right now I'm a college sophomore.  And besides

 6  being a student I also work at Pizza Hut.  I am not married.

 7  I don't have any children.  I've never been in the military

 8  and I've never served jury duty before.

 9          THE COURT:  Thank you.  All right.  We're going to

10  start -- and this is why we switched you around.  Juror

11  No. 15 is Ms. Morin -- how am I saying it?

12          PROSPECTIVE JUROR MORIN:  Morin.

13          THE COURT:  Morin.  I'm sorry.  And if you'll go

14  ahead and then we'll go down the row that way.

15          Go ahead, ma'am.

16          PROSPECTIVE JUROR MORIN:  My name is Julie Morin.

17  I've lived in Jacksonville for nine years and Florida for

18  30.  I have a bachelor's degree in business management.

19  Right now I'm a preschool director.

20          I am married.  My husband is an electronical

21  engineer.  We have three children, three, eight, and 15.

22  I've never been in the military and I've never been on a

23  jury.

24          THE COURT:  Thank you.  Ms. Watts.

25          PROSPECTIVE JUROR WATTS:  My name is Donna Watts.

```
 1   I've lived in Jacksonville for ten years.  I've resided in

 2   Jacksonville for ten years and I've lived here for 12, in

 3   the state of Florida for 12.  High school.  Occupation,

 4   self-employed.  Marital status, widow.  Served in the

 5   military -- my husband was in the Navy, but I have not

 6   served in the military.  No children.  No jury duty have I

 7   ever served.

 8             THE COURT:  Thank you.

 9             PROSPECTIVE JUROR CRIST:  Good morning.  My name

10   is Ralph Crist.  I live in Orange Park, Florida.  I've lived

11   there for about 13 years.  I've lived in Florida for about

12   13 years as well.  Have a bachelor's degree.

13             I'm an environmental engineer, civil service for

14   the Navy.  I'm married.  My wife is a human resources

15   manager.  We have four children, 11, eight, four, and two.

16             And I've had no previous military service.  And I

17   was selected for a jury -- a juror in Clay County several

18   years ago, but I guess it was settled before the trial

19   began.

20             THE COURT:  Was it a criminal or civil case?  Do

21   you remember?

22             PROSPECTIVE JUROR CRIST:  It was a criminal case.

23             THE COURT:  Okay.  Criminal case?  Thank you.

24             Mr. Montgomery, if you'll hold on one second to

25   give the counsel a chance to catch up.
```

1           All right.  Mr. Montgomery, go ahead, sir.

2           PROSPECTIVE JUROR MONTGOMERY:  I'm Mike

3  Montgomery.  I live at Neptune Beach.  I've been at Neptune

4  Beach for 13 years.  Been in the state of Florida for 19

5  years.

6           I have an associate's degree in management.  I'm

7  the engine planning evaluation branch head supervisor at NAS

8  Jax.

9           I'm married.  My wife's occupation, she's a speech

10 and language pathologist for the Duval County school system.

11 We have two children, ages 11 and 12.

12          I previously served in the U.S. Army.  I was a

13 Hawk missile mechanic.  I have served on a jury before,

14 civil case.  No grand jury.  It was about four years ago.

15 And, yes, a verdict was reached.

16          THE COURT:  Thank you, sir.  Ms. Griffin.

17          PROSPECTIVE JUROR GRIFFIN:  Good morning.  My name

18 is Joy Griffin.  I live in Palm Coast, Florida.  I've been

19 there for two years.  And I've been in Florida for two

20 years.

21          I have a bachelor's of arts degree in education.

22 I'm a retired teacher, former Head Start supervisor.  I am

23 married.  My husband was the principal.

24          I have two children, a school psychologist and a

25 pharmaceutical rep.  No military service.  And I've never

1   been called for jury.

2            THE COURT:  Thank you.  Yes, ma'am.

3            PROSPECTIVE JUROR MCCOIN:  My name is Julia

4   McCoin.  We've lived here for about 17 years, 17 years in

5   Florida also.  I have three years of college in speech and

6   hearing therapy.

7            Right now we own our own company, McMillan Bedding

8   Company.  I am married.  My husband is the president of the

9   company.  We have two children, age 34 and 30.

10           I have not served in the military -- oh, my

11  children, one is a microbiologist.  The other is now a house

12  mom, but she was a psychologist.  I have served on jury

13  duty.  It was a civil case and was declared a mistrial.

14           PROSPECTIVE JUROR SPENCER:  The name is Ronald

15  Spencer.  I've lived in Florida for 18 years.  Lived in

16  Jacksonville for the full time, 18 years.  I have two and a

17  half years of college.

18           I'm now employed by CSX Real Property as manager

19  of real estate.  I'm married.  My wife is a homemaker.  I

20  have two daughters, 29 and 26.  My 29-year-old daughter is a

21  stay-at-home mom.

22           My 26-year-old daughter is a -- she works in the

23  credit union.  I previously served six years in the U.S.

24  Army Reserves, 100th Division training unit.  And I have not

25  had any previous jury duty.

1        THE COURT:  Thank you.  All right.  We're going to

2   pick it up on the -- in the second row on the left.  And

3   hopefully it's Mr. Ponder.

4        PROSPECTIVE JUROR PONDER:  Correct.

5        THE COURT:  All right.  Good.

6        PROSPECTIVE JUROR PONDER:  My name is Maurice

7   Ponder.  I live in Jacksonville, Florida.  I've lived at my

8   residence for seven years.  I've lived in the state of

9   Florida for 39 years.  High school education.  I'm a lead

10  custodian for the Duval County School Board.  I'm married.

11  My wife's a waitress.

12        I have three kids, age two, four, and 11.  I

13  served in the U.S. Army '76, material handler specialist.

14  And I haven't served on a jury before.

15        THE COURT:  Thank you, sir.  Ms. Taylor.

16        PROSPECTIVE JUROR TAYLOR:  My name is LaTonya

17  Taylor.  I've lived in Jacksonville for 25 years.

18        THE COURT:  Ms. Taylor, if you could do me just a

19  little favor and speak up just a little bit.  I know it's

20  hard, but Ms. Bishop needs to write it down.

21        PROSPECTIVE JUROR TAYLOR:  I've lived in

22  Jacksonville for 25 years.  I've lived in Florida for 25

23  years.  I have two years of college education.  I work for

24  the United States Postal Service.

25        I'm single.  I have one child that is four.  I've

1   never served in the military.  And I've been on jury as a --

2   on a civil case.  I don't remember the verdict.

3            THE COURT:  Okay.  Did the jury actually reach a

4   verdict?  I'm not asking you what it was.  Do you remember

5   if they actually came to a verdict?

6            PROSPECTIVE JUROR TAYLOR:  Yeah, they did.

7            THE COURT:  Okay.  Thank you, ma'am.

8            PROSPECTIVE JUROR PRZYBYLOWICZ:  My name is Susan

9   Przybylowicz.  I've lived in Jacksonville for three years.

10  I have a high school education.  I am a teacher's aide.  I

11  am married.  My husband works -- well, is in the U.S. Navy.

12  I have two children, 14 and 12.  Never been in the military

13  and never served on a jury.

14           THE COURT:  Thank you.

15           PROSPECTIVE JUROR HOLTON:  My name is Jason

16  Holton.  I've lived in Lake Butler for 17 years.  I've been

17  in Florida for 24 and a half.  I have a high school diploma.

18  I'm a technician at Florida Pest Control.  I'm single.  I

19  have a one-year-old son.  No military service and no jury

20  duty.

21           THE COURT:  Mr. Dreistadt, if you'll hold up one

22  second, please.  Counsel, ready?

23           Mr. Dreistadt, go ahead, sir.

24           PROSPECTIVE JUROR DREISTADT:  My name is Bernard

25  Dreistadt.  I've lived in Jacksonville for 13 years, in

1  Florida for 20.   I have a bachelor's degree with some

2  postgraduate study in business.

3         I'm director of product development for a health

4  insurance company.   I'm married.   My wife does not work

5  outside the home.   I have four children, 31, 27, 23, and 13.

6         The adults are a teacher, social worker, customer

7  service rep for a financial institution.   No previous

8  military service.   I have served on a civil case, on a jury

9  in a civil case, which did reach a verdict.

10         THE COURT:   Thank you.   And you pronounce it

11  Dreistadt?

12         PROSPECTIVE JUROR DREISTADT:   Dreistadt, yes, sir.

13         THE COURT:   All right, sir.   Thank you.

14         Ms. Garner?

15         PROSPECTIVE JUROR GARNER:   My name is Angela

16  Garner.   I've lived in Orange Park for 12 years.   Been in

17  Florida for 12 years.   In the last semester of my bachelor's

18  degree.   Practice administrator for an HIV Aids clinic.   I'm

19  married.   No children, no military service, and no jury

20  service.

21         THE COURT:   Thank you.

22         Ms. Workman.

23         PROSPECTIVE JUROR WORKMAN:   Angela Workman.   I

24  live in Ponte Vedra Beach.   I've been there seven years.

25  Been in Florida for 37 years.   I have a bachelor degree.   I

 1  work at Bank of America.  I manage a group of programmers

 2  and business analysts.

 3          I am married.  My husband works in the marine

 4  industry.  We do not have any children.  No military

 5  service.  I have served on a jury before.  It was a criminal

 6  case.  And we did reach a verdict.

 7          THE COURT:  Thank you.  Mr. Russo, give us a

 8  second, sir.

 9          Go ahead, sir.

10          PROSPECTIVE JUROR RUSSO:  William Russo.  I've

11  lived in Jacksonville for ten years and in Florida for ten

12  years.  I have a four-year degree working with a nonprofit

13  organization, director of development.  I am married.

14          My wife works part time for a home developer and

15  also stays at home with the children.  My children are seven

16  and four.  And I have never been in the military nor served

17  on a jury.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR STILWELL:  I'm Anna Stilwell.  I

20  have lived in Palatka for the past 20 years, state of

21  Florida for 41 years.  I have two years of college.

22          I'm a personal assistant for a businessman in

23  Palatka, Florida.  And I am married.  And my spouse is

24  self-employed as an auto electrician.  I have two children,

25  ages 13 and 8.  I've never served in the military.  And I

1  have served as a juror.  It was a criminal case.  And we did

2  return a verdict.

3            PROSPECTIVE JUROR BELGER:  I'm Sam Belger.  I've

4  lived in Jacksonville, Florida, for 31 years.  I have two

5  years of college.  I'm the assistant fleet coordinator for

6  Duval County School Board.  My wife is a hairdresser.  No

7  children.  No military service.  And I was on a jury,

8  criminal.  And we reached a verdict.

9            PROSPECTIVE JUROR WRIGHT:  My name is Samantha

10  Wright.  I live in Interlachen.  I've lived in Florida my

11  whole life.  I have an associate in arts degree.  I'm a

12  public assistant specialist with the Department of

13  Children & Families.

14            At nighttime I bag groceries.  And on the weekend

15  I work in the family business.  I'm divorced.  I have two

16  children, ages 13 and 11.  No military service.  I served on

17  a jury in a criminal case.  And we did return a verdict.

18            THE COURT:  Thank you.

19            PROSPECTIVE JUROR ELLISON:  My name is Sandra

20  Ellison.  I've lived in Jacksonville all my life.  I

21  completed high school.  I'm a correctional officer.  I am

22  married.  My husband is retired, divisional technician for

23  BellSouth.

24            I have four children, ages 37, 36, 33, and 31.

25  One is a security officer, one is a business manager for a

 1  radio station, and the other one works for -- my son works

 2  for the post office.  I've never been in the military.  And

 3  I've been called but never -- never served on a jury.

 4          THE COURT:  Which child of yours is a security

 5  officer?

 6          PROSPECTIVE JUROR ELLISON:  My second child, my

 7  second daughter.

 8          THE COURT:  And security officer for whom?

 9          PROSPECTIVE JUROR ELLISON:  For Shands.

10          THE COURT:  Okay.  So she works in security at

11  Shands Hospital?

12          PROSPECTIVE JUROR ELLISON:  Yes, sir.

13          THE COURT:  Okay.  Thank you.

14          PROSPECTIVE JUROR JOHNSTON:  I'm Mary Johnston.

15  And I've been in Florida and in Jacksonville for 31 years.

16  I'm an RN with three additional years of college.  I am

17  single with no children, no military service.  I was called

18  for jury duty but did not serve.

19          THE COURT:  Thank you.  And last but not least.

20          PROSPECTIVE JUROR SUMMERFORD:  My name is Jerry

21  Summerford.  I've lived in Jacksonville, Florida, all my

22  life.  I have a bachelor's degree.  I'm a project manager

23  for BlueCross/BlueShield.

24          I'm married.  My wife is a homemaker.  I have two

25  children.  My son is 26 and works for Bank of America.  My

1   daughter is 18.  She's a student.

2          I've not had previous military experience.  I have

3   served jury duty on a criminal case.  And we did reach a

4   verdict.

5          THE COURT:  Thank you.  Well, thank you, ladies

6   and gentlemen, for doing that.  That's a way for us to learn

7   a little bit about each of you and then to begin the process

8   of selecting the jury.

9          So I appreciate your patience with that.  What I'm

10  going to do now is to continue to ask you some questions

11  that I'm asking to the group at large.  And many of these

12  questions you probably won't have any answer to or won't

13  have anything to say about.

14          If any of you do have something that's responsive

15  to the question, if you could raise your hand, and I'll call

16  on you as I can.

17          Again, if any of these questions are about matters

18  that you prefer to discuss more in private over here, that's

19  perfectly fine.  And just let me know -- point over there or

20  say, I'd like to discuss it in private, and we'll be happy

21  to do that.  We don't ask these questions just to ask them.

22  They are important for us to pick a fair and impartial jury.

23          So the first question I have for all of you is for

24  those of you who have had jury service, is there anything

25  about that service that would make it difficult for you to

 1  be fair if you were selected as a juror in this case?

 2  Anybody have any bad experiences or anything that happened

 3  during their jury service that would make it hard for you to

 4  be impartial and fair in this case?  Anybody?

 5          Okay.  Do any of you know any of the rest of you

 6  who are sitting here?  In other words, do you see any -- of

 7  the other prospective jurors, do any of you see anybody that

 8  you know?

 9          Yes, ma'am.

10          UNIDENTIFIED PROSPECTIVE JUROR:  I believe

11  Mr. Ponder is the custodian at our school.

12          THE COURT:  Okay.  And is there anything about

13  the fact that you know him through that that would make it

14  difficult for you to serve with him on a jury?

15          UNIDENTIFIED PROSPECTIVE JUROR:  (Shakes head

16  negatively)

17          THE COURT:  Mr. Ponder, would you have any problem

18  with that?

19          PROSPECTIVE JUROR PONDER:  No, sir.

20          THE COURT:  Okay.  Thank you.  Anybody else?

21          All right.  Besides Mr. Beverly, do any of you

22  know me?

23          UNIDENTIFIED PROSPECTIVE JUROR:  Indirectly.  I

24  believe I know your parents.

25          THE COURT:  And how do you know my parents?

1        UNIDENTIFIED PROSPECTIVE JUROR:  Socially.

2        THE COURT:  Okay.  Well, I take it -- really, you

3  know, of course, I'm -- people knowing me isn't really going

4  to matter too much, but it's a question we do ask.  Is there

5  anything about that that would make you uncomfortable being

6  in this case?

7        UNIDENTIFIED PROSPECTIVE JUROR:  No, sir.

8        THE COURT:  Okay.  Anybody else?  All right.  I'm

9  going to read off the names of my staff.  And if anybody

10  happens to know them -- I think Mr. Beverly is going to know

11  some of these folks.  And he doesn't need to respond.

12        But Susan Weissman, Amanda Bagni, Brooke Matheson,

13  Donna Howard, or Shannon Bishop, anybody know any of those

14  folks?

15        Okay.  Again, I believe we have two people,

16  Mr. Beverly and Mr. Wisnovsky, who told us that they've

17  studied law before.

18        Have any of the rest of you had any other legal or

19  paralegal type training at all?  Anybody ever studied law or

20  paralegal or legal related?

21        All right.  We've got a couple of hands.  Let's

22  start, sir, right here.  If you'll give us your name again

23  when you stand up, please.

24        PROSPECTIVE JUROR MONTGOMERY:  My law, research

25  and everything, was in my associate's degree in business

1  management.

2           THE COURT:  And you're Mr. Montgomery, right?

3           PROSPECTIVE JUROR MONTGOMERY:  Yes, sir.

4           THE COURT:  Okay.  And that was part of your...

5           PROSPECTIVE JUROR MONTGOMERY:  Curriculum.

6           THE COURT:  Curriculum.  Okay.  Is there anything

7  about that training that would make it difficult for you to

8  be of service here today?

9           PROSPECTIVE JUROR MONTGOMERY:  No, sir.

10          THE COURT:  Would you be able to put aside

11  whatever it is that you learned in that course and to accept

12  the law that I give you as being the law in this case that

13  you would apply?

14          PROSPECTIVE JUROR MONTGOMERY:  Yes, sir.

15          THE COURT:  Okay.  Thank you.  I think we had a

16  couple of other hands.  Yes.  If you'd stand up and give us

17  your name.

18          PROSPECTIVE JUROR HOLTON:  Jason Holton.  I

19  studied Legal I and Legal II in a CJI class for correctional

20  training.  I never completed the course.  But I did study

21  that.

22          THE COURT:  All right.  And remind me what your

23  occupation is now.

24          PROSPECTIVE JUROR HOLTON:  I'm Florida Pest

25  Control.

1          THE COURT:  Okay.  So this was something that you

2     had done but you didn't complete?  Is that...

3          PROSPECTIVE JUROR HOLTON:  Yes, sir.

4          THE COURT:  All right.  Is there anything about

5     that course work that would make it difficult for you to

6     serve here?

7          PROSPECTIVE JUROR HOLTON:  No, sir.

8          THE COURT:  Would you be able to listen to what I

9     tell you the law is that's going to apply in this case and

10    apply that law and kind of put out of your mind anything

11    else you learned?

12         PROSPECTIVE JUROR HOLTON:  Yes, sir.

13         THE COURT:  Thank you, sir.  I believe there was a

14    couple of others.  Yes, ma'am.  If you'll again give us your

15    name, please.

16         PROSPECTIVE JUROR MORIN:  I'm Julie Morin.  I also

17    took business law as part of my college degree in business

18    management.

19         THE COURT:  Would you have any trouble separating

20    that out from the law that I'm going to give you in this

21    case?  Anybody else?

22         Yes, ma'am.

23         PROSPECTIVE JUROR WRIGHT:  Samantha Wright.  I

24    graduated from the basic recruit academy for the Pasco

25    County Sheriff's Office in 1987.  And had children instead.

```
 1            THE COURT:  All right.  Will you be able, ma'am,
 2   to kind of put that aside, what you learned there, and to
 3   apply the law that I'll give you in this case?
 4            PROSPECTIVE JUROR WRIGHT:  Yes, sir.
 5            THE COURT:  Do you have any doubt about your
 6   ability to do that?
 7            PROSPECTIVE JUROR WRIGHT:  No, sir.
 8            THE COURT:  Thank you.  Anybody else with any kind
 9   of law or paralegal type training?
10            Okay.  Have any of you ever appeared in court as
11   either a witness or a party?  A witness is obviously
12   somebody that testifies.  A party is actually the person
13   that either brings the suit or is defending the suit.
14            Have any of you ever appeared in court in that
15   capacity?
16            All right.  Mr. Wisnovsky, go ahead.
17            PROSPECTIVE JUROR WISNOVSKY:  I appeared both as
18   a witness in criminal cases and an expert witness in a civil
19   case.
20            THE COURT:  Okay.  All right, sir.  Anybody else?
21            PROSPECTIVE JUROR WISDOM:  Tonya Wisdom.  When I
22   was 15 I was in an auto accident and we went before a judge
23   to get an award for the accident because it was a very
24   severe accident.  And that was the only time.
25            THE COURT:  Okay.  And so that was -- did it
```

```
 1  actually go to trial or...
 2            PROSPECTIVE JUROR WISDOM:  It did not go to trial.
 3            THE COURT:  Okay.  Did you actually appear in
 4  court and testify?
 5            PROSPECTIVE JUROR WISDOM:  I did.
 6            THE COURT:  Okay.  Is there anything about that
 7  experience that would make it difficult for you to be fair
 8  and impartial in this case?
 9            PROSPECTIVE JUROR WISDOM:  I don't think so.
10            THE COURT:  Okay.  How long ago was that?
11            PROSPECTIVE JUROR WISDOM:  18 years ago.
12            THE COURT:  Okay.  Thank you, ma'am.  Anybody
13  else?  Yes, on the -- let's start with Ms. Morin.
14            PROSPECTIVE JUROR MORIN:  I've been called as a
15  witness before in some custody issues with parents in my job
16  as a preschool director.
17            THE COURT:  And have you actually had to testify
18  in court?
19            PROSPECTIVE JUROR MORIN:  Yes, I did.
20            THE COURT:  Is there anything about that
21  experience that would make it difficult for you to be fair
22  and impartial in this case?
23            PROSPECTIVE JUROR MORIN:  No.
24            THE COURT:  Okay.  And is that -- how many times
25  have you testified?
```

```
 1              PROSPECTIVE JUROR MORIN:  Twice.

 2              THE COURT:  All right.  Thank you, ma'am.  I think

 3    there was some more on the front row there.

 4              Yes, sir, Mr. Montgomery.

 5              PROSPECTIVE JUROR MONTGOMERY:  Just appeared as

 6    a -- I guess it was a summons to appear for a class-action

 7    suit at the federal court, or whatever, when I first arrived

 8    here in Jacksonville.  1985 I think is --

 9              THE COURT:  Was that in connection with a business

10    that you had or...

11              PROSPECTIVE JUROR MONTGOMERY:  It was in

12    connection with NAS Jax.  I was...

13              THE COURT:  Okay.  So did you actually have to

14    appear?

15              PROSPECTIVE JUROR MONTGOMERY:  Yes.

16              THE COURT:  And did you testify or...

17              PROSPECTIVE JUROR MONTGOMERY:  I had to testify.

18              THE COURT:  Okay.  Anything about that experience

19    that would affect your ability to be fair and impartial in

20    this case?

21              PROSPECTIVE JUROR MONTGOMERY:  No, sir.

22              THE COURT:  Okay.  Yes, ma'am.

23              PROSPECTIVE JUROR MCCOIN:  I was a witness for a

24    child custody case.

25              THE COURT:  And you're Ms. McCoin, right?
```

```
 1            PROSPECTIVE JUROR MCCOIN:  Right.

 2            THE COURT:  All right.

 3            PROSPECTIVE JUROR MCCOIN:  In the sovereign state

 4   of Texas a long time ago.

 5            THE COURT:  Okay.  Anything about that experience

 6   that would make it hard for you to serve on this jury with

 7   impartiality and fairness?

 8            PROSPECTIVE JUROR MCCOIN:  No, sir.

 9            THE COURT:  Yes, sir.

10            PROSPECTIVE JUROR SPENCER:  Ron Spencer.  I served

11   as a -- or I was called as a witness in a divorce case for

12   my daughter.  Is that...

13            THE COURT:  Yes, sir.  That's fine.  And did you

14   actually testify?

15            PROSPECTIVE JUROR SPENCER:  Yes.

16            THE COURT:  All right.  Anything about that

17   experience that would make it hard for you to serve on this

18   jury?

19            PROSPECTIVE JUROR SPENCER:  No.

20            THE COURT:  Thank you.  Anybody else?  All the way

21   in the back.  Mr. Russo.

22            PROSPECTIVE JUROR RUSSO:  Yes.  15 years ago I had

23   to go to court on a drinking-and-driving charge and had to

24   testify.

25            THE COURT:  All right.  And is there anything
```

1    about that experience that would make it difficult for you

2    to be fair and impartial in this case?

3              PROSPECTIVE JUROR RUSSO:  I don't believe so.  No,

4    sir.

5              THE COURT:  All right, sir.  Was there a

6    resolution of the case?

7              PROSPECTIVE JUROR RUSSO:  There was.

8              THE COURT:  Okay.  And, you know, obviously,

9    Mr. Moore is charged with a crime.  He's presumed to be

10   innocent.  The government has brought the charge.  Is the

11   fact that you were at some point in your past life charged

12   with an offense, would that make it more difficult for you

13   to be fair in this case, do you think?

14             PROSPECTIVE JUROR RUSSO:  I don't believe so, sir.

15             THE COURT:  Do you have any doubt about it?

16             PROSPECTIVE JUROR RUSSO:  No.  No, sir.

17             THE COURT:  All right.  Thank you.  Anybody else?

18   Yes, ma'am.

19             PROSPECTIVE JUROR STILWELL:  Anna Stilwell.  I had

20   a lawsuit filed against me and was subpoenaed to appear in

21   federal court in August of 2000.  We settled out of court,

22   though.

23             THE COURT:  Okay.  So were you actually a party to

24   that lawsuit then?

25             PROSPECTIVE JUROR STILWELL:  Yes.

1          THE COURT:  It was against you?

2          PROSPECTIVE JUROR STILWELL:  Yes.

3          THE COURT:  And you don't have to go into a lot of

4   detail, but what kind of suit?  Was it breach of

5   contract or...

6          PROSPECTIVE JUROR STILWELL:  Yes.  Breach of

7   contract.  I had a business, a temporary personnel business.

8          THE COURT:  Okay.  Was the fact that you've been

9   sued like that before, even though it did get settled, would

10  that have any affect on your ability to be fair and

11  impartial in this case?

12         PROSPECTIVE JUROR STILWELL:  No.

13         THE COURT:  Okay.  Thank you, ma'am.  Anybody

14  else?

15         The question I just asked and the question I'm

16  going to ask are very similar, but just sometimes people

17  don't think of it the same way.  Have any of you ever sued

18  anybody or been sued by anybody?  Mr. Wisnovsky?

19         PROSPECTIVE JUROR WISNOVSKY:  A defendant in a

20  civil suit as a result of my employment as an FBI agent.

21  And the case was eventually dismissed without resolution.

22         THE COURT:  Okay.  Anybody else?  Yes, ma'am, on

23  the front row.

24         PROSPECTIVE JUROR GRIFFIN:  I had a lawsuit

25  against a neurosurgeon.

1          THE COURT:  And you're Ms. Griffin, right?

2          PROSPECTIVE JUROR GRIFFIN:  Yes.

3          THE COURT:  All right.  And what was the -- how

4   did it turn out?  Did it get settled or...

5          PROSPECTIVE JUROR GRIFFIN:  Yes.

6          THE COURT:  And is there anything about that

7   experience -- so you were the plaintiff, you brought the

8   lawsuit?

9          PROSPECTIVE JUROR GRIFFIN:  Yes.

10          THE COURT:  And then it was settled out of court.

11   Is there anything about that experience that would make it

12   difficult for you to be fair and impartial in this case?

13          PROSPECTIVE JUROR GRIFFIN:  No.

14          THE COURT:  How long ago was that, ma'am?

15          PROSPECTIVE JUROR GRIFFIN:  15 years ago, maybe,

16   20.

17          THE COURT:  Okay.  Now, do you understand that

18   that was a civil case and this is a criminal case and that

19   the rules are going to be a lot different in this case?

20          PROSPECTIVE JUROR GRIFFIN:  Yes.

21          THE COURT:  And are you willing to listen to what

22   I tell you the rules are and to apply those rules and kind

23   of put the civil case out of your mind?

24          PROSPECTIVE JUROR GRIFFIN:  Yes.

25          THE COURT:  Thank you.  Anybody else?

1          All right.  During the trial you'll be asked to

2   keep an open mind and not form or express any opinions about

3   the testimony and the evidence until you've heard all of the

4   evidence and the closing arguments and my instructions to

5   you on the law.

6          Can all of you wait until you've heard everything

7   to express or form any opinion about the case?  Is there

8   anybody that can't do that?

9          Do all of you believe in our trial by jury under

10  our judicial system?  Is there anybody who doesn't believe

11  in jury trials or our jury system?

12         Do each of you understand that a person such as

13  Mr. Moore is presumed innocent of the crimes charged and

14  that he is not required to prove his own innocence?  Do you

15  all understand that?

16         Will any of you have any difficulty following that

17  rule?  Do each of you understand that a defendant such as

18  Mr. Moore cannot be found guilty unless the government

19  proves him guilty beyond a reasonable doubt?  Will any of

20  you have any difficulty following that rule?

21         Do all of you understand that a defendant such as

22  Mr. Moore has the right to remain silent and that if he

23  chooses not to testify you should not consider that in

24  reaching your decision?  Do all of you understand that?

25  Will any of you have any difficulty following that rule?

1          Have you or any close member of your family ever

2   served as a prosecuting attorney, either federal, state, or

3   military?

4          Mr. Beverly?

5          PROSPECTIVE JUROR BEVERLY:  I was an assistant

6   state attorney here in Duval County.

7          THE COURT:  For how long, sir?

8          PROSPECTIVE JUROR BEVERLY:  1984 to 1986.

9          THE COURT:  And do you think that that experience

10  that you had as a prosecuting attorney would make it

11  difficult for you to be fair and impartial in this case?

12          PROSPECTIVE JUROR BEVERLY:  No.

13          THE COURT:  And would the fact that you were a

14  prosecuting attorney make it more likely that you would

15  favor the prosecution, the government, in this case?

16          PROSPECTIVE JUROR BEVERLY:  No.

17          THE COURT:  Do you have any doubt about your

18  ability to be fair and impartial in this case even though

19  you've had that prior experience?

20          PROSPECTIVE JUROR BEVERLY:  No.

21          THE COURT:  Thank you, sir.  Anybody else?

22          Have any of you or any close members of your

23  family ever had any contact or dealing with the U. S.

24  Attorney's Office in this district?

25          Obviously, we already know about Mr. Wisnovsky.

1  Anybody else have any dealings with the U. S. Attorney's

2  Office or any close members of your family?

3        Mr. Beverly?

4        PROSPECTIVE JUROR BEVERLY:  Well, I have,

5  obviously, acquaintances there.  But my mother was an

6  Assistant United States Attorney years ago.

7        THE COURT:  Okay.  Anything about that fact that

8  would make it difficult for you to be fair and impartial in

9  this case?

10        PROSPECTIVE JUROR BEVERLY:  No.

11        THE COURT:  Thank you, sir.  Anybody else?  And it

12  doesn't just mean you've had to work there or you know

13  somebody.  If, you know, you've been investigated by them or

14  any relationship with the U. S. Attorney's Office that

15  you're aware of.  Okay.  Anybody?

16        All right.  To your knowledge, have you or any

17  close member of your family ever been the subject of an

18  investigation by the United States Attorney's Office, a

19  federal grand jury, or a federal law enforcement agency?

20        And, again, if anybody wants to answer in private,

21  I'd be happy to do that.  Anybody have an answer to that?

22  Yes, sir.  Give us your name.

23        PROSPECTIVE JUROR CRIST:  Can I discuss it

24  privately?

25        THE COURT:  Sure.  Yes, sir.  Come up here.  Let's

1  see counsel, please.

2            (Sidebar conference)

3            THE COURT:  You're Mr. Crist?

4            PROSPECTIVE JUROR CRIST:  Yes, sir.  I think it

5  applies to the question you just asked before.  It was a

6  trespassing charge that somebody had filed against me.  And

7  it went to the sheriff's office and the U.S. -- the

8  District -- Clay County District Attorney's Office.  And

9  they -- they didn't pursue investigating it further.

10           THE COURT:  So there was a complaint, basically --

11           PROSPECTIVE JUROR CRIST:  Complaint, yes, sir.

12           THE COURT:  -- about trespassing?  And then it

13  went to the States Attorney in Clay County?

14           PROSPECTIVE JUROR CRIST:  They reviewed it.

15           THE COURT:  And they reviewed it and decided not

16  to prosecute it?

17           PROSPECTIVE JUROR CRIST:  Yes, sir.

18           THE COURT:  How long ago was that?

19           PROSPECTIVE JUROR CRIST:  Two or three years ago.

20           THE COURT:  Is there anything from that

21  experience, from your standpoint, that would make it

22  difficult for you to be fair and impartial in this case?

23           PROSPECTIVE JUROR CRIST:  No, sir.

24           THE COURT:  For example, this is a different

25  agency.  But would you hold it against the government in

1  this case because somebody complained about --

2           PROSPECTIVE JUROR CRIST:  No, sir.

3           THE COURT:  Would you be more likely to favor a

4  defendant over a prosecutor because of that experience?

5           PROSPECTIVE JUROR CRIST:  No, sir.

6           THE COURT:  Would it have any affect on you

7  whatsoever?

8           PROSPECTIVE JUROR CRIST:  No, sir.

9           THE COURT:  Okay.  Thank you, sir.

10          (The following proceedings occurred in open court)

11          PROSPECTIVE JUROR WISNOVSKY:  Your Honor, while

12  you're there, may I come up?

13          THE COURT:  Yes, sir, Mr. Wisnovsky.

14          (Sidebar conference)

15          PROSPECTIVE JUROR WISNOVSKY:  I have an adult son

16  who is charged by the state with a drug possession charge.

17  I think as part of that investigation DEA is -- was aware of

18  that, because I was contacted about that.

19          THE COURT:  Right.  Might have been a joint task

20  force or something?

21          PROSPECTIVE JUROR WISNOVSKY:  Yes.  Yes.

22          THE COURT:  And is that an ongoing matter?

23          PROSPECTIVE JUROR WISNOVSKY: There's no

24  resolution, yes.  It's an old case.

25          THE COURT:  Okay.  Is there anything about that

1   experience that you think would make it difficult for you to

2   serve as a juror in this case?

3              PROSPECTIVE JUROR WISNOVSKY:  No, sir.  I've

4   also -- I'm sure I have during the course of my employment

5   been charged with responsibilities of investigating certain

6   judicial officers, including members of the United States

7   Attorney's Office and the judiciary.

8              THE COURT:  Okay.  Obviously, you've had a long --

9   you know, you had a long career with the FBI.  And you've

10  given this information about your son here.  But is there

11  anything about any of that that you, in your own mind, feel

12  would compromise your ability to sit as a fair and impartial

13  juror?

14             PROSPECTIVE JUROR WISNOVSKY:  No, sir.  And to be

15  perfectly -- to make sure that I am blunt about disclosure,

16  I have worked for defense attorneys who have defended

17  federal criminal defendants and --

18             THE COURT:  And that was after your FBI career?

19             PROSPECTIVE JUROR WISNOVSKY:  Yes.  Yes.  So I've

20  really been on both sides.

21             THE COURT:  All right.  Well, I think we've got a

22  sense of the situation.  Do y'all have anything?

23             MR. TALBOT:  What was his son being prosecuted --

24  in state court or federal?

25             PROSPECTIVE JUROR WISNOVSKY:  State.

1          MR. TALBOT:  And that matter is still pending?

2          PROSPECTIVE JUROR WISNOVSKY:  Yes.

3          MR. TALBOT:  Okay.  All right.

4          THE COURT:  Thank you.

5          MR. MAKOFKA:  May I ask one question while we're

6   still on the record?  Is that in the state of Florida?

7          PROSPECTIVE JUROR WISNOVSKY:  Yes.

8          (The following proceedings occurred in open court)

9          THE COURT:  Before Ms. Bishop sits down, anybody

10  else?

11          Ms. Griffin, I saw you make a motion.  Did you

12  have something you wanted to say, ma'am?

13          PROSPECTIVE JUROR GRIFFIN:  Me?  No.

14          THE COURT:  I'm sorry.  Yes.  Ms. Griffin, did you

15  have something?

16          PROSPECTIVE JUROR GRIFFIN:  No.

17          THE COURT:  Okay.  I'm sorry.  I thought I saw you

18  raise your hand there.  I just wanted to make sure.

19          All right.  So there are no other responses to

20  that question, right?

21          All right.  Have any of you ever been sued or sued

22  the United States Government or any of its agencies?

23  Anybody?

24          Okay.  Have any of you ever had a claim or dispute

25  with the United States Government or any of its agencies,

 1  even if it didn't result in a lawsuit?  Mr. Wisnovsky?

 2          PROSPECTIVE JUROR WISNOVSKY:  An EEO complaint.  I

 3  was the complainant against my agency.

 4          THE COURT:  Okay.  Were you the complaining party

 5  or the party complained against?

 6          PROSPECTIVE JUROR WISNOVSKY:  The complaining

 7  party.

 8          THE COURT:  All right.  And was that matter

 9  resolved?

10          PROSPECTIVE JUROR WISNOVSKY:  Yes.

11          THE COURT:  And is there anything about that

12  situation that would make it difficult for you to be fair

13  and impartial in this case?

14          PROSPECTIVE JUROR WISNOVSKY:  No, sir.

15          THE COURT:  Anybody else?  Dispute or claim with

16  the federal government?

17          Okay.  Now, one of the principal responsibilities

18  of jurors is to consider the testimony of various witnesses

19  and to determine the credibility, meaning the believability

20  of that witness.

21          A number of law enforcement officers will be

22  testifying in this case, as we've already discussed.  With

23  respect to these witnesses, because of any past experiences

24  that you've had, or for any other reason, would any of you

25  tend to believe or disbelieve a law enforcement witness over

1    any other witness simply because that person is a law

2    enforcement officer?   Anybody?

3            Okay.   If it appears during the trial that any

4    witness has in the past been involved in the use and

5    distribution of illegal drugs, do any of you have such

6    strong feelings about illegal drugs that you would be unable

7    to fairly and impartially weigh and consider the

8    believability of that witness?   Anybody have such strong

9    feelings that they wouldn't be able to evaluate that witness

10   like any other witness?

11           All right.   I believe we've already covered this.

12   But have any of you ever testified in court in a criminal

13   case?   Other than I know Mr. Russo already told us about a

14   situation.   Anything else in a criminal case?

15           Mr. Wisnovsky, obviously, as an FBI agent you

16   would have.

17           Anybody else?

18           Okay.   Do any of you have any religious or moral

19   beliefs that you believe would preclude you from serving as

20   a juror because it would involve sitting in judgment of

21   another person?

22           Do any of you hold any religious or moral beliefs

23   that just prohibit you from sitting in judgment of another

24   person?

25           Do any of you have any medical or physical

1  condition or impairments such that it would be difficult for

2  you to serve as a juror, such as a hearing or a vision

3  problem or anything like that of a medical or physical

4  nature?

5          Okay.  Have any of you ever been the victim of a

6  crime?  Anybody?

7          Mr. Wisnovsky?

8          PROSPECTIVE JUROR WISNOVSKY:  I've been shot by a

9  bank robber.

10          THE COURT:  And that was in the course of your FBI

11  responsibilities?

12          PROSPECTIVE JUROR WISNOVSKY:  Yes.

13          THE COURT:  Anybody else?  Yes, sir?  And Mr.  --

14          PROSPECTIVE JUROR CHAVANA:  Chavana.

15          THE COURT:  All right.

16          PROSPECTIVE JUROR CHAVANA:  I've had a brother

17  that was killed, you know, so...

18          THE COURT:  In the course of a crime?

19          PROSPECTIVE JUROR CHAVANA:  Yeah.

20          THE COURT:  And was the person who committed the

21  crime prosecuted?

22          PROSPECTIVE JUROR CHAVANA:  Yes, he was.  And he

23  served 12 years in prison in New York state.

24          THE COURT:  Would anything about that experience

25  that happened to your brother, would that affect your

 1  ability to be a fair and impartial juror in this case?

 2            PROSPECTIVE JUROR CHAVANA:  No, sir.

 3            THE COURT:  Do you understand that, obviously,

 4  this is a totally different situation and it has to be

 5  judged on its merits?  Do you understand that?

 6            PROSPECTIVE JUROR CHAVANA:  Yes, sir.

 7            THE COURT:  Do you have any doubt about your

 8  ability to do that?

 9            PROSPECTIVE JUROR CHAVANA:  No, sir.  No doubts.

10            THE COURT:  Thank you, sir.

11            Yes, ma'am.  In the back.

12            PROSPECTIVE JUROR WISDOM:  Tonya Wisdom.

13            THE COURT:  Yes.

14            PROSPECTIVE JUROR WISDOM:  I've been date raped.

15  There was no -- I didn't tell anybody.  It was never taken

16  to court.  Nothing ever happened to the guy.

17            THE COURT:  And how long ago did that occur,

18  ma'am?

19            PROSPECTIVE JUROR WISDOM:  Almost 20 years ago.

20            THE COURT:  And I'm sure this is a difficult thing

21  for you to -- I appreciate you bringing it to our attention.

22  And the only thing I want to ask you is is there anything

23  about that experience for you, as bad as it was, that would

24  make it difficult or impossible for you to sit as a fair and

25  impartial juror in this case?

 1            PROSPECTIVE JUROR WISDOM:  No, sir.

 2            THE COURT:  Okay.  Thank you, ma'am.

 3            Yes, ma'am.

 4            PROSPECTIVE JUROR PAGANO:  My name is Angelina

 5  Pagano.  My apartment was robbed.  This was about 25, 30

 6  years ago.

 7            THE COURT:  Okay.  And was the person apprehended?

 8            PROSPECTIVE JUROR PAGANO:  No.

 9            THE COURT:  Is there anything about that

10  experience that would make it difficult for you to give both

11  the defendant and the government a fair trial in this case?

12            PROSPECTIVE JUROR PAGANO:  No, sir.

13            THE COURT:  Thank you, ma'am.  Anybody else in the

14  box here?

15            Yes, ma'am.

16            UNIDENTIFIED PROSPECTIVE JUROR:  Indirectly.  My

17  mother was shot and killed.  It was murder/suicide.  My

18  husband's father was hit by a drunk driver.  His sister was

19  killed by a contracted murderer by her husband.  And then

20  had, you know...

21            Other than that...

22            THE COURT:  And so those -- they're all different

23  situations, but they, obviously, all are serious matters.

24  Is there anything about those situations that you've just

25  described to us that would make it difficult for you to sit

1  through this trial or to be a fair and impartial juror in

2  this case?

3          UNIDENTIFIED PROSPECTIVE JUROR:  No.  I have no

4  problem with that.

5          THE COURT:  Okay.  Now, this case does involve

6  allegations of guns as being a felon in possession and other

7  charges associated with guns.  Would that fact make it more

8  difficult for you to sit as a fair and impartial juror?

9          UNIDENTIFIED PROSPECTIVE JUROR:  No.

10          THE COURT:  Thank you.  Anybody else in the box?

11          All right.  Now, I believe there were some other

12  folks out here.

13          Yes, ma'am.

14          PROSPECTIVE JUROR MCCOIN:  We own our own

15  business.  So we have had some credit card fraud.  And we

16  did have some checks stolen.  No one was apprehended on

17  that.  But the credit card fraud was apprehended.  And he is

18  making restitution.

19          THE COURT:  Okay.  Anything about those

20  experiences that would make it difficult for you to sit as a

21  fair and impartial juror in this case?

22          PROSPECTIVE JUROR MCCOIN:  No, sir.

23          THE COURT:  And, for the record, that's Ms. McCoin

24  again.

25          All right.  Anybody else?  I think I see a hand,

 1  but I can't see who's raising it.

 2          PROSPECTIVE JUROR WORKMAN:  Workman.  My husband

 3  owns his own business and he was robbed repeatedly.  So we

 4  have had -- the person was apprehended eventually and they

 5  did serve time for it.  In addition, we have also had checks

 6  stolen.

 7          THE COURT:  Is there anything about those

 8  experiences that would make it difficult for you to be a

 9  fair and impartial juror in this case?

10          PROSPECTIVE JUROR WORKMAN:  No, sir.

11          THE COURT:  Thank you.  Anybody else here?

12  Anybody?  Okay.  Thank you again.

13          And, again, we're getting into some areas that,

14  again, I'll be happy to speak to you privately if you'd

15  prefer.  Other than what you've previously told me about --

16  because some of you have told me about some things already.

17  But other than things you've already disclosed, have you, a

18  relative, or close friend, ever been charged with a crime

19  which is more serious than a traffic infraction?

20          And, again, it can be handled privately.  But if

21  you've already told me about it, you don't need to tell me

22  again, but...

23          Mr. Montgomery, sir.

24          (Sidebar conference)

25          PROSPECTIVE JUROR MONTGOMERY:  I had a -- I got a

1    younger brother that was convicted of drugs, selling drugs,

2    and served time in Virginia.  Not here.  And it's been 30

3    years.

4              THE COURT:  Okay.  Well, obviously, this is also a

5    drug case -- or a charge is that it is.  Would the

6    experience you had with your brother make it difficult for

7    you to be fair and impartial in this case?

8              PROSPECTIVE JUROR MONTGOMERY:  No.  I was in the

9    military at the time and everything, so I wasn't even

10   around.

11             THE COURT:  Do you have any doubt about your

12   ability to be fair and impartial even though you've had that

13   experience?

14             PROSPECTIVE JUROR MONTGOMERY:  No.

15             THE COURT:  Okay.

16             MR. TALBOT:  Did he feel like his brother was

17   treated fairly by the law enforcement?

18             PROSPECTIVE JUROR MONTGOMERY:  Oh, yes.  Oh, yes.

19   I think he tried it.

20             THE COURT:  Okay.

21             MR. MAKOFKA:  Was that in the federal or state

22   system, if you know?

23             PROSPECTIVE JUROR MONTGOMERY:  I think it was --

24   he served time in the local jail.  So it must have been the

25   state.

1          MR. MAKOFKA:  Okay.  Thank you.

2          MR. TALBOT:  Okay.  Thank you.

3          THE COURT:  Thank you.

4          (The following proceedings occurred in open court)

5          THE COURT:  Anybody else that wants to respond to

6    that?

7          Yes, ma'am.

8          (Sidebar conference)

9          PROSPECTIVE JUROR SETTING:  I have two sons that

10   were -- one was caught with drug paraphernalia.  And it was

11   a misdemeanor probation.  And then the other son was -- hot

12   wired a front-end loader.  And it was just restitution.

13         THE COURT:  Okay.  And did this happen a long time

14   ago or recently?

15         PROSPECTIVE JUROR SETTING:  20, 21.  It was five,

16   six years ago.

17         THE COURT:  Okay.  Anything about those

18   experiences that would make it difficult for you to be fair

19   and impartial in this case?

20         PROSPECTIVE JUROR SETTING:  No.

21         THE COURT:  Did you feel like your sons, in both

22   cases, were treated appropriately by law enforcement and the

23   judicial system?

24         PROSPECTIVE JUROR SETTING:  Uh-huh (affirmative).

25         THE COURT:  Is there -- and these were state

1  matters?   They weren't federal matters?

2          PROSPECTIVE JUROR SETTING:   No.   They were state.

3          THE COURT:   Wait, ma'am.

4          MR. TALBOT:   Where was the location of that?

5          PROSPECTIVE JUROR SETTING:   West side, here in

6  Jacksonville.

7          MR. TALBOT:   Both here in Jacksonville?

8          MR. MAKOFKA:   And may I have your last name again?

9  I apologize.

10          PROSPECTIVE JUROR SETTING:   Setting.

11          MR. TALBOT:   Thank you, ma'am.

12          THE COURT:   Anybody else want to be heard on that?

13          (The following proceedings occurred in open court)

14          PROSPECTIVE JUROR ELLISON:   I can do it from here.

15          THE COURT:   That's fine.   We'll go ahead and get

16  this gentleman first.

17          (Sidebar conference)

18          THE COURT:   If you'll give us your name again,

19  sir.

20          PROSPECTIVE JUROR TOLLEY:   Daniel Tolley.   Back

21  when I was 18 I got charged with illegal discharge of a

22  firearm.   And I had to pay a fine and serve probation.

23          THE COURT:   Where was that?

24          PROSPECTIVE JUROR TOLLEY:   Fairfax County,

25  Virginia.

1            THE COURT:  And did you feel you were treated
2    fairly by the law enforcement and the judicial system?
3            PROSPECTIVE JUROR TOLLEY:  Yes.
4            THE COURT:  Is there anything about that
5    experience that would make it difficult for you to be a fair
6    and impartial juror in this case?
7            PROSPECTIVE JUROR TOLLEY:  No.
8            THE COURT:  Does the fact that this case also
9    involves some allegations about guns, does that make it
10   uncomfortable for you to serve as a juror?
11           PROSPECTIVE JUROR TOLLEY:  No.
12           THE COURT:  Thank you, sir.  Anybody else wish to
13   be heard privately before I...
14           (The following proceedings occurred in open court)
15           THE COURT:  I believe, Ms. Ellison, you said you
16   had something you wanted to say.
17           PROSPECTIVE JUROR ELLISON:  Yes, sir.  I had a
18   brother that was arrested for auto theft.  It's been like 30
19   some-odd years ago.  He served --
20           THE COURT:  And was he convicted?
21           PROSPECTIVE JUROR ELLISON:  Yes, sir.  He served
22   three and a half years.
23           THE COURT:  And do you have any complaints about
24   the way that he was treated by law enforcement or by the
25   court system?

1          PROSPECTIVE JUROR ELLISON:  No, sir.

2          THE COURT:  Is there anything about that

3   experience that would make it difficult for you to serve as

4   a fair and impartial juror in this case?

5          PROSPECTIVE JUROR ELLISON:  No, sir.

6          THE COURT:  Thank you, ma'am.  Anybody else want

7   to say anything?  Yes, ma'am.

8          PROSPECTIVE JUROR GARNER:  A previous job there

9   was three of us that were arrested for suspicion of grand

10  theft.  But the charges were dismissed against two of us.

11         THE COURT:  And you're Ms. Garner, ma'am; is that

12  right?

13         PROSPECTIVE JUROR GARNER:  Yes.

14         THE COURT:  And I take it -- were you one of the

15  ones it was dismissed against?

16         PROSPECTIVE JUROR GARNER:  Yes.

17         THE COURT:  Was there anything -- and how long ago

18  was that?

19         PROSPECTIVE JUROR GARNER:  Eight years ago.

20         THE COURT:  Was that here or somewhere else?

21         PROSPECTIVE JUROR GARNER:  Here.

22         THE COURT:  And is there anything about that

23  experience that would make it difficult for you to be fair

24  and impartial in this case?

25         PROSPECTIVE JUROR GARNER:  No.

1          THE COURT:  Okay.  Thank you, ma'am.  Anybody

2    else?

3          Have any of you, or a relative of yours or a close

4    friend, ever had an unpleasant or bad experience with a law

5    enforcement officer or agency?

6          Okay.  Is there anything about the nature of the

7    charges in this case that generates such strong feelings as

8    would make it difficult for you to be fair and impartial to

9    both the defendant and the United States?  Anybody?

10         All right.  We're making progress, ladies and

11   gentlemen, on getting the questions asked.  So I appreciate

12   your patience.  I've still got a few more.

13         And my preference -- it's about 20 to twelve.  My

14   preference is to go ahead and finish the questioning so that

15   you can -- you know, we may not get the selection done, but

16   at least get done with the questioning before you take your

17   lunch break.

18         But I know you've been sitting there for a while.

19   Why don't you just kind of stand up and stretch for a

20   minute.  And then we'll finish the questioning.

21         All right.  We're going to resume the questioning,

22   ladies and gentlemen.  And some of you have already given

23   information along these lines.

24         So if you've already given the information, you

25   don't have to give it again.  But do you have any member of

1  your family, close friend, or acquaintance who is involved

2  in law enforcement, including state or federal police

3  officers, sheriff's deputies, law enforcement agents, ATF,

4  FBI, DEA, IRS, or any state or other federal law enforcement

5  agency?  And if you've already disclosed that or talked

6  about it, you don't need to do it again.

7            Yes.  It's Ms. Wisdom, right?

8            PROSPECTIVE JUROR WISDOM:  Yes.  My mother tells

9  me that I have cousins in Tennessee in the state police.  I

10  don't know them.

11            THE COURT:  Okay.  Anything about that fact that

12  would make it hard for you to serve as a juror in this case?

13            PROSPECTIVE JUROR WISDOM:  No.

14            THE COURT:  Okay.  Thank you.  Anybody else?

15  Mr. Montgomery?

16            PROSPECTIVE JUROR WISDOM:  I've got a nephew

17  that's a sheriff's deputy in the city of Norfolk in

18  Virginia.

19            THE COURT:  And are y'all close?

20            PROSPECTIVE JUROR WISDOM:  He's my God child.

21            THE COURT:  Okay.  Anything about the fact that he

22  serves in law enforcement that would make you more favorable

23  to the law enforcement folks in this case?

24            PROSPECTIVE JUROR WISDOM:  No.

25            THE COURT:  Are you able to be fair and impartial

 1  even though you have that relationship?

 2          PROSPECTIVE JUROR WISDOM:  Yes.

 3          THE COURT:  Do you have any doubt about your

 4  ability to do that?

 5          PROSPECTIVE JUROR WISDOM:  No, I do not.

 6          THE COURT:  Anybody else?

 7          Yes, sir.  Mr. Spencer.

 8          PROSPECTIVE JUROR SPENCER:  Yes, sir.  I know a

 9  couple of police officers from my church and one retired

10  officer from my church.

11          THE COURT:  Any problem with you being fair and

12  impartial in this case because of those relationships?

13          PROSPECTIVE JUROR SPENCER:  No, sir.

14          THE COURT:  Would you be more likely to believe a

15  police officer on the stand than you would somebody else

16  because of those relationships?

17          PROSPECTIVE JUROR SPENCER:  No, sir.

18          THE COURT:  Thank you.  Yes, sir.  I'm sorry.  I

19  can't -- if you'll stand up.  Go ahead.

20          PROSPECTIVE JUROR DREISTADT:  My father worked for

21  the Internal Revenue Service.

22          THE COURT:  Okay.  And what type of --

23          PROSPECTIVE JUROR DREISTADT:  Collection manager.

24          THE COURT:  Okay.  Thank you, sir.  And you're

25  Mr. Holton?

```
 1              PROSPECTIVE JUROR DREISTADT:  Dreistadt.
 2              THE COURT:  I'm sorry.  I'm looking at the wrong
 3    -- I apologize, sir.  Go ahead.  All right.  Thank you.
 4              Anybody else?
 5              Okay.  Now, again, I'm going to ask a question
 6    that has some sensitivity to it.  If you prefer to be heard
 7    at sidebar, please let me know.  Also, if you've already
 8    given me this information, you don't need to give it again.
 9              Have you or family members or close friends or
10    acquaintances of yours had a problem with illegal narcotics
11    or controlled substances?
12              And, again, if you've already given me the
13    information, you don't need to give it to me again.  And if
14    you'd like to be heard at sidebar, I'd be happy to do that.
15              Anybody have a response to that?
16              UNIDENTIFIED PROSPECTIVE JUROR:  Same.
17              THE COURT:  You've already given us the
18    information.  Yes, sir.
19              PROSPECTIVE JUROR STAMPER:  Yes, sir.  My
20    stepfather is an alcoholic, but that's about it.
21              THE COURT:  Okay.  Is there anything about that,
22    Mr. Stamper, that would make it hard for you to be fair and
23    impartial in this case?
24              PROSPECTIVE JUROR STAMPER:  No, sir.
25              THE COURT:  Thank you.
```

1          Ms. Ellison.

2          PROSPECTIVE JUROR ELLISON:  Yes, sir.  I have a

3 couple of brothers that are on drugs.

4          THE COURT:  Currently?

5          PROSPECTIVE JUROR ELLISON:  Yes, sir.

6          THE COURT:  Okay.  And are they in legal problems

7 now, or this is just something that they're dealing with?

8          PROSPECTIVE JUROR ELLISON:  Just something that

9 they're dealing with.

10          THE COURT:  Okay.  And is there anything about

11 that fact -- obviously, this is a case that's potentially

12 about drugs.  At least that's the allegations.  Is there

13 anything about that fact that would make it difficult for

14 you to be fair and impartial?

15          PROSPECTIVE JUROR ELLISON:  No, sir.

16          THE COURT:  Would you be able to judge this case

17 on the evidence presented here and kind of put out of your

18 mind for now the problems that your brothers are having?

19          PROSPECTIVE JUROR ELLISON:  Yes, sir.  They're

20 adults.  They know.

21          THE COURT:  Okay.  Thank you, ma'am.

22          Anybody else?  Yes.

23          UNIDENTIFIED PROSPECTIVE JUROR:  I have a sister

24 that previously had a problem with crack cocaine.  But it

25 was very short term.

1          THE COURT:  All right.  Is there anything about --

2   and how long has -- let's put it this way.  How long has the

3   problem been resolved?

4          UNIDENTIFIED PROSPECTIVE JUROR:  I'd say probably

5   about 11 years.

6          THE COURT:  And is there anything about that

7   experience with your sister that would make it difficult for

8   you to sit as a juror in a case that would be potentially

9   about drugs?

10         UNIDENTIFIED PROSPECTIVE JUROR:  No.

11         THE COURT:  Would you be able to give both the

12  government and the defendant a fair trial and judge only

13  on -- once you hear the evidence in court, even though

14  you've had that experience?

15         PROSPECTIVE JUROR ELLISON:  Yes, sir.

16         THE COURT:  Thank you.

17         Yes, ma'am.  Ms. Pagano, right?

18         PROSPECTIVE JUROR PAGANO:  Pagano, right.  I have

19  a nephew that has a drug problem.  And no one has really

20  seen him.  He's estranged from the family.  So it's been

21  quite some time ago.

22         THE COURT:  All right.  And do you know if he has

23  had any legal problems, or he just has a problem that you're

24  aware of?

25         PROSPECTIVE JUROR PAGANO:  No.  I think he's

1    legally.

2             THE COURT:   Okay.   But you're not aware of his

3    current situation then?

4             PROSPECTIVE JUROR PAGANO:   Not right now, no.

5             THE COURT:   Okay.   And does this person live in

6    Jacksonville or somewhere else?

7             PROSPECTIVE JUROR PAGANO:   No.   New Jersey.

8             THE COURT:   Okay.   Is there anything about that

9    experience that would make it hard for you to be fair and

10   impartial in this case?

11            PROSPECTIVE JUROR PAGANO:   No.

12            THE COURT:   Do you think you could give both the

13   defendant and the government a fair trial even though you're

14   aware of that experience?

15            PROSPECTIVE JUROR PAGANO:   Yes.

16            THE COURT:   Thank you.

17            Anybody else?   Thank you for that information.

18   Again, we don't ask for any other reason other than in order

19   to get a fair and impartial jury.

20            Are any of you members of any groups that advocate

21   the legalization of drugs or -- that is, the legalization of

22   drugs which are currently illegal, or do any of you advocate

23   that position regardless of whether you're in such a group?

24   Anybody?

25            Do any of you have any special experience with

1  firearms?

2         Mr. Montgomery?

3         PROSPECTIVE JUROR MONTGOMERY:  Just the military,

4  you know, training, I had.

5         THE COURT:  Okay.  And I assume Agent --

6  Mr. Wisnovsky, you've carried a firearm and --

7         PROSPECTIVE JUROR WISNOVSKY:  Yes, sir.

8         THE COURT:  -- and had training?

9         PROSPECTIVE JUROR PAGANO:  Yes, sir.

10        THE COURT:  Okay.  Yes, sir, Mr. Stamper.

11        PROSPECTIVE JUROR STAMPER:  I have my merit

12  shooting badge from Boy Scouts.  But that's about it.

13        THE COURT:  Thanks.  Did somebody have their

14  hand -- Ms. Ellison?

15        PROSPECTIVE JUROR ELLISON:  Yes, sir.  Dealing

16  with my job.

17        THE COURT:  Do you carry a firearm in your job?

18        PROSPECTIVE JUROR ELLISON:  Occasionally, yes,

19  sir.

20        THE COURT:  Okay.  So any of you --

21        MR. TALBOT:  Your Honor, Ms. Burns had her...

22        THE COURT:  I'm sorry.

23        PROSPECTIVE JUROR BURNS:  I used to go hunting

24  with my father when I was a child.  But other than that...

25        THE COURT:  Okay.  Do any of you who've said you

1  have special knowledge or experience or training with

2  firearms, do any of you think that would in any way affect

3  your ability to be fair in this case, knowing that there are

4  some firearms issues that are going to be brought up?  Any

5  of you have any problem with that?

6          Okay.  Do any of you hold any such strong feelings

7  or opinions about the United States Government or the local

8  government or the federal agencies, like the Bureau of

9  Alcohol, Tobacco and Firearms, have any strong feelings or

10  opinions about them one way or the other that would make it

11  difficult for you to be fair and impartial in this case?

12          I asked you earlier whether any of you were a

13  member of any organization that advocated the legalization

14  of drugs.  And now I'm going to ask you:  Do any of you

15  belong to groups such as Mothers Against Drunk Driving or AA

16  or Alanon or any of the narcotics support groups?  Any

17  groups such as that?  Do any of you belong to -- Mr. Russo?

18          PROSPECTIVE JUROR RUSSO:  Yes, Your Honor.  I'm a

19  member of Alcoholics Anonymous.

20          THE COURT:  All right, sir.  Anything about that

21  membership that would make it difficult for you to serve as

22  a fair and impartial juror?

23          PROSPECTIVE JUROR RUSSO:  I don't believe so.  I

24  do attend a meeting down at the FSP.  I attend a meeting

25  down in that prison.

1          THE COURT:  Okay.  All right.  Thank you, sir.

2          Anybody else belong to any groups -- either those

3   groups or groups like that?  Do any of you or your families

4   or close friends belong to the National Rifle Association?

5          Mr. Wisnovsky.  Just raise your hand if -- all

6   right.  We've got Mr. Wisnovsky.  Anything about that

7   membership, Mr. Wisnovsky, that would make it difficult for

8   you to be fair and impartial in this case?

9          PROSPECTIVE JUROR WISNOVSKY:  No, sir.

10          THE COURT:  All right.  And go ahead, ma'am.

11          UNIDENTIFIED PROSPECTIVE JUROR:  Just my husband's

12   a member of the NRA.

13          THE COURT:  Okay.  And anything about that

14   membership -- how long has he been a member?

15          UNIDENTIFIED PROSPECTIVE JUROR:  A long time.  20

16   years.

17          THE COURT:  Okay.  Anything about that membership

18   that would -- his membership that would make it difficult

19   for you to be a fair and impartial juror in this case?

20          UNIDENTIFIED PROSPECTIVE JUROR:  No.

21          THE COURT:  And I think there were other hands.

22   Yes, ma'am.

23          UNIDENTIFIED PROSPECTIVE JUROR:  My boyfriend is a

24   member of the NRA.  He's been a member for quite some time.

25          THE COURT:  Anything about that that would make it

1  difficult for you to be fair and impartial in this case?

2  We're going to be talking about guns and things.  Anything

3  about that that would give you any concern?

4          UNIDENTIFIED PROSPECTIVE JUROR:  No.

5          THE COURT:  Mr. Stamper?

6          PROSPECTIVE JUROR STAMPER:  My grandfather has

7  been a lifetime member for as long as I can remember.

8          THE COURT:  Anything about that that would make it

9  difficult for you to be fair and impartial in this case?

10          PROSPECTIVE JUROR STAMPER:  No, sir.

11          THE COURT:  Thank you, sir.

12          Anybody else?  Yes, ma'am, Ms. Morin.

13          PROSPECTIVE JUROR MORIN:  My father has been a

14  lifetime member.  He's also a safe hunters instructor.

15          THE COURT:  Anything about that that would make it

16  difficult for you to be fair and impartial in this case?

17          PROSPECTIVE JUROR MORIN:  No.

18          THE COURT:  Thank you.  Anybody else?  Any of you

19  belong to any other groups that are similar to the NRA or --

20  or I guess you could characterize them as advocating or

21  progun-type groups, other than the NRA, or anybody -- any

22  family member belong to any of those groups?  Anybody?

23          Okay.  Now the opposite question.  Do any of you

24  belong to any groups that seek to control gun -- you know,

25  handgun control or -- or any type of group that seeks to

1  control past gun control laws and that type of thing?

2  Anybody?  You, a relative, or close friend?  Anybody?  Okay.

3          All right.  Let me see counsel at sidebar for a

4  minute, please.

5          (Sidebar conference)

6          THE COURT:  Okay.  I have asked the questions that

7  I generally ask, as well as the questions of yours that both

8  of you proposed that I thought were appropriate and were not

9  duplicative of those I previously asked.

10         My question is -- Mr. Talbot, I'll start with you.

11 Are there any other questions or areas of inquiry that you

12 are requesting on behalf of the government?

13         MR. TALBOT:  No, sir.

14         THE COURT:  Mr. Makofka?

15         MR. MAKOFKA:  I always have to ask for these

16 questions.  It's the question relating to:  By virtue of the

17 fact the defendant's here and you're hearing him charged

18 with a crime, is there anything about that that would lead

19 you to be fair and impartial just based on that fact alone?

20 And you may very well have covered that area.

21         THE COURT:  I got presumption of innocence and

22 feel like I --

23         MR. MAKOFKA:  I'm fine with that.  That's fine.

24         THE COURT:  Anything else?

25         MR. MAKOFKA:  No thank you, Your Honor.

1            THE COURT:  Okay.  Now, let me ask you this

2  question.  Are there any potential challenges for cause that

3  you think require further inquiry by the Court before I

4  dismiss the venire?

5            In other words, if you've got somebody in mind, is

6  there a question I need to ask them in order to probe or

7  not?  If you already have the record, you --

8            MR. MAKOFKA:  I'd almost ask for one more

9  clarification as to one lady who's on the panel.  And I

10 would like to grab my notes if I could.

11           THE COURT:  Okay.

12           MR. MAKOFKA:  Let me see if I can make some sense

13 out of this.  The potential juror was Sharon Middleton.  And

14 I believe the response is to one of your earlier questions

15 regarding impartiality she gave.  And I believe -- so

16 instead of an absolute affirmative -- and, frankly, I

17 believe the question was because she -- she was No. 8.  She

18 knew Matt Robinson's -- Detective Robinson's wife.  And she

19 had children that went to school with the wife.  And she

20 never met Mr. Robinson.

21           And I think you said would that keep you from

22 being fair and impartial.  And it was equivocal.  And I just

23 wanted to sort of --

24           THE COURT:  Anything else?

25           MR. TALBOT:  No.  And, just for the record, I'm

 1  not going to propound any cause challenges, just so I...

 2          MR. MAKOFKA:  And that would be our only one.

 3          THE COURT:  I'll see about that.  Okay.  Thank

 4  you.

 5          (The following proceedings occurred in open court)

 6          THE COURT:  Ms. Middleton, you indicated earlier

 7  that you were friends with the wife of Officer Matt

 8  Robinson; is that correct?

 9          PROSPECTIVE JUROR MIDDLETON:  Yes, acquaintances.

10          THE COURT:  Okay.  And I know I asked you this

11  before, but I just want to make sure I'm clear on it.  Is

12  there anything about that relationship with Officer

13  Robinson's wife and the association your children have that

14  would make it difficult for you to be fair and impartial in

15  this case?

16          PROSPECTIVE JUROR MIDDLETON:  No.

17          THE COURT:  Do you have any doubt about your

18  ability to judge the testimony of Officer Robinson, if he

19  does testify, the same way that you would judge everybody

20  else's?

21          PROSPECTIVE JUROR MIDDLETON:  No.

22          THE COURT:  Would you tend at all to favor his

23  testimony or to think he's more likely to be telling the

24  truth because of your past relationship with his wife?

25          PROSPECTIVE JUROR MIDDLETON:  No.

1          THE COURT:  And, as I recall, you told me you

2     didn't actually know him, right?

3          PROSPECTIVE JUROR MIDDLETON:  No.  I have not met

4     him, I don't believe.

5          THE COURT:  Thank you, ma'am.  All right.  We are

6     just about through, ladies and gentlemen.  I have a couple

7     more questions and then I'm going to let you get some lunch.

8          During the course of the trial there will be

9     questions of law that arise during the trial.  And before

10    you retire to deliberate, the Court will instruct you on the

11    law you are to follow in reaching your verdict.

12          Regardless of any opinion you have as to what the

13    law ought to be, it would be a violation of your sworn duty

14    to base a verdict upon any other view of the law than that

15    which I will give to you in my instructions, just as it

16    would be a violation of your sworn duty as judges of the

17    fact to base a verdict upon anything but the evidence in

18    this case.

19          Can each of you perform your sworn duty as a juror

20    as I've just indicated?  Is there anyone who doesn't feel

21    that they can do that?

22          If you are selected as a juror in this case, can

23    and will each of you render a fair and impartial verdict

24    based upon the evidence presented in this courtroom and the

25    law as it pertains to this particular case as instructed by

 1  the Court?

 2          All right.  And then the last question is kind of

 3  an odd question.  But it's one that we -- that I ask.  We've

 4  asked you a lot of questions here today.  And you -- and I

 5  think you kind of get the sense of what the questioning is

 6  and what the reason for it is.

 7          But every once in a while there's something that

 8  we didn't ask you that we should have.  And so my question

 9  for you is:  Is there anything that you think would be

10  significant to deciding whether you'd be a fair and

11  impartial juror, anything that is maybe close to what we

12  asked you but we didn't exactly ask you the right question

13  that you think you ought to talk to us about before we

14  finalize the process?

15          Does anybody have anything on their mind or --

16  sometimes you say, you know, three questions ago I wish I

17  would have said something.

18          Mr. Montgomery?

19          PROSPECTIVE JUROR MONTGOMERY:  I've just got one

20  thing.  I know a police -- married couple police officer and

21  they go to the church that I go to.  And that wasn't ever --

22  you know, we do have a -- we don't go out to dinner or

23  anything like that, but we do church activities.

24          THE COURT:  Anything about that relationship that

25  would make it difficult for you to be fair and impartial in

 1  this case?

 2              PROSPECTIVE JUROR MONTGOMERY:  No.

 3              THE COURT:  And let me just be clear.  The people

 4  that you know, they're not any of the witnesses that we've

 5  named?

 6              PROSPECTIVE JUROR MONTGOMERY:  No.

 7              THE COURT:  This is just another couple?

 8              PROSPECTIVE JUROR MONTGOMERY:  Yes, sir.

 9              THE COURT:  Okay.  Thank you, sir.  I believe

10  there was somebody else.  Was there a hand?  Anybody else?

11  Anything on your mind?  Any other things that you wish you

12  had said but you didn't get a chance to?

13              Okay.  Very good.

14              All right.  What we're going to do -- ladies and

15  gentlemen, that completes the questioning.  And what we're

16  going to do is I'm going to let you go have some lunch.  And

17  then I'm going to ask you to come back and then we will

18  actually select the jury as soon as you get back.

19              Because when you leave the lawyers -- either now

20  or right -- or before you come back -- are going to go ahead

21  and do the selection process while you're not here.

22              So when you come back, we will actually pick the

23  jury.  And those of you who are selected, obviously, will

24  stay, and those of you who are not will go back to

25  Ms. Abernathy for further instructions by her.

 1          But rather than make you wait for us to do that

 2   before you eat your lunch, we're going to go ahead and let

 3   you have your lunch break, because it takes a little while

 4   sometimes.

 5          The only thing I will say to you is I know you

 6   don't know very much about the case yet, but I will ask you

 7   not to discuss the case at all with your fellow prospective

 8   jurors or anybody else or to allow anybody to discuss it

 9   with you during this lunch break.

10          And if you run into one of the lawyers or

11   something, they -- they're not supposed to talk to you.  So

12   sometimes you'll think they're being unsociable, but they're

13   under instructions not to talk to you.  So if you happen to

14   run into them or get on an elevator or something like that,

15   don't think they're being unfriendly to you.  It's just

16   because I'm telling them to do that so we don't have any

17   problems or questions.

18          So if you'll just not discuss it with anybody,

19   don't let anybody discuss it with you over the lunch break,

20   I will appreciate it.  And what we are going to do is -- I'm

21   going to ask you to be back here at 1:15.

22          And what you'll do is you'll come into the

23   courtroom.  And you don't have to -- you can all sit in the

24   back.  And what will happen is Ms. Howard will have a list

25   of who's been selected.  And once everybody's here she'll

1   call up the people who are actually going to be sitting on

2   the jury.

3           So you folks in the chairs here, if you'll sit in

4   the back as well when you come back.  And it really doesn't

5   matter even what order you sit in, because we'll know who

6   you are and we'll call you up.

7           So if everybody could go have lunch and be back at

8   1:15.  There are a couple of places around here.  And the

9   court security officer can talk to you about it if you don't

10  know where to go.  But I hope you enjoy your lunch.  And

11  we'll see you back here at 1:15.

12          (Venire exited at 12:01 p.m.)

13          THE COURT:  All right.  Everybody can have a seat.

14  The record will reflect that the venire has been excused.

15  Mr. Talbot and Mr. Makofka, I'm willing to do this now or

16  I'm willing to do it when -- you know, in enough time -- in

17  other words, I'm willing to give you your lunch break now

18  and we'll be back in time to do it.

19          Obviously, Mr. Moore has to be here and the

20  marshals have to get him downstairs and get him some lunch.

21  But I'm sure we can work that out.

22          So, Mr. Talbot, are you ready to proceed?  Or

23  would you prefer to do it after the break?

24          MR. TALBOT:  Your Honor, I'm ready to proceed now.

25          THE COURT:  Mr. Makofka?

1          MR. MAKOFKA:  Your Honor, I'd prefer to do it

2   after the break, only because the defendant indicates he'd

3   like to take a recess.

4          THE COURT:  That's fine.  I assume -- we have no

5   challenges from the government for cause.  We've got to talk

6   about Ms. Middleton, maybe, by Mr. Makofka.  And then we can

7   just go right to peremptory.  So this isn't going to take

8   very long.

9          So what we will do is we will reconvene here

10  precisely at 1 o'clock so that we can have the jury

11  selected, so when they show back up we're ready to seat

12  them.  And so I'd ask the marshals to escort Mr. Moore.  And

13  we'll be back here at 1 o'clock.  Court will be in recess.

14          COURT SECURITY OFFICER:  All rise.  This Honorable

15  Court is now in recess.

16          (Recess, 12:05 p.m. to 1:07 p.m.)

17          THE CLERK:  All rise.  Be seated, please.

18          THE COURT:  What's going on?

19          COURT SECURITY OFFICER:  We're bringing him now.

20  We're just making sure that everybody is back by the...

21          THE COURT:  Okay.  Thank you.

22          All right.  The record will reflect that we're

23  back in session.  The venire panel is still excused, but

24  we're back to actually select the jury.  Mr. Moore is

25  present, along with his counsel, Mr. Makofka.  And

1  Mr. Talbot is here as well.

2         What I want to -- and we have concluded the voir

3  dire questioning and examination.  And so we're actually

4  ready to proceed to challenges.  I'd first ask the

5  government whether they have any challenges for cause?

6         MR. TALBOT:  No challenges for cause, Your Honor.

7         THE COURT:  Mr. Makofka?

8         MR. MAKOFKA:  None for cause, Your Honor.

9         THE COURT:  All right.  Then we'll go ahead and

10  start with the peremptories.  And as I indicated earlier,

11  because under the rules the government gets -- I'm sorry,

12  the defendant gets ten and the government gets six, we'll do

13  it two to one alternating format until we get the numbers

14  evened up.

15         And so what I will do is ask Mr. Makofka whether

16  there are any challenges he wishes to make.  And he's got

17  two available to him at this time.

18         MR. MAKOFKA:  Yes, Your Honor.  At this time the

19  defense would strike prospective jurors 1 and 2 from the

20  venire.

21         THE COURT:  So Mr. Rowe and Mr. Mattison?

22         MR. MAKOFKA:  That's correct, sir.

23         THE COURT:  All right.  Nos. 1 and 2 are struck by

24  the defense.  And, Mr. Talbot, does the government wish to

25  exercise a challenge?

1           MR. TALBOT:  Yes, Your Honor.  We would challenge

2  juror No. 13, Ms. Wisdom.

3           THE COURT:  All right.  Ms. Wisdom, No. 13, is

4  struck by the government.  Just so everybody is on the same

5  page, what that means right now is that jurors 14, 15, and

6  16 would be on the panel -- I'm sorry.  Wait a minute.

7           Just 14 and 15.  I'm sorry.  That will make 12.

8  I'm sorry.

9           All right.  So, Mr. Makofka, you have two

10 challenges if you care to exercise them.

11          MR. MAKOFKA:  Yes, Your Honor.  The defense would

12 exercise challenges as to with respect to jurors 8, Sharon

13 Middleton, and No. 10, Angelina Pagano.

14          THE COURT:  All right.  No. 8, Ms. Middleton, and

15 No. 10, Ms. Pagano, are also struck by the defendant.

16          Mr. Talbot, do you want to make a challenge?

17          MR. TALBOT:  So that -- just so I'm clear, we're

18 going up to juror 17?

19          THE COURT:  Yes.  Let me count it.  That's

20 correct, sir.

21          MR. TALBOT:  Okay.  I have no challenges to jurors

22 3 through 17.

23          THE COURT:  All right.  So let's be clear what

24 that means, that if -- you essentially are passing.  That

25 means you still retain your challenges you have left, but

1    you'll only be able to exercise those challenges as to any

2    later added jurors.  That would be any juror 18 and beyond

3    that's added.  Correct?

4              MR. TALBOT:  Correct.  I'm clear.

5              THE COURT:  All right.  So the government passes

6    and is willing to accept the jury as constituted.

7              Mr. Makofka, do you have other challenges?

8              MR. MAKOFKA:  We do, Your Honor.  We would strike

9    jury No. 11, George Wisnovsky.  And I believe we have an

10   additional, at this time, if that's correct.  We would also

11   strike -- may I just have one moment to confer, Judge?

12             THE COURT:  Sure.

13             MR. MAKOFKA:  If I may inquire while I'm speaking

14   with the defendant, that would have our last juror if we

15   accepted after the last strike at what number, if I may?

16             THE COURT:  No. 18, although Mr. Talbot would be

17   permitted to exercise a challenge as to No. 18 if he so

18   desired, just so you're clear.

19             MR. MAKOFKA:  Yes, Your Honor.  The defense would

20   also strike No. 15, Julie Morin.

21             THE COURT:  All right.  So you've challenged --

22   you've struck Mr. Wisnovsky, No. 11, and you've now struck

23   Ms. Morin, No. 15.  That would make the jury pool through

24   No. 19, Ms. Griffin.

25             Mr. Talbot, you would have the ability to strike

1  either No. 18 or 19 if you so desire.

2           MR. TALBOT:  No challenges, Your Honor.

3           THE COURT:  All right.  So the government passes

4  again.

5           MR. MAKOFKA:  The defense would strike No. 19,

6  Your Honor.  I'm sorry.  I didn't mean to cut you off.

7           THE COURT:  All right.  So you're going to strike

8  No. 19, Ms. Griffin, correct?

9           MR. MAKOFKA:  Yes, sir.

10          THE COURT:  Are you going to exercise -- well,

11 actually, we're now -- let me make sure the numbers are

12 right.  Yeah.  You've still got one more you can exercise at

13 this time.

14          MR. MAKOFKA:  Your Honor, if we may have just one

15 moment?

16          THE COURT:  Sure.

17          MR. MAKOFKA:  The panel would conclude upon which

18 number, if I may?

19          THE COURT:  I believe 20, but we'll count it to

20 make sure.  Yes.  It would go through No. 20, Ms. McCoin,

21 right now.

22          MR. MAKOFKA:  We accept the panel, Judge.

23          THE COURT:  All right.  And, Mr. Talbot, you would

24 have the ability to accept -- I mean, to strike No. 20 if

25 you so chose.

 1              MR. TALBOT:  No challenge.

 2              THE COURT:  All right.  So both parties have

 3    passed even though they have not exhausted their

 4    peremptories.  Is that correct, Mr. Talbot?

 5              MR. TALBOT:  That's correct.

 6              THE COURT:  And Mr. Makofka?

 7              MR. MAKOFKA:  That's correct, sir.  Thank you.

 8              THE COURT:  All right.  So both parties passing

 9    constitutes an acceptance of the jury.  And let's make sure

10    we're all on the same page.

11              The jury would be constituted of -- the 12-person

12    jury would be constituted of No. 3, Mr. Chavana, No. 4 -- I

13    believe it's Leckenbusch, 5 Burns, 6 Beverly, 7 Miller,

14    9 Tolley, 12 Setting, 14 Stamper, 16 Watts, 17 Crist,

15    18 Montgomery, and 20 McCoin.

16              Is that correct, Mr. Talbot?

17              MR. TALBOT:  I think that's correct, Your Honor.

18              THE COURT:  Mr. Makofka?

19              MR. MAKOFKA:  Yes, Your Honor.  It appears so.

20              THE COURT:  All right.  So that will be our

21    12-person jury.  Now, if there are no challenges, our

22    alternates would be Mr. Spencer, No. 21, and Mr. Ponder,

23    No. 22.  Because they're the next two on the list.

24              But the government and the defense each get one

25    challenge if they care to use it.  And, Mr. Talbot, the

1  government, goes first.

2          MR. TALBOT:  I have no challenge as to either 21

3  Spencer or 22 Ponder.

4          THE COURT:  Mr. Makofka?

5          MR. MAKOFKA:  We challenge No. 21, Robert Spencer.

6          THE COURT:  Okay.  That means Nos. 22 and 23 are

7  on the panel.

8          And, Mr. Talbot, I would -- you passed on 21 or

9  22, but you haven't had a chance to consider 23.  I would

10 give you a chance to exercise your challenge as to 23 if you

11 care to.

12         MR. TALBOT:  I would challenge 23.

13         THE COURT:  All right.  Now, then that would leave

14 Mr. Ponder and the woman whose name I can't pronounce.  It's

15 P-r-z-y-b-y-l-o-w-i-c-z.  And I believe that will do us.

16 Because you've already exercised yours, Mr. Makofka.  So...

17         So the alternates would be No. 22, Ponder, and

18 No. 24, Przybylowicz.

19         Is that correct, Mr. Talbot?

20         MR. TALBOT:  Correct.

21         THE COURT:  Mr. Makofka?

22         MR. MAKOFKA:  Yes, Your Honor.

23         THE COURT:  All right.  Are the parties satisfied

24 with the selection process and the way the Court has

25 conducted it?

 1            MR. TALBOT:  Yes, sir.

 2            MR. MAKOFKA:  Yes, Your Honor.

 3            THE COURT:  Okay.  Any other issues before we

 4   bring the jury in and dismiss those who have been not

 5   selected and impanel those who have?

 6            Mr. Talbot, you ready to do that?

 7            MR. TALBOT:  Ready, Your Honor.

 8            MR. MAKOFKA:  We're ready to proceed, Judge.

 9            THE COURT:  All right.

10            MR. TALBOT:  Your Honor, will we be proceeding

11   directly from opening to the first witness?

12            THE COURT:  What I'm going to do is once they come

13   in I'm going to swear them.  I have about five minutes or so

14   of preliminary instructions.  Then I was going to proceed to

15   opening statement.  And then I was going to get going, if we

16   could.  But if you need --

17            MR. TALBOT:  I don't.  I just need to make sure I

18   have a witness outside the courtroom.

19            THE COURT:  A little bit will depend -- I'm not

20   sure we talked about this the other day.  How much are you

21   requesting in terms of time for opening?

22            MR. TALBOT:  I hope to take around 15 minutes.

23            THE COURT:  Mr. Makofka?

24            MR. MAKOFKA:  Significantly less.  A few minutes,

25   Judge.

1          THE COURT:  All right.  Well, then we -- the outer

2   limit will be 15 minutes per side.  Obviously, I'm not going

3   to object if you take less.  But 15 minutes will be the

4   outer limit of it.

5          ' And, you know, if we -- I probably would go ahead

6   and start with a witness then.  But if you need a short

7   break, I can give that to you.

8          All right.  Are we ready for them?

9          MR. MAKOFKA:  Yes, Your Honor.

10          THE COURT:  Okay.  If you'd bring in the panel.

11          (Venire entered, 1:25 p.m.)

12          THE COURT:  Don't worry about the order of your

13   seating at this time.  Everybody can just have a seat.  And

14   we may be a little tight with all y'all back there.  As a

15   matter of fact, some of the court personnel may need to

16   offer you their seat.  But we're going to clear you out in

17   just a second.  There you go.

18          All right.  Is everybody back?

19          Okay.  Ladies and gentlemen, welcome back.  And

20   for those of you who are standing, I apologize, but it will

21   just be for a minute.

22          While you were at lunch and in just the last few

23   minutes we have selected a jury in this case.  And

24   Ms. Howard will be calling up the 14 people who have been

25   selected to be on the jury.

1        When she calls your name, if you'll come and sit,

2   starting with the front row and then the back row.  And

3   those of you who are not called, if you'll just remain

4   seated and then I'll give you some more instructions

5   afterwards.

6        So, Ms. Howard, if you'll go ahead and call up the

7   jury, please.

8        THE CLERK:  Henry Chavana.  Right in this chair,

9   please.  Peggy Ann Leckenbusch, Terri Burns, Thomas Beverly,

10  Wayne Miller, Daniel Tolley, Kim Setting.

11       Coming back in the next row, James Stamper, Donna

12  Watts, Ralph Crist, Michael Montgomery, Julia McCoin,

13  Maurice Ponder, and Susan Przybylowicz.

14       JUROR PRZYBYLOWICZ:  Przybylowicz.

15       THE CLERK:  Thank you.

16       THE COURT:  Is it all right if we call you Ms. P?

17       JUROR PRZYBYLOWICZ:  Yes.  Yes, sir.

18       THE COURT:  All right.  Before I talk to those

19  folks who -- and y'all who didn't get a seat, y'all are

20  welcome to have a seat now.  Thank you.

21       Before I talk to you all, let me make sure we've

22  got the right folks in the box here.  Mr. Chavana,

23  Ms. Leckenbusch, Ms. Burns, Mr. Beverly, Mr. Miller,

24  Mr. Tolley, Ms. Setting, Mr. Stamper, Ms. Watts, Mr. Crist,

25  Ms. McCoin, Mr. Ponder, and Ms. P.

1          Did I call everybody's name?

2          Mr. Montgomery, I'm sorry, I skipped over you.

3   You are part of the...

4          All right.  Did I miss anybody else?  And

5   everybody whose name I called is there?  Okay.  Then that's

6   the right folks.

7          Is that right, Mr. Talbot?

8          MR. TALBOT:  Yes, Your Honor.

9          THE COURT:  And Mr. Makofka?

10         MR. MAKOFKA:  Yes, Your Honor.

11         THE COURT:  Okay.  Very good.  All right.  Well, I

12  will get to y'all in just one minute.  So just relax for a

13  moment.  For those of you who were not selected, let me say

14  how much I appreciate your help this morning.

15         As I told you, don't take it personally.  It has

16  nothing to do with you.  It's just a part of the process.

17  Obviously, out of a group of 35 people we were -- certain

18  numbers were going to be selected and certain weren't.  So

19  it's certainly no reflection on you.

20         It is still a service to be among those

21  considered.  And on behalf of the Court, I appreciate all

22  your cooperation this morning.  I hope we used your time as

23  well as we could.  Obviously, things take some time and --

24  and I do appreciate your patience and cooperation.

25         What you all will do now is go back down to the

1  fourth floor room where you were this morning with

2  Ms. Abernathy.  She will give you further instructions as to

3  what you need to do for the remainder of your jury service.

4          I'm positive -- or I say -- yes, I'm positive

5  you're not going to be used the rest of today.  But she will

6  give you further instructions.  I think she tells you about

7  calling in and that type of thing.

8          Also, if you need any vouchers or that type of

9  thing, she'll be the one to take care of all of that.  So on

10  behalf of all the judges of the Court, I do appreciate your

11  service today.  And I will ask you to go ahead and go back

12  down to the fourth floor now.

13          Thank you, ladies and gentlemen.

14          (Prospective jurors not selected excused,

15  1:28 p.m.)

16          THE COURT:  And those of you who have been waiting

17  for a seat, you're welcome to take a seat over in the

18  audience there.  Thank you.

19          All right.  Ms. Howard, if you'll please swear in

20  the jury.  And, ladies and gentlemen, if you'll stand and

21  raise your right hand, please.

22          THE CLERK:  Do each of you solemnly swear or

23  affirm that you will well and truly try the case now before

24  the Court and render a true verdict according to the law,

25  evidence, and instructions of this Court, so help you God?

1        JURY PANEL:  We do.

2        THE COURT:  Thank you, ladies and gentlemen.  You

3  may have a seat.  I'm going to, for the next five minutes or

4  so, give you some preliminary instructions as to how the

5  case is going to go and some things you need to know.  Then

6  we're going to go right into the trial.

7        The lawyers will be making their opening

8  statements.  I'm sure we're going to have witness testimony

9  today.  So we're going to get right to work so that we use

10  your time wisely.

11        Ladies and gentlemen, you've now been sworn in as

12  the jury to try this case.  Before we get into any further

13  discussion, I want to talk to you about the people who will

14  be working with you during this trial.

15        First, as I said to you this morning, my name is

16  Tim Corrigan.  I am a United States District Judge.  And

17  I'll be your judge in this case.

18        The rules don't really encourage me to socialize

19  with you during the course of the trial, because I'm

20  supposed to make sure that I maintain my impartiality.  So I

21  won't be socializing with the parties or the lawyers or with

22  you-all.

23        But please don't think that means I'm not

24  concerned about your welfare.  There will be people that

25  will be interacting with you.  My courtroom deputy, Donna

1   Howard,  will probably be the one that you'll be seeing the

2   most.

3          The court security officer, who you've already

4   met, will be interacting with you.  And they are very

5   interested in your welfare, as am I.  And so anything that

6   comes to their attention they think I need to know about,

7   they certainly will let me know.

8          The other people that you see in the courtroom

9   today are my law clerk, who's Brooke Matheson.  She's right

10  down here.  She is a person that helps me with legal issues

11  and other issues during the course of the trial.

12         Sometimes she'll be here, sometimes she won't.

13  But you'll see her coming in from time to time.  And she

14  does work directly with me.

15         The other person, a very important person in the

16  courtroom, is Shannon Bishop, who's our court reporter.  It

17  is her job to take down literally everything that is said in

18  court.  And it's a very difficult job and she does it very

19  well.  So you'll see her throughout the course of this

20  trial.

21         I also have other staff folks that work with me.

22  And you may see them from time to time.  But these are the

23  primary people that you will run into during the course of

24  the trial.

25         Now, the court security officer, as I said, I know

1  you've already met, so I won't reintroduce him.  He will be

2  providing security for the courtroom and also be attending

3  to your needs during your jury service.

4        If you have any questions relating to anything

5  about your service or your accommodations or whatever,

6  please speak with either the court security officer or Ms.

7  Howard and they'll do everything they can to make your jury

8  service as pleasant as possible.

9        You've already been introduced to the lawyers and

10 the clients and the case agent, so I won't do that again.  I

11 do want to tell you just some kind of logistical things.

12        Any personal items that you wish to bring with you

13 can be kept in the jury room which -- and I don't think

14 you've been in yet, but it's right through that door there.

15 That's the door you'll be going into the next time you take

16 a break.

17        You can keep your personal items in there, because

18 the door -- the outside door to that is locked.  And so you

19 can feel that the security of it is maintained.

20        There's also in there a refrigerator, a microwave,

21 and a coffee maker.  So some people like to bring their

22 lunch, for example.  Feel free to do that.  Stick it in the

23 refrigerator.  You've got a microwave in there if you need

24 that.  There will be coffee made in the morning for those of

25 you who drink coffee.  And, as I said, anything we can do to

1  help make your service more pleasant, please let us know.

2           As I told you, I'm intending to run the trial on a

3  9 o'clock to no later than 5 o'clock schedule, with

4  appropriate breaks and a lunch break.

5           We really will try to start as close to 9 o'clock.

6  I'm always ready to go.  Sometimes -- and it's not other

7  people's faults.  There's just various things that make

8  things take a little bit longer.

9           But what I'm going to ask each of you to do, you

10  can be helpful to us, if you'll make sure you're in the jury

11  room by 8:45 so that we're ready to go at 9 o'clock and --

12  and so -- because we really want to try, as I said, to

13  utilize your time as wisely as we can and keep the trial

14  moving.

15          There are restroom facilities right in the jury

16  room for your convenience.  But there's also facilities

17  right across the hallway.  If you prefer the larger

18  facilities, you can use those as well.

19          Unfortunately, the parking is not great around the

20  federal courthouse, as you may have already discovered this

21  morning.  But we don't have any great advice for you other

22  than just do the best you can.  You do get a voucher for

23  parking.  So it's not -- so just do the best you can to find

24  a place that's suitable.

25          We're not going to have you out of here at night

1  in the dark.  You'll be out of here during the daylight

2  hours.  So you don't have to worry about that.  And anything

3  to do with parking and so forth can be handled by either the

4  court security officer or the jury administrator.

5           As I said, if there's anything else we can do to

6  help you and make your service more pleasant, please let us

7  know.

8           Now, as I told you before lunch, in order to make

9  sure that everybody stays impartial and does what they're

10 supposed to do, I have instructed all the lawyers and the

11 parties in the case, as well as members of their staff, not

12 to attempt to speak with you during the course of the trial.

13           Thus, if you find yourself in proximity with one

14 of the lawyers or parties, don't be offended if they don't

15 speak to you, because they're just doing what I asked them

16 to do.

17           Likewise, you should not speak with them or with

18 anyone else about this case while it is being tried.  If

19 anyone attempts to discuss the case with you, you should

20 immediately tell them to stop and to report any such contact

21 to the court security officer, who will report it to me.

22           While you're serving on the jury you'll have

23 badges that you'll be provided which will identify you as a

24 juror.  And so that makes it easier for people to know who

25 not to talk to.

1        And that will be an instruction that will happen

2   throughout the trial.  I'll remind you almost every time you

3   leave.  The rules say you're not supposed to talk about the

4   case with anybody, including your fellow jurors, until it's

5   time to go decide the case.  And you should not let anybody

6   talk to you about it.

7        It's a very normal thing to go home at night and

8   have a spouse or your Aunt Mabel or somebody want to talk

9   about it.  And if you would just say to them, The judge

10  asked me not to talk about it until the case is over, that

11  would be the best.

12       And the reason for that is -- it's not that we

13  don't trust you or anything.  The reason is that the law

14  wants to make very certain that you wait until the very end

15  of the case, after you've heard everything, to start making

16  up your mind.

17       And so not talking about it is one way to do that.

18  So you're keeping an open mind the whole time.  So I'll be

19  giving you that instruction.  You'll probably get tired of

20  hearing me say it.  But I'll be giving you that instruction

21  as we go through the trial.

22       My job is to decide all questions of law and

23  procedure that arise during the trial.  And before you do

24  retire to the jury room at the end of the trial to

25  deliberate upon your verdict and decide the case, I'll

1    explain to you the rules of law that you must follow and

2    apply in making your decision.

3            Now, when we do get ready to go with the evidence

4    in the case, it will be presented to you during the trial

5    and it will consist primarily of the testimony of witnesses

6    and tangible items, including papers or documents called

7    exhibits.  We may also have -- I expect to have some tapes,

8    some videotape, as well as part of the evidence in this

9    case.

10           Regarding the testimony you hear during the trial,

11   you need to pay close attention to that testimony, because

12   it will be necessary for you to rely on your memories as to

13   that testimony.

14           Although Ms. Bishop is taking down everything

15   that's said, her transcript will not be available in time

16   for you to have it back in the jury room.  So, basically,

17   you have to remember what people said and rely upon your

18   memories during the course of the trial when you get ready

19   to go deliberate.

20           Fortunately, this should be a fairly short trial

21   and you ought to be able to remember.  But I just wanted to

22   make sure you weren't expecting when you got back there to

23   have all the transcripts of everything that was said.

24           Now, we do treat the exhibits differently.  In

25   other words, if there's a document or photograph or

1 something that's admitted into evidence, you will have those

2 back in the jury room and available for your inspection

3 during the deliberations.

4         Now, I am going to permit you to take notes, if

5 you want to.  If you'd like to take notes during the trial,

6 you're allowed to do that.

7         Ms. Howard will be providing note pads and pens

8 for you and will collect them from you at the end of the day

9 and give them back to you in the morning.

10         On the other hand, of course, there's nothing

11 saying you have to take notes.  And if you don't want to,

12 you don't have to.  That will be left up to you

13 individually.

14         Now, if you do decide to take notes, don't try to

15 write everything down, because you'll get so involved in the

16 note-taking that you might become distracted from the

17 ongoing proceedings.

18         Also, your notes should be used only as aids to

19 your memory.  And if your memory should later differ from

20 your notes, you should rely upon your memory and not your

21 notes.

22         Your notes should be personal to you and should

23 not be read by the other jurors.  If you do not take notes,

24 you should rely upon your own independent recollection or

25 memory of what the testimony was, and you should not be

1  unduly influenced by the notes of the other jurors.

2        Notes are not entitled to any greater weight than

3  the recollection or impression of each juror concerning what

4  the testimony was.

5        Now, as I said, during the trial you should keep

6  an open mind and you should avoid reaching any hasty

7  impressions or conclusions.

8        Please reserve your judgment until you have heard

9  all of the testimony and the evidence and the closing

10  arguments of the lawyers and my instructions to you on the

11  law.

12        Because of your obligation to keep an open mind

13  during the trial, coupled with your obligation to then

14  decide the case only on the basis of the testimony and

15  evidence presented, as I said, please do not discuss the

16  case during the trial in any manner among yourselves or with

17  anyone else, nor should you permit anyone to discuss it with

18  you.

19        And you should avoid reading any newspaper

20  articles that might be published about the case or avoid

21  anything that might be on television or radio or the

22  internet.

23        I'm not aware that this case has generated any

24  publicity, but, as you all know, especially with the

25  internet, there can be all kinds of things on there that you

1   don't expect.  And so I am going to ask you to avoid any

2   media or any computer information about this case.

3         In addition, you must not visit the scenes of any

4   events that are involved in the case.  If you hear some

5   testimony about a location, you're not allowed to just go

6   out and do your own investigation or research.

7         And the reason for that is that everything that

8   happens -- all the evidence is what you hear in the

9   courtroom.  And so you should not do your own investigation

10  or research.

11        From time to time during the trial I may be called

12  upon to make rulings of law on objections or motions made by

13  the lawyers.

14        You should not conclude or infer from any rulings

15  I make or any comments I make that I have any opinion of the

16  merits of the case which favors one side or the other.

17        And if I should sustain an objection to a question

18  that then goes unanswered by a witness, you should not guess

19  or speculate what the answer might have been, nor should you

20  draw any inferences or conclusions from the question itself.

21        During the trial it may be necessary for me to

22  confer with the lawyers from time to time out of your

23  hearing with regard to questions of law or procedure that

24  require consideration by me alone.  And on some occasions

25  you may be excused from the courtroom for this same reason.

1          I'll try to limit those interruptions as much as

2   possible.  But you should remember the importance of the

3   matter you are here to determine and should be patient even

4   though the case may seem to go somewhat slowly for you at

5   times.

6          Now, the case is going to proceed in this way.  In

7   a few minutes I'll be asking the attorneys to make their

8   opening statements.

9          The counsel for the government, Mr. Talbot, will

10  make his opening statement first.  Then Mr. Makofka is

11  privileged to make an opening statement at that time as

12  well.  And that's what I understand he intends to do.

13  Neither party is obligated to make a statement, but I'm told

14  that both of them intend to do so.

15         Second, after we finish the opening statements,

16  the government will present its testimony and evidence in

17  support of the charges contained in the indictment.

18         Third, after the government has presented its

19  evidence, the defendant may present evidence but is not

20  obligated to do so.  The law never imposes on a defendant in

21  a criminal case the burden of calling any witnesses or

22  introducing any evidence.

23         Fourth, if Mr. Moore chooses to produce testimony

24  or evidence, the government will have the opportunity to

25  then present rebuttal testimony or evidence if it so

1  desires.

2       The law gives the government this opportunity to

3  present rebuttal evidence because it is the government's

4  burden to prove the defendant's guilt beyond a reasonable

5  doubt.

6       Fifth, at the conclusion of all of the evidence

7  the attorneys will have an opportunity to make final

8  arguments.  After that, I will then instruct you on the

9  applicable law and you will then retire to deliberate upon

10  your verdict.

11       Although I'll give you more complete instructions

12  at the end of the case before you begin to deliberate, I now

13  give you some further preliminary instructions to help you

14  as you listen to the evidence.

15       First, the indictment or formal charge against any

16  defendant is not evidence of guilt.  It is only an

17  accusation and nothing more.

18       Indeed, every defendant is presumed by the law to

19  be innocent.  Therefore, the defendant, Mr. Moore, starts

20  out here with a clean slate.

21       The law does not require a defendant to prove

22  innocence or to produce any testimony or evidence at all.

23  And if a defendant elects or chooses not to testify, you

24  should not consider that in any way during your

25  deliberations.

1          The government has the burden of proving a

2   defendant guilty beyond a reasonable doubt.  And if it fails

3   to do so, you must find the defendant not guilty.

4          While the government's burden of proof is a strict

5   or heavy burden, it is not necessary that a defendant's

6   guilt be proved beyond all possible doubt.  It is only

7   required that the government's proof exclude any reasonable

8   doubt concerning the defendant's guilt.

9          A reasonable doubt is a real doubt based upon

10  reason and common sense after careful and impartial

11  consideration of all the evidence in the case.

12          Proof beyond a reasonable doubt, therefore, is

13  proof of such a convincing character that you would be

14  willing to rely and act upon it without hesitation in the

15  most important of your own affairs.

16          In your deliberations you must consider only the

17  evidence that I will admit in the case.  The term evidence

18  includes the testimony of witnesses and the exhibits

19  admitted in the record.

20          Remember that anything the lawyers say is not

21  evidence.  It is your own recollection and interpretation of

22  the evidence that controls.

23          In considering the evidence you may make

24  deductions and reach conclusions which reason and common

25  sense lead you to make and you should not be concerned about

whether the evidence is direct or circumstantial.

Direct evidence is the testimony of one who asserts actual knowledge of the fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove any fact in dispute. The law makes no distinction between the weight you give to either direct or circumstantial evidence.

Now, in saying that you must consider all the evidence I do not mean that you must accept all the evidence as true or accurate.

You should decide whether you believe what each witness has to say and how important that testimony is. In making that decision, you may believe or disbelieve any witness in whole or in part.

Also, the number of witnesses testifying concerning any particular dispute is not controlling. In deciding whether you believe or do not believe any witness, I suggest you ask yourself a few questions.

Did the witness impress you as one who is telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions

1   clearly and answer them directly?  Did the witness'

2   testimony differ from other testimony or other evidence?

3          You should also ask yourself whether there was

4   evidence tending to prove that a witness testified falsely

5   concerning some important fact or whether there was evidence

6   that at some other time a witness said or did something or

7   failed to say or do something which was different from the

8   testimony the witness gave before you during the trial.

9          You should keep in mind, of course, that a simple

10  mistake by a witness does not necessarily mean that the

11  witness was not telling the truth as he or she remembers it,

12  because people naturally tend to forget some things or

13  remember other things inaccurately.

14          So if a witness has made a misstatement, you need

15  to consider whether it was simply an act -- I'm sorry, an

16  innocent lapse of memory or an intentional falsehood.  And

17  the significance of that may depend on whether it has to do

18  with an important fact or only an unimportant detail.

19          So those are just some preliminary instructions to

20  help you as you begin to hear the evidence in this case.

21  I'll be giving you a more complete set of instructions at

22  the end of the case before you start to deliberate.

23          We're going to begin the trial by allowing the

24  lawyers for each side an opportunity to make their opening

25  statements.

1            Again, these opening statements are not to be

2   considered by -- as evidence in the case or as your

3   instructions on the law.

4            However, they are intended to help you understand

5   the issues and evidence as it comes in, as well as the

6   positions taken by both sides.

7            So I ask you to give the lawyers your close

8   attention as I now recognize them for the purpose of opening

9   statements.

10           Before I do that, Mr. Talbot, does the government

11  have any objection to the preliminary instructions?

12           MR. TALBOT:  No, sir.

13           THE COURT:  Mr. Makofka?

14           MR. MAKOFKA:  No, Your Honor.  But I'd ask to

15  approach very briefly, if we may.

16           THE COURT:  Sure.

17           MR. MAKOFKA:  Thank you.

18           (Sidebar conference)

19           MR. MAKOFKA:  I wanted to put on the record the

20  fact that during the Court's preliminary instructions the

21  case agent for the government walked inside the jury room

22  here with a box with labels on it that said explosive,

23  caution, danger, in plain view of the jury.

24           Now, I'm not saying that's a big deal at this

25  point, but I could clearly see it.  And I would ask the

 1  agent to be a little more subtle next time.

 2          THE COURT:  All right.  Would you do that,

 3  Mr. Talbot?

 4          MR. TALBOT:  Sure.  Do you want me to talk

 5  about --

 6          MR. MAKOFKA:  The labels.

 7          MR. TALBOT:  That's not what's in there.

 8          MR. MAKOFKA:  The labels are facing the jury right

 9  now.  And I didn't want to make a big deal, but there's

10  three or four of them.  And they're under the table.  So I'd

11  like her to turn it around.

12          THE COURT:  Well, that was the question I was

13  going to ask you.  Do you want Mr. Talbot to say anything

14  about it or just turn it around?

15          MR. MAKOFKA:  I think if she turned it around and

16  we didn't say anything about it, that would be fine.

17          MR. TALBOT:  Okay.

18          THE COURT:  That would be fine.  Let me ask you --

19  I just want to make sure it's clear on the record.

20  Obviously, both of you left Mr. Beverly on the jury, who is

21  my former law partner.  I assume you made whatever judgments

22  you want to make.

23          But I want to make sure that both parties are on

24  the record as understanding that Mr. Beverly and I were law

25  partners for probably close to ten years, and I've known him

1   for 15 or 20 years.  I consider him a good friend of mine.

2          I'm not uncomfortable with it.  I don't think

3   there's any legal basis for him not to be on the jury.  But

4   I just didn't want there to be any issue about it later on.

5   So, again, I assume you all understood that when you left

6   him on there.

7          But, Mr. Makofka, do you understand that?

8          MR. MAKOFKA:  Yes.

9          THE COURT:  And you're comfortable?

10         MR. MAKOFKA:  Very comfortable.

11         MR. TALBOT:  Clear and comfortable.

12         THE COURT:  All right.  I'm just going to -- if

13   you'll talk to your agent about that and then we'll proceed

14   straight to opening.

15         (The following proceedings occurred in open court)

16         THE COURT:  Ladies and gentlemen, before

17   Mr. Talbot begins his opening, I'm going to pass out these

18   note pads.  And what I'll ask you to do with them is write

19   your name on the first page so that when we're collecting

20   them we can give them back to you and you'll be able to get

21   your same pad back every time.

22         And, again, that's totally optional.  I've already

23   given you the instruction on that.  And we'll wait a moment

24   so everybody gets one before I'll recognize Mr. Talbot.

25         Everybody got one?

1           Okay.  Then, Mr. Talbot, on behalf of the

2    government, you may proceed with opening statement.

3           MR. TALBOT:  Thank you, Your Honor.  Good

4    afternoon, members of the jury.  This case began on August

5    30th, 2002, out at Jacksonville Beach, here in Duval County,

6    Florida.

7           This case started when Detective Branscom with the

8    Jacksonville Beach Police Department got a phone call from a

9    confidential informant.

10          Now, this particular confidential informant is

11   somebody that Detective Branscom had worked with before.

12   And the arrangement was that the confidential informant

13   would come in and then the confidential informant would be

14   paid for his services.

15          Some confidential informants are arrested and work

16   off charges.  This particular confidential informant was

17   being paid for his services somewhere between 80 and $100

18   for the work he did for Jacksonville Beach Police Department

19   on August 30, 2002.

20          Now, he came into the police department -- the CI,

21   as I'll call him, met with Detective Branscom.  And the

22   object of their meeting that evening was that the CI would

23   try and contact somebody and arrange to purchase some, in

24   this case, crack cocaine from that individual.

25          Detective Branscom gave the CI his cell phone,

1  Detective Branscom's cell phone, and the CI called up

2  somebody -- Detective Branscom didn't know who he was

3  calling up -- to arrange to buy some crack cocaine.

4        An arrangement was made and the meeting was going

5  to take place at the McDonald's out at Jacksonville Beach.

6  So Detective Branscom and the CI get in their surveillance

7  vehicle.  I think it's a van or a Suburban, something like

8  that.  And they're going out to park near the parking lot

9  there at the McDonald's.

10        Now, the CI is searched and -- to make sure he

11  doesn't have any narcotics on him or any weapons or anything

12  illegal.  He's searched and he's clean.  A wire is put on

13  the CI so that Detective Branscom can listen and see what's

14  going on.

15        I'm going to tell you up front in this particular

16  case the wire didn't work.  So the tape-recording that was

17  made didn't work, as far as that wire goes.

18        The CI gets the wire and gets $60 to purchase the

19  crack cocaine.  The CI gets out of the van and walks up.

20  And the CI is sort of milling around the parking lot in

21  McDonald's waiting for this person who he's called to show

22  up.

23        A short time goes by and a burgundy vehicle, older

24  model vehicle, pulls into the parking lot.  And Detective

25  Branscom is watching this.

1        Now, Detective Branscom also has a video camera in

2   his van.  And the video camera malfunctioned also.  You'll

3   get to see the part of the video camera that worked.  We get

4   a little of the start and get a little of the end, but we

5   don't get the middle part.  You'll get to see what there is

6   to see.  But the videotape malfunctioned.

7        The CI is waiting in the parking lot.  The maroon

8   car pulls up.  Detective Branscom sees an individual who's

9   later identified as Marco Gaines and wearing a red football

10  jersey.

11       He sees Marco Gaines exit this maroon car and go

12  up toward the McDonald's.  The CI comes and appears to get

13  into this maroon car.

14       Now, we don't know who's inside the maroon car at

15  that point in time.  The CI gets in.  He's in the car for a

16  very brief period of time, less than a minute.

17       The CI comes back out of this maroon car.  He

18  walks back to where Detective Branscom is.  And he hands

19  Detective Branscom what you will see as an exhibit that is

20  crack cocaine, about half a gram of crack cocaine.

21       As the CI is walking back Detective Branscom sees

22  Marco Gaines, the guy in the red football jersey -- and

23  you'll see this on the tape.  Sees the guy in the red

24  football jersey coming back to the car.

25       And then the person that gets out of the car --

1    after Marco Gaines walks back up, the person that gets out

2    of the car is Algie Moore.  The car is registered to Algie

3    Moore.

4             Algie Moore and Marco Gaines walk into the

5    McDonald's there.  And they're in there for about five

6    minutes.  When they come back out Detective Tator, with the

7    Jacksonville Beach Police Department, and Corporal Bacon --

8    Bacon and Tator, okay, easy to remember -- they follow Algie

9    Moore.  They're in an unmarked police car.  And so they

10   follow Algie Moore, who's the driver, and Marco Gaines,

11   who's the passenger, as they leave McDonald's.

12            As they're heading out of McDonald's, they radio

13   for a marked unit to come make a traffic stop on the

14   vehicle.  Keith Dorough is the marked unit for Jacksonville

15   Beach Police Department.  He's also a K-9 officer.  He comes

16   in and makes a traffic stop on Algie Moore.

17            He walks up to the car and Algie Moore is the

18   driver.  As it turns out, Algie Moore has also got a

19   suspended driver's license.  And he gets arrested right

20   there and he's taken out of the car.

21            Marco Gaines is in the passenger seat.  Algie

22   Moore is wearing a white T-shirt and blue jeans and Marco

23   Gaines is the one wearing the red football jersey.

24            Algie Moore is taken and he's put into Officer

25   Dziedzicki's patrol car.  He can't be put in Officer

1   Dorough's car.  So he gets put in Officer Dziedzicki's

2   patrol car.

3           Marco Gaines is also taken out of the passenger

4   side of the car.  Some time goes by and off -- well,

5   actually, Officer McMinn gets there right away.

6           At some point after this stop, Officer McMinn is

7   the one who begins a detailed search of the vehicle.

8   There's several people that, you know, shine flashlights in,

9   sort of looking around.  Detective Tator is there, Corporal

10  Bacon, Officer McMinn.  Officer McMinn has a training

11  officer there.  Keith Dorough is there.

12          Eventually ATF Agent Shannon Desmond shows up and

13  then the Jacksonville Beach Police Detective Matt Robinson

14  shows up.  So a lot of people are here at the scene.

15          But it's Officer McMinn that eventually is the one

16  tasked with making a detailed search of the vehicle.  He

17  starts on the passenger side and he works his way around to

18  the driver's side.

19          Once he gets to the driver's side he notices that

20  the -- the door hardware, sort of that plastic thing on the

21  inside of the door that's got the armrest and everything

22  else, is rattling.

23          He looks at it, you know, closer and he sees --

24  and you'll see a picture of it -- that the armrest where the

25  driver's armrest would go, in the back side of it there's a

1    cut-out hole.

2              Inside that cut-out hole, down in this armrest --

3    it takes them a while to get it out -- there is a film

4    cannister with about one and a half grams of crack cocaine

5    inside.  So there's more crack cocaine in this armrest.

6              On the driver's floorboard in the vehicle -- and

7    you'll see pictures of this, too -- near the parking brake

8    -- there's a foot pedal parking brake down on the floorboard

9    -- underneath the carpet -- the carpet has been pulled back

10   and you'll see -- you'll also see an orange cable that goes

11   to some amplifiers in the car.  But you'll see that in this

12   picture.

13             Down underneath this carpet there is a firearm.

14   And it is -- it's a Jennings .22.  And it's loaded and

15   chambered.  And it's right down there underneath this

16   carpet.

17             Officer McMinn seizes the crack cocaine once he

18   finds it and it's placed in Officer Dorough's vehicle and

19   it's eventually turned over to Matt Robinson.  That's sort

20   of the chain of custody of that.

21             The firearm is collected by Shannon Desmond from

22   the Bureau of Alcohol, Tobacco and Firearms.  That's taken

23   into her custody.

24             Now, Algie Moore is -- he's arrested and he's back

25   in Officer Dziedzicki's patrol car.  Eventually Marco Gaines

1    is also placed in the patrol car and the two of them are

2    taken to the Jacksonville Beach Police Department.

3              Once they get to the police department Officer

4    Dziedzicki sees Algie Moore trying to talk on the phone.

5    He's handcuffed and he's able to work the phone up so he can

6    try and talk on the phone.

7              Officer Dziedzicki takes the telephone away from

8    him and puts it up on the counter at the police station

9    outside the holding area.

10             Detective Branscom comes along and gets that

11   telephone.  And that telephone is an item of evidence that

12   you'll get to see.

13             Photographs were taken of that phone by Matt

14   Robinson later on, some months later.  But at the time

15   Detective Branscom looks on Algie Moore's cell phone and

16   sees his phone number that's been dialed to that phone at

17   8:34, approximately, before the drug deal was arranged.

18             So the inference, of course, is that Detective --

19   remember, Detective Branscom's cell phone was used to call

20   an unknown individual.  That cell phone is in the possession

21   of Algie Moore.  And that's seized in evidence and you'll

22   get to see that and see the pictures of it.

23             $60 was paid for the crack cocaine.  Jacksonville

24   Beach did not take any money away from Algie Moore or Marco

25   Gaines that night on August 30th.

1          You'll get to see jail records on August 30th,

2    2002, when Algie Moore is booked into the -- the

3    Jacksonville Sheriff's Office jail here in Duval County.  He

4    has over $90 on him.

5          The only other person in the vehicle is Marco

6    Gaines.  Marco Gaines also goes to jail that night.  And

7    when Marco Gaines gets booked into the Jacksonville

8    Sheriff's Office jail he has 91 cents on him.

9          So that's an important piece -- even though the

10   serial numbers are not matched up on the money, that's how

11   much they have respectively going into the jail.

12         You'll hear several witnesses that -- in fact, we

13   have quite a few in this case.  They're expert witnesses.

14   Four of them work for the Florida Department of Law

15   Enforcement.  Two of them are chemists.  One of the chemists

16   tested the crack cocaine that was purchased by the CI.  The

17   other chemist tested the crack cocaine that was found inside

18   the door.

19         And they both test positive for crack cocaine.

20   And you'll get the various weights of that.  It's not a lot

21   of crack cocaine, just a few rocks, but it is crack cocaine.

22         Also, there's a fingerprint expert that tested the

23   gun, tested the film cannister, tested the bullets, tested

24   the magazine.  Pretty much anything we could take a

25   fingerprint off of.  We didn't find anything.  Of course,

1  that's the bottom line of that.  But you'll hear that

2  testimony from that expert.  Also, we have a firearms expert

3  who test fired the firearm in question.  And it is a

4  functioning firearm.

5          Also, one of the elements that I want you to

6  listen to evidence for and facts for is whether or not the

7  firearm traveled in interstate commerce.  That's an element

8  in a federal case for a felon possessing a firearm.

9          This particular firearm did travel in interstate

10  commerce.  I can't remember which state.  I think it was

11  California that it was manufactured in.  So it --

12  manufactured in California.  By definition it had to travel

13  interstate commerce.  But listen for evidence of that.

14          I want to tell you at the outset that this is not

15  a perfect case.  And I say that because I want you to listen

16  very carefully to the witnesses on the stand.

17          Whether there is sufficient evidence in this case

18  beyond and to the exclusion of a reasonable doubt is going

19  to come from the witnesses and what they say.

20          So I urge you to pay close attention to their

21  testimony, how they testify, what they say, what their

22  memory is.  There are some things that the Jacksonville

23  Beach Police Department did wrong.  No question.

24          Audio didn't work.  Video doesn't work.  They

25  didn't mark the serial numbers on the money and seize that

1  later.   There's some things they didn't do perfect.   It's

2  not a perfect case.   But at the end of the case you'll see

3  that there is sufficient evidence there beyond a reasonable

4  doubt.   But listen carefully to the witnesses, because the

5  case will be made there or not made there.   Thank you.

6           THE COURT:   Thank you, Mr. Talbot.

7           Mr. Makofka, do you wish, on behalf of Mr. Moore,

8  to make an opening?

9           MR. MAKOFKA:   I do, Your Honor.

10          THE COURT:   You may proceed, sir.

11          MR. MAKOFKA:   Thank you.   May it please the Court.

12  Respective counsel, ladies and gentlemen of the jury, good

13  afternoon.   I know we've already met sort of informally,

14  but, again, I'm David Makofka.   I just wanted to take a few

15  minutes to thank you for coming out this morning.

16          I know if you're anything like me, you probably

17  left your homes in the rain to get here, and we want to

18  thank you for doing so.

19          And let me just jump right in by saying that it is

20  my distinct pleasure to address you this afternoon on behalf

21  of Mr. Algie Moore, who's the young man seated at the table

22  with me.   And he'll be with me throughout the course of the

23  trial.

24          And I sort of want to open by talking to you about

25  the fact that I can appreciate what the government's just

1    said, and I appreciate the candor of the government's

2    attorney when he indicated to you that this is, in fact, not

3    a perfect case.  And I think that's where we're going to

4    start our presentation this afternoon, by telling you that

5    we agree this is not a perfect case from the government's

6    perspective.  We think it is a very strong case from the

7    defense perspective.  And we're going to tell you why.

8            But, first, I'd like to sort of ask each and every

9    one of you if you could just put what you heard aside for a

10   second.  And as the Court has indicated to you, try to keep

11   an open mind as you listen to all this.

12           You're going to hear that Mr. Moore is a young man

13   who's 21 years of age.  He's from the local Jacksonville

14   Beach community.  He's lived there pretty much his whole

15   life.

16           And we expect that it will come out that Mr. Moore

17   is not -- well, he has not led a perfect life.  He's been a

18   troubled youth.  And you're also going to hear that in the

19   past, unfortunately, he's one of the people in our community

20   that has sustained a -- or been found guilty of a felony

21   crime.

22           We want to tell you that up front.  It's

23   important, because one of the charges that you've been

24   advised about deals with a felon being in possession of a

25   firearm in violation of federal law.

1        And up front we want to tell you that, that we're

2   admitting that he is a convicted felon.  But you're going to

3   learn that with respect to the felony conviction Mr. Moore

4   has sort of done what he was supposed to do.  And he's been

5   back in society and he's been living relatively trouble free

6   with his grandmother out in Jacksonville Beach prior to the

7   evening of August 30th of last year.

8        And to that end, let me make a few comments about

9   the law enforcement community out there.  I don't know how

10  many of you have been there.  And it really doesn't matter.

11  I think the evidence will very clearly show that we're

12  talking about a very tight-knit group of law enforcement

13  officers out there, a smaller law enforcement community.

14       And I say this because you're going to hear that

15  Mr. Moore, for whatever reason, has had -- I don't want to

16  put too fine a point on this, but continual brushes with the

17  law with the same group of individuals year after year after

18  year.

19       Now, on the surface some of you may be thinking,

20  Well, why is this lawyer telling us that his client has had

21  trouble with the law?  I'm telling you this up front because

22  it's essential to our theory of the defense case that these

23  individuals over time, for whatever reason, have developed,

24  we believe, some type of an animus, some type of bias

25  against Mr. Moore, or what have you.  And we think the

1   evidence will clearly bear that out.

2           And, in particular, you've heard that there is an

3   officer involved in this case.  His name is Keith Dorough.

4   He's a K-9 officer who drives around in his car, has a dog,

5   and he effectuates traffic stops and that kind of thing.

6           You're going to hear -- and we'd ask you to pay

7   particular attention to Officer Dorough's testimony, because

8   he's central in this case.

9           Officer Dorough -- you recall from the

10  government's opening statement, he's the officer that shows

11  up after the alleged drug sale and he effectuates the

12  traffic stop on Mr. Moore, pulls him over.

13          And Officer Dorough, along with another officer,

14  Dave McMinn, began basically to proceed to search the

15  defendant's car after he's arrested for driving on a

16  suspended driver's license.

17          And I say this because the government has

18  indicated to you that Dave McMinn is central in conducting

19  the search in this case.

20          Well, ladies and gentlemen, two sides to every

21  story.  We're here to tell you that's not, in fact, the case

22  at all, that Officer Dorough is the first on the scene,

23  Officer Dorough is the first to get in the car, and he is

24  central in conducting the search.

25          And it would be our position and we believe the

1  evidence will show that McMinn was sort of just there.

2  That's not to say that McMinn didn't find some items in the

3  vehicle.

4         We're just telling you we think Officer Dorough

5  had a much bigger role than what the government has

6  indicated to you.

7         And I want to talk about Officer Dorough just a

8  little bit more.  He's more than just a K-9 officer.  You're

9  going to hear this Officer Dorough -- and I won't get into

10 too many details at this juncture, because you'll hear his

11 testimony.

12        Officer Dorough has had a history with his

13 Jacksonville Beach Police Department agency of police

14 misconduct relating to acts of dishonesty.

15        Okay.  And we'd like you to pay close attention to

16 that testimony.  Because we submit, ladies and gentlemen,

17 that what you will hear will shock you, quite frankly.  And

18 that is as to Officer Dorough.

19        Additionally, we'd ask you to pay attention in

20 relation to Officer Dorough and see if he testifies

21 regarding an incident that occurred back in 1999 involving

22 this gentleman right here.

23        See if there's any reason there for him to dislike

24 Mr. Moore.  We'd also, along the same line, suggest to you

25 that when you hear Detective Robinson testify that you'll

1  also keep the same set of operative facts in your minds,

2  because we submit to you that Detective Robinson, like

3  Detective -- or Officer Dorough has a reason to dislike

4  Mr. Moore.

5          It's unrelated to these events.  It's back in 1999

6  something happened.  And you're going to hear about it.

7  We'd also ask you to pay particular attention to the fact

8  that the government will not call any witness into this

9  courtroom, ladies and gentlemen, and talk to you about,

10  first of all -- they can tell you that they saw the

11  defendant selling drugs hand to hand with a confidential

12  informant or anybody.

13          They cannot call one witness to come in and say

14  that.  And we want you to see if they do call a witness

15  along those lines.

16          Also, see if they call a witness into this

17  courtroom to tell you that they personally observed the

18  defendant ever touching, possessing, holding, storing, what

19  have you, a firearm.

20          We challenge the government to do that.  Because

21  we contend that there are no such witnesses on the face of

22  this planet that can tell you anything like that.

23          Additionally, there are a few other matters and

24  then I'll sit down.  We'd like you to pay close attention to

25  the videotape of the alleged drug sale.

1          And the government has told you it's not a

2    continuous tape.  It stops, starts, stops, starts.  And we

3    submit that the critical portions of the videotape that are

4    supposed to show the transaction don't.

5          They show maybe some things occurring before the

6    transaction or maybe some things occurring after the

7    transaction.  But they don't show the important parts.

8          The government has told you that it's

9    malfunctioned.  The same with the audiotape that we don't

10   anticipate you hearing.  That malfunctioned as well.  So

11   that's not available for your consideration.  But we'd ask

12   you, as to the video, to watch it carefully and listen

13   carefully to what is said.

14         Something the government, for whatever reason, did

15   not tell you is that there is a videotape of Mr. Moore in

16   the back of Patrolman Dziedzicki's car -- I know I'm

17   probably mispronouncing his name -- after Mr. Moore was

18   taken into custody, that is by Officer Dorough or others.

19   He's placed in the back of the patrol car.  There's a

20   videotape running.  Okay?

21         And he's sitting in the back of the car and one of

22   the things you'll see on the tape -- well, you won't see it,

23   but you'll hear it very clearly -- is Mr. Moore initiating a

24   cell phone conversation.

25         Now, ladies and gentlemen, this is critical

1  evidence.  And we'd ask you to listen to this very

2  carefully.  We're going to play this on our case.  This

3  isn't part of their evidence.  This is something they

4  provided to us.  They chose not to play.  We want you to

5  hear it.

6         Because what you hear on the audio portion of that

7  tape is interesting.  You will hear Mr. Moore call his

8  mother.  And it's our position up front that Mr. Moore

9  doesn't know he's being videotaped and audiotaped.  And he

10  has a conversation with his mother.

11         And she'll be a witness in this case to verify all

12  of this.  But see if in his conversation with his mother he

13  does not act in a manner that's inconsistent with somebody

14  who's just been pulled over with drugs in the car and with a

15  gun in the car.  We'd ask you to pay close attention to that

16  as we play it in our case.

17         Also, one other point that I think is critical.

18  The government told you that the drug transaction at the

19  McDonald's took place with the use of a confidential

20  informant, a person that they wire up, give some money to,

21  and he goes and trots off and buys drugs from people.

22         Did you feel like you were missing something?  The

23  government didn't tell you they were going to call him as a

24  witness.

25         MR. TALBOT:  Objection.  Argumentative.

1              MR. MAKOFKA:  I can rephrase it, Your Honor.

2              THE COURT:  Why don't you do that.

3              MR. MAKOFKA:  The government never indicated that

4    they would call the confidential informant as a witness.

5    Well, ladies and gentlemen, we'll call him on our case to

6    tell you a little bit about what happened that night.

7              And we'd ask you to give him your full attention.

8    Above all, in this kind of a case, especially where, you

9    know, there's multiple counts and there's going to be all

10   kinds of testimony and all kinds of evidence, we'd ask that

11   you sort of keep an open mind, as the Court has asked you to

12   do, and, you know, reserve judgment until you've heard

13   everything.

14             We think this is going to be an interesting case

15   for all of you.  And we submit that after you've heard

16   everything you will return a verdict of not guilty as to all

17   counts.  Thank you.

18             THE COURT:  Thank you, sir.  Before we begin the

19   actual calling of witnesses on the government's case, does

20   either party wish to invoke the rule?

21             MR. MAKOFKA:  The defense would invoke the rule,

22   Your Honor.

23             THE COURT:  All right.  That will be fine.  If

24   both of you will instruct your witnesses accordingly.

25             And, Mr. Talbot, are you prepared to proceed with

1  the government's case?

2  　　　　MR. TALBOT:  I am prepared to proceed forward.

3  However, Your Honor, if you want me to take a minute or two,

4  I have witnesses upstairs and downstairs.  Or I can just

5  advise them on my next break.

6  　　　　THE COURT:  Well, let's do this.  We haven't been

7  going that long, but the jury probably wouldn't mind a

8  little break anyway and give you a chance to get your ducks

9  in a row.

10  　　　　And if you would -- the rule that we'll invoke is

11  that the witnesses should not discuss their testimony during

12  the course of the trial with anyone and that the witnesses

13  should not -- anybody who's going to be a witness in the

14  case should not be in the courtroom until -- at least until

15  their testimony has been concluded.

16  　　　　Obviously, the admonition against discussing it

17  with anyone does not necessarily apply to the lawyers.  As

18  you all know -- you all know what the rules are with respect

19  to that, but I do have a rule that once a witness has been

20  tendered for cross-examination that there should be no

21  discussion until the witness is tendered back on redirect.

22  　　　　But other than that, it would just be governed by

23  the rules of ethics and privilege.  So why don't we --

24  ladies and gentlemen, let's take a break.

25  　　　　This will be kind of our afternoon break.  It's a

 1  little bit early.  But let's take ten minutes.  So we'll

 2  reconvene at no later than 2:30.

 3           I will, as I will the whole time, ask you not to

 4  discuss the case with anybody or let anybody discuss it with

 5  you during the course of the case.  And feel free to,

 6  obviously, use the facilities, or there's a vending machine

 7  downstairs, or step outside for a moment if you want to get

 8  some fresh air.  But I will ask everybody to be back and

 9  ready to go at 2:30.

10           You'll go into the jury room, by the way, and the

11  officer will show you -- so you'll go into the jury room and

12  then we call you out when it's time.  That's the way it will

13  work from now on.  Okay?  All right.  We'll take a recess.

14           COURT SECURITY OFFICER:  All rise for the jury.

15           (Recess, 2:18 p.m. to 2:30 p.m.)

16           THE CLERK:  All rise.  This Court is again in

17  session.  Be seated, please.

18           THE COURT:  All right.  We ready for the jury?

19           MR. TALBOT:  Yes, sir.

20           MR. MAKOFKA:  Yes, Your Honor.

21           COURT SECURITY OFFICER:  All rise for the jury.

22           (Jury in, 2:35 p.m.)

23           COURT SECURITY OFFICER:  Please be seated.

24           THE COURT:  All right.  Ladies and gentlemen,

25  we're actually going to begin the evidence phase of the

1   trial.  The government has the burden of proof.  And so it

2   begins the case.

3         And, Mr. Talbot, are you ready to proceed?

4         MR. TALBOT:  Yes, Your Honor.

5         THE COURT:  And what would you like to do?

6         MR. TALBOT:  The United States would call Michael

7   Branscom.

8         THE CLERK:  Come forward, please.  Raise your

9   right hand.  Do you solemnly swear to tell the truth, the

10  whole truth, and nothing but the truth, so help you God?

11        THE WITNESS:  I do.

12        THE CLERK:  Thank you.  Have a seat, please.  And

13  please state your name and spell your last name for the

14  record, please.

15        THE WITNESS:  Michael Lynn Branscom.  Last name is

16  B-r-a-n-s-c-o-m.

17        THE COURT:  You may proceed, sir.

18        MR. TALBOT:  Thank you, Your Honor.

19                **MICHAEL LYNN BRANSCOM,**

20  having been produced and first duly sworn as a witness,

21  testified as follows:

22                **DIRECT EXAMINATION**

23  BY MR. TALBOT:

24  **Q.**    Mr. Branscom, how are you employed?

25  **A.**    Detective, Jacksonville Beach Police Department.

1   Q.      And how long have you been a detective with the

2   Jacksonville Beach Police Department?

3   A.      Approximately four years.

4   Q.      And do you have any prior law enforcement experience

5   before that?

6   A.      Yes.  I've been with the Jacksonville Beach Police

7   Department for over 12 years.  Prior to that I had a year

8   and a half experience at Fernandina Beach Police Department.

9   And a little bit over a year's experience prior to that, the

10  Nassau County Sheriff's Office.

11  Q.      All right.  So you've had four years as a

12  detective --

13  A.      Yes, sir.

14  Q.      -- with Jax Beach?  But you've been with them longer

15  than that?

16  A.      Yes, sir.

17  Q.      What is your current assignment with Jacksonville

18  Beach Police Department?

19  A.      I work with a community response team.

20  Q.      And what does that involve?

21  A.      We work everything from beach patrol to vice,

22  narcotics, organized crime.

23  Q.      Now, Jacksonville Beach Police Department, is that

24  within Duval County?

25  A.      Yes, sir, it is.

1  Q.     Okay.  But your jurisdiction is not of the entire

2  Duval County area?

3  A.     No.  Our jurisdiction is just the city limits of

4  Jacksonville Beach.

5  Q.     Okay.  And approximately how many officers work at

6  Jacksonville Beach Police Department?

7  A.     Fully staffed we have, I think, now 56.

8  Q.     Okay.  I want to direct your attention to August 30,

9  2002.  Were you working as a detective with Jacksonville

10 Beach on that day?

11 A.     Yes, I was.

12 Q.     Okay.  And particularly that evening, did you have

13 any contact with a confidential informant?

14 A.     Yes, I did.

15 Q.     Okay.  What was the contact that you had?

16 A.     The confidential informant contacted me and stated

17 that he had someone he could possibly purchase some crack

18 cocaine from.

19 Q.     Okay.  Did this confidential informant come see you

20 in person or was this over the phone?

21 A.     He -- what he'd normally do will come to the front of

22 the police department, use the pay phone, call me and let me

23 know he's there, and then I'll go to the station and get

24 him.

25 Q.     Okay.  When you first talked to him on the evening of

1  August 30, 2002, was it over the telephone or was it in

2  person?

3  **A.**      I believe that night he had called and -- to let me

4  know he was in the front lobby of the police department.

5  And I went out and got him.

6  **Q.**      Okay.  This confidential informant, was that someone

7  you had worked with prior to August 30, 2002?

8  **A.**      Yes.

9  **Q.**      Okay.  Approximately how many times?

10  **A.**      I would say 15, 16 times or more.

11  **Q.**      And was this confidential -- I guess what was the

12  deal this particular night, on August 30?  Was he working

13  off charges or was he going to get paid or --

14  **A.**      He was going to be paid.

15  **Q.**      And how much was he paid?

16  **A.**      I think that night, I think, I gave him 20 or 40, I

17  can't remember, dollars.

18  **Q.**      I guess I was under the impression it was closer to

19  $100.

20  **A.**      100?  I -- after doing as many deals with him, I

21  can't remember exactly how much it was that night.

22  **Q.**      Okay.  Would it be unusual for him to get $100?

23  **A.**      No.

24  **Q.**      Okay.  So he's been paid up to $100 or --

25  **A.**      Yes.  Yes, he has.

1  Q.     Okay.  And I guess all added up he's been paid a lot

2  more than that?

3  A.     Yes, he has.

4  Q.     Okay.  But on this particular night you're not

5  certain what the amount was that he was going to get paid?

6  A.     Right.

7  Q.     Okay.  When he got to the station, what happened?

8  A.     Well, he got all the -- brought him back and he said

9  that he had gotten some numbers.

10          MR. MAKOFKA:  I object.  Hearsay.

11          MR. TALBOT:  Okay.

12 BY MR. TALBOT:

13 Q.     Don't tell me what the confidential informant said.

14 A.     Oh, I'm sorry.

15 Q.     Just tell me what happened.  What did the two of

16 y'all do?

17 A.     Well, he had a phone number to a subject that he knew

18 of the street name of Wax.  I said, Well, can you call this

19 guy and see if we can order some cocaine, some crack?  And

20 he said, Yeah, we'll give him a call.

21 Q.     Okay.  Was this -- did you know this person named

22 Wax?

23 A.     No.  I wasn't sure who he was talking about at that

24 time.  All he knew was his street name was Wax.

25          MR. MAKOFKA:  I'll object to what he knew, Judge.

1          THE COURT:  That's sustained.  Just ask the

2   question, Mr. Talbot, a little different way.

3          MR. TALBOT:  Okay.

4   BY MR. TALBOT:

5   Q.    Did you know the person named Wax?

6   A.    No.

7   Q.    Had you ever heard of the name Wax before?

8   A.    No.

9   Q.    Now, you mentioned a telephone call.

10  A.    Yes.

11  Q.    Did a telephone call take place?

12  A.    Yes, it did.

13  Q.    And what happened with the telephone call?

14  A.    The CI made the call using my cell phone to the

15  subject named Wax to set up a deal, a purchase of crack

16  cocaine in the parking lot of McDonald's on 3rd Street South

17  in Jacksonville Beach.

18  Q.    What is your cell phone number?

19  A.    838-2074.

20  Q.    I guess let me be specific.  What was your cell phone

21  number on August 30, 2002?

22  A.    838-2074.

23  Q.    Is that still your cell phone today?

24  A.    Yes, it is.

25  Q.    Now, approximately what time was this phone call

1  made?

2  A.    I can't -- without my report, I can't recall exactly

3  what the time was --

4  Q.    Okay.

5  A.    -- the approximate time.

6  Q.    Was it dark outside?

7  A.    The best I can recall, yes.

8  Q.    Okay.  We'll move on and come back to that.  Now, the

9  phone call that the confidential informant made, did you

10 listen in on that phone call?

11 A.    Well, I listened the best I could with him standing

12 there speaking.

13 Q.    Okay.  So you just heard one half of the

14 conversation?

15 A.    Yes.

16 Q.    Were you able to hear the person that was supposedly

17 being called on the other end of the phone?

18 A.    Barely.

19 Q.    Okay.  So you wouldn't be able to testify as to what

20 was said to the CI by supposedly --

21 A.    No.  Not by being able to hear it.  No, sir.

22 Q.    Did there appear to be somebody on the other end of

23 the phone?

24 A.    Yes.

25 Q.    Okay.  This wasn't a situation where the CI just

1    dialed up nobody and just was acting like he was...

2    A.      Right.  No, I could...

3    Q.      You could hear somebody on the other end?

4    A.      Yes.

5    Q.      What happened after the deal was set up?  What's the

6    next thing that happened?

7    A.      Well, I searched my confidential informant.  He was

8    found free of any contraband.

9    Q.      How did you search him?

10   A.      I patted him down, had him take everything out of his

11   pockets, make sure he was free of contraband.  After that we

12   got in our surveillance vehicle and I drove.  And I drove

13   him down from across the parking lot at McDonald's.

14   Q.      Okay.  Did you park in the parking lot at McDonald's?

15   A.      No.  Where I parked was actually on 1st Avenue South,

16   on the south side of the street.

17   Q.      Okay.  And how did you park your vehicle?

18   A.      I pulled it in facing south.  I pulled it straight

19   in.

20   Q.      Okay.  What part -- was your vehicle facing

21   McDonald's or...

22   A.      No.  The back end was facing McDonald's.

23   Q.      Okay.  And how many people drove or rode with you to

24   the McDonald's or across from the parking lot?

25   A.      Just one, the CI.

1  Q.    Just the two of y'all?

2  A.    Yes.

3  Q.    Okay.  And I just want to clarify.  You said you

4  searched the CI for contraband?

5  A.    Yes.

6  Q.    Did you find any?

7  A.    No, I did not.

8  Q.    How carefully did you look?

9  A.    Well, I checked him fairly carefully, made sure he

10 didn't have anything on him.

11 Q.    Okay.  You got to the parking lot across from

12 McDonald's.  What happened there?

13 A.    When we pulled in I handed him the money to make the

14 purchase with.

15 Q.    How much money did you hand him?

16 A.    60.

17 Q.    Okay.  Did you photocopy that money or mark the

18 serial numbers or anything like that?

19 A.    No, I did not.

20 Q.    Okay.  What happened next?

21 A.    I gave him a wire device to put on.  I had him exit

22 the vehicle and go over into the parking lot and wait.

23 Q.    Okay.  What was the wire device?

24 A.    It was just a small -- looked like a little pager.

25 Q.    Okay.  And what does it do?

1   A.      It's a wireless device that you can hear -- like you

2   can hear me now through this, except it's wireless.  So I

3   can listen in for a conversation, see what's going on, make

4   sure everything's going okay.

5   Q.      Were you able to listen in as this deal went down?

6   A.      No.  It wasn't working very well that night.  The

7   weather wasn't very good.  And the -- the recording I was

8   getting -- or the feedback I was getting was fairly

9   scratchy.

10  Q.      Okay.  So the -- is it fair to say that the -- that

11  that tape you made is of no evidentiary value?

12  A.      No, sir.

13  Q.      Okay.  You gave the CI this wire.  What happened

14  after that?

15  A.      I gave it to him, had him exit the vehicle.  And he

16  went over to the McDonald's parking lot and stood up near

17  where the pay phone is beside McDonald's.

18  Q.      Okay.  Did the deal go down right when he got to the

19  parking lot?

20  A.      No.  It was a few minutes later.

21  Q.      Okay.  Did you know what type of vehicle -- well, let

22  me back up.

23          What was the arrangement?  Was this going to be

24  somebody coming in a car or on foot?  Or did you know?

25  A.      Yeah.  Yeah.  The best description I could get was it

1 was going to be a four-door maroon-type vehicle.

2 Q.    Okay.  So is that what you were looking for?

3 A.    Yes, it was.

4 Q.    And I've got the picture.  I've got you sitting there

5 watching the parking lot.  The CI is in the parking lot.

6 What happens next?

7 A.    Well, a short time later I see a maroon four-door

8 vehicle pull in.  I was in the van by myself and I was

9 trying to work the audio equipment and the video equipment.

10 So whenever I seen the car pull in, I started taping.  I had

11 a video camera and I started taping.

12 Q.    And what type of video camera was this?

13 A.    It's a handheld camcorder.  It's a Sony.

14 Q.    Were you holding it or was it on a tripod or...

15 A.    I was holding.

16 Q.    Okay.  You were holding.  And what was your intention

17 with the video camera?  What were you trying to do?

18 A.    I was just trying to capture the CI meeting with the

19 suspect.

20 Q.    Okay.  Now, you've seen the video in this case --

21 A.    Yes, I have.

22 Q.    -- is that correct?  And we'll introduce it in a

23 second.  But it seems incomplete.  Would you agree?

24 A.    Yes.  Yes.

25 Q.    Okay.  What happened with the video?

1  **A.**     Well, between trying to work the audio and the video,

2  which is kind of hard to do, and the vehicle I was in,

3  because I was having to move around to get -- to be able to

4  see the parking lot and all that, and my -- my skills with

5  trying to work both at the same time, I -- the time I moved

6  the camera away and then I hit the button and it stopped

7  recording, because I was reaching over to try to adjust the

8  volume of the wire so I could hear.

9  **Q.**     Would it be fair -- we'll call it operator error in

10 this case?

11 **A.**     Yes.

12 **Q.**     So your equipment didn't seem to malfunction,

13 but...

14 **A.**     Between trying to work two things at one time and

15 make sure I watch him and he's all right, yeah, it was

16 operator error.

17 **Q.**     Okay.  Now, the maroon car that pulled up in the

18 parking lot, did you watch that vehicle?

19 **A.**     Yes, I did.

20 **Q.**     And what happened when that vehicle -- well, I'm

21 assuming it pulled into the McDonald's parking lot.  Did it?

22 **A.**     Yes, it did.

23 **Q.**     All right.  What happened when it pulled into the

24 parking lot?

25 **A.**     Well, when the car pulled in there was a BM, got out

1  of the car, started walking up to the door of the

2  McDonald's.  Then my CI walked over to that vehicle and it

3  appeared he got in the vehicle.

4  Q.     Okay.  The person that walked from the car up to the

5  McDonald's, describe that person.

6  A.     He was wearing a -- a maroonish red kind of jersey,

7  appeared to be about five, six, five, seven.

8  Q.     Okay.  And was this -- was it a male, female?

9  A.     It was a male.  I'm sorry.

10  Q.     Okay.  White male, black male?

11  A.     Black male.

12  Q.     Okay.  And you saw this person -- did you see this

13  person actually get out of the maroon car?

14  A.     Well, from where I was sitting, he appeared up,

15  because there was a car parked beside where the suspect

16  pulled in beside another car.  He appeared.  And I seen him

17  walk up towards the side of McDonald's.

18  Q.     Okay.  And that was before the CI walked over to the

19  maroon car?

20  A.     Yes.

21  Q.     Okay.  Did you specifically see the CI go up to the

22  maroon car, or was your vision blocked?

23  A.     Well, from where I was sitting, I could see where he

24  walked up to the side of a car.  And it appeared where

25  the -- that car had pulled in -- I saw him.  I could see his

1   head and then he disappeared.

2   Q.      Who's he?

3   A.      I'm sorry, the CI.  I could see the CI's head walk up

4   to the side of the car, then he disappeared for a short

5   time.  And then I could see his head appear.

6   Q.      Okay.  How long did the CI appear to be in the

7   vehicle?

8   A.      Probably less than a minute and a half.

9   Q.      Okay.  Was it -- so not very long period of time?

10  A.      No.  Not very long at all.

11  Q.      Okay.  Could it have been less than a minute?

12  A.      Yeah.  Very well possibly could be.

13  Q.      What happened after the CI left the maroon car?

14  A.      Well, the CI got out, walked up.  And he was going to

15  walk over to my location.  But then the other BM started

16  coming -- came back out.  The two BM's that was in the

17  vehicle --

18  Q.      What's a BM?

19  A.      I'm sorry.  Black male.  I'm sorry about that.  Black

20  male.  The two black males got up and they started to walk

21  up towards the McDonald's.  So my CI was just walking around

22  in the parking lot, because he didn't want to come directly

23  to me because they may see him.

24  Q.      Okay.  So what did you do?

25  A.      Well, I just sat there and watched.  And when the two

1  black males came back out, got in the vehicle, and started

2  pulling out, my CI came back to me in the surveillance

3  vehicle I was in.

4  Q.     Did you move your surveillance vehicle?

5  A.     After the deal was done, yes.

6  Q.     Okay.  After it was done?

7  A.     Yes.

8  Q.     Did you move your vehicle before the CI got back into

9  your vehicle?

10 A.     No.

11 Q.     Okay.  So you stayed in the same spot?

12 A.     Yes.

13 Q.     All right.  Were you able to see inside the maroon

14 car?

15 A.     No, I could not.

16 Q.     Okay.  Why not?

17 A.     Because where it was parked -- like I say, there was

18 a vehicle between me and that car.  So I could actually see

19 into the car.

20 Q.     Did the car have tinted windows?

21 A.     Best I can recall I believe it did.

22 Q.     Okay.  But you weren't in a position to see the

23 windows?

24 A.     No.

25 Q.     What happened when the CI got back to your vehicle?

1  A.      The CI came back to the vehicle, got in the vehicle,

2  handed me the drugs.  I placed them in a container.  And I

3  checked -- searched him again to make sure that he was free

4  of contraband, and --

5  Q.      Was he?

6  A.      Yes.  He was free of contraband.

7  Q.      Okay.  And what did the CI give you?

8  A.      He gave me pieces of suspected crack cocaine.

9  Q.      Okay.  What did you do with that suspected crack

10 cocaine?

11 A.      I put it in an envelope for safekeeping until I could

12 get to the -- back to the station and test it and weigh it.

13 Q.      Okay.  And what did you do with it after -- did you

14 take it back to the station?

15 A.      Yes, I did.

16 Q.      Okay.  What did you do with it at the station?

17 A.      When I got to the station I field tested it.  It

18 field tested positive.  I weighed it and I placed it in

19 evidence.

20 Q.      Okay.

21         MR. TALBOT:  Your Honor, may I approach the

22 witness?

23         THE COURT:  Sure.

24 BY MR. TALBOT:

25 Q.      Detective Branscom, I'm going to show you what's been

1  marked as Government's Exhibit No. 1.  If you would take a

2  look at that, please.

3  A.      Okay.

4  Q.      Do you recognize that?

5  A.      Yes, I do.

6  Q.      And how do you recognize that?

7  A.      It has my initials with my ID number on the back.

8  And it also has my name with my ID number on the front.  And

9  that's my handwriting.

10  Q.      Okay.  And what is this?

11  A.      Approximately 5.36 grams of crack cocaine.

12  Q.      Okay.  We've been discussing some crack cocaine in

13  this case.  Does this have any bearing on this case?

14  A.      Yes.  This is the crack that I received from my CI.

15  Q.      Okay.  If you would, please, open that up.  Okay.

16  What is that?

17  A.      That's the container that I put the crack cocaine in

18  whenever I received it.

19  Q.      Okay.  Let's open that.  Or is it open?  Is it loose

20  in there?

21  A.      Yes, it is.

22  Q.      Okay.  Take a look at that.  Does that appear to be

23  the crack cocaine that you remember from this case?

24  A.      Yes, it does.

25  Q.      Okay.  Obviously, you probably can't recognize it,

1  but it appears to be the same quantity?

2  **A.**     Yes.

3          MR. TALBOT:  Okay.  All right.  If we can get a

4  piece of tape.  I was sort of expecting there might be a

5  plastic bag.  If you'll just seal that up with that tape.

6  BY MR. TALBOT:

7  **Q.**     After you put this into evidence, was this

8  transmitted to the Florida Department of Law Enforcement?

9  **A.**     Once I dropped it, then later I think it was

10  submitted to be properly weighed and tested.

11  **Q.**     Okay.  Are there some markings on here that you don't

12  recognize from when you first submitted it?

13  **A.**     Yes, the -- these numbers here.

14  **Q.**     Okay.  Are there any other -- I mean, other than --

15  **A.**     That and the FDLE.

16  **Q.**     There's an FDLE stamp on it?

17  **A.**     Yes, there is.

18  **Q.**     Okay.  But somebody else would have done that?  You

19  didn't drive it over to FDLE yourself?

20  **A.**     No.  No, sir.

21  **Q.**     Okay.  But that is the -- are you certain that is the

22  crack cocaine that you got from the CI on August 30, 2002?

23  **A.**     Yes, it is.

24  **Q.**     Okay.

25          MR. TALBOT:  Your Honor, I would offer Exhibit 1

1  into evidence.

2            MR. MAKOFKA:  No objection.

3            THE COURT:  Exhibit 1 will be admitted.

4            (Government's Exhibit No. 1 was received into

5  evidence)

6            MR. TALBOT:  May I approach again?

7            THE COURT:  Yes, sir.

8  BY MR. TALBOT:

9  Q.      I'm going to show you what's been marked as

10  Exhibit 3 for identification.  If you could open that up.

11  Do you recognize that?

12  A.      Yes, I do.

13  Q.      And how do you recognize that?

14  A.      I saw it about ten to one today.

15  Q.      Okay.  We watched that videotape in my office?

16  A.      Yes, we did.

17  Q.      And is that the videotape that you attempted to tape

18  in this case on August 30, 2002?

19  A.      Yes, it is.

20  Q.      Okay.  I was going to say has it been altered any way

21  that you can tell?

22  A.      No, it has not.

23  Q.      Okay.  It's everything that you took or didn't take?

24  A.      Yes, it is.

25  Q.      Okay.

1          MR. TALBOT:  Your Honor, I would offer Exhibit 2

2     into evidence and request to publish.

3          MR. MAKOFKA:  No objection.

4          THE COURT:  You said 2.  I think it's actually 3.

5          MR. TALBOT:  I'm sorry.  3.  I skipped one.

6          THE COURT:  All right.  So this will be Government

7     Exhibit 3, which is the videotape.  And no objection to it.

8     And it will be admitted.  And you may publish it, sir.

9          MR. MAKOFKA:  Your Honor, may the defendant

10    relocate where he can view the video as well?

11         THE COURT:  Sure.  Yeah.  That will be fine.

12         I want to make sure the members of the jury -- are

13    any of you being -- can you see over the podium there?

14    Everybody can see?  Okay.

15         (Government's Exhibit No. 3 was received into

16    evidence)

17         (Videotape played)

18    BY MR. TALBOT:

19    Q.   I want to back that up and ask you some questions

20    about what you saw.  Okay.  When this first starts there

21    appears to be somebody wearing a sweatshirt hood.  Does this

22    person have anything to do with this case?

23    A.   No, he does not.

24    Q.   Okay.  Who was that person?

25    A.   I have no idea.

1  Q.     It was just somebody walking through the parking lot?

2  A.     Yeah.  They came from where the vehicle had pulled

3  in.  And not knowing exactly who I was looking for when

4  someone appeared, I started filming, not knowing if that was

5  them or not.

6  Q.     Okay.  We'll play a little bit and stop and ask you

7  some questions.

8           (Videotape played)

9  Q.     Okay.  That person isn't related to this case?

10  A.     No, it's -- no, that person is not.

11           (Videotape played)

12  Q.     Who's that?

13  A.     Which one?

14  Q.     In the hat.

15  A.     That's the CI.

16  Q.     Okay.  The CI is walking away in the baseball hat?

17  A.     Yes.

18  Q.     Now, when this cuts out is that when you turn it off?

19  A.     Yeah.  I was trying to move around.  Because the

20  record button, when you hold the camcorder, is right at the

21  thumb.  So when I moved I hit it.

22  Q.     Okay.  Who are these two people right there?  There's

23  a guy in a white hat and red shirt and a white T-shirt.

24  A.     That's the suspects.

25  Q.     Okay.  Which one of those -- now, there are two of

1  them.

2  A.     Yes.

3  Q.     You mentioned somebody walking into the restaurant

4  when this first started.

5  A.     Yes.

6  Q.     Which one walked into the restaurant?

7  A.     The one wearing the reddish, maroon colored jersey.

8  Q.     And the other one wearing the white shirt -- you

9  weren't able to see into the vehicle but you didn't see that

10 person?

11 A.     No, I did not.

12 Q.     When did you first see that person?

13 A.     Whenever I -- this portion of the video here,

14 whenever they come walking from the car.

15 Q.     Okay.  Now, the guy in the maroon shirt's in the

16 parking lot?

17 A.     Right.

18 Q.     When did he get from the McDonald's to the parking

19 lot?

20 A.     Well, he had walked up to McDonald's.  And my CI went

21 over and made the deal.  When my CI had came back up,

22 because I was trying to watch him, hold the camera, and do

23 the audio, he had walked back out to the vehicle, and then

24 they both walked up to McDonald's.

25 Q.     Okay.  So the guy in the maroon shirt was not in the

1  -- was not in the car when the CI got in there?

2  A.     No.

3  Q.     Okay.  Are you certain?

4  A.     Yes.

5  Q.     Now, who is the person in the white shirt that we see

6  walking into the McDonald's right there?

7  A.     The defendant.

8  Q.     Okay.

9           (Videotape played)

10 BY MR. TALBOT:

11 Q.     Were you the only law enforcement officer around the

12 McDonald's parking lot that night?

13 A.     No, I was not.

14 Q.     Who else was there?

15 A.     My corporal, Robby Bacon, and Detective Tonya Tator.

16 Q.     Where were they?

17 A.     They were in a vehicle just east of the parking lot.

18 They were in another parking lot, but they were just east of

19 McDonald's.

20 Q.     And what type of vehicle were they in?

21 A.     It was an unmarked vehicle, or old police car

22 unmarked.

23 Q.     Were they together?

24 A.     Yes.

25 Q.     There's some radio contact back and forth.  Who's

1    that with?

2    **A.**      That's with Corporal Bacon and Detective Tator.

3    **Q.**      Okay.  And what was their function that night at the

4    McDonald's?

5    **A.**      They were there for additional backup and to do an ID

6    on the suspect, because we -- we wasn't sure who he was.

7    **Q.**      Okay.  After the guy in the maroon shirt and the

8    fellow in the white shirt came back out of McDonald's, what

9    happened when they got back to the parking lot?

10   **A.**      Well, when they got back to the parking lot they got

11   back in the car.  By that time the CI was with me.  I had

12   backed out and pulled up to where the stop sign is at 3rd.

13   That's why the last camera angle is a little bit different.

14   **Q.**      Okay.  So you had moved your vehicle before that last

15   shot?

16   **A.**      Yeah.  After the -- after the buy and...

17   **Q.**      Okay.  Because I thought you told me before that you

18   had not moved your camera -- moved your vehicle until after

19   the...

20   **A.**      After the buy, yeah.

21   **Q.**      Okay.  So you did move it after the buy and before

22   the two people left the McDonald's?

23   **A.**      Yeah.  I'm sorry.  Yes.

24   **Q.**      Okay.  Just so I'm clear.  Because it did look like

25   your angle was a little different.

1  A.      Yes.  Yes, it was.

2  Q.      Did you follow this maroon car out of the parking

3  lot?

4  A.      No, I didn't follow it out of the parking lot.

5  Q.      Okay.  Did anybody follow it from Jax Beach PD?

6  A.      Detective -- Corporal Bacon and Detective Tonya Tator

7  followed the vehicle.

8  Q.      Okay.  And what did you do?

9  A.      I was listening to the radio and they was telling me

10  where the vehicle was.

11              MR. MAKOFKA:  Objection.  Hearsay.

12              THE COURT:  Overruled.

13  BY MR. TALBOT:

14  Q.      All right.  Well, let me ask it this way.  Detective

15  Tator and Corporal Bacon followed the burgundy vehicle?

16  A.      Yes, they did.

17  Q.      Okay.  And what did you do after the burgundy vehicle

18  left the McDonald's parking lot?

19  A.      Well, I was listening to the radio to find out where

20  they were.  And I had the CI with me.  And I heard that they

21  had the vehicle stopped.  And I drove by where they had the

22  vehicle stopped so the CI could point out the suspect that

23  he had bought the crack from.

24  Q.      Okay.  Now, don't tell me what the CI said.  You

25  drove him by.  And then where did you go after that?

1  A.      After that I drove to the police station.

2  Q.      Okay.  And what did you do at the police station?

3  A.      At the police station I paid the CI his money.  I

4  field tested the crack cocaine.  I weighed the crack

5  cocaine.  And I put it in the envelope that you saw.

6  Q.      Okay.  Were you -- at some point the defendant was

7  brought to the police station?

8  A.      Yes, he was.

9  Q.      Okay.  Were you still at the police station when that

10 happened?

11 A.      Yes.  Yes, I was still there.

12 Q.      Okay.  And did you seize any additional evidence

13 after the defendant was brought to the police station?

14 A.      Yes, I did.  I went back to the holding cell.  And

15 there was a cell phone laying on a counter across from where

16 the holding cell is.  I asked if this was the suspect's cell

17 phone.  And they said, Yes, it was.

18          MR. MAKOFKA:  Objection.  It's hearsay.

19          THE COURT:  All right.  I'll sustain it.

20 BY MR. TALBOT:

21 Q.      Just tell me what you saw.  You saw -- you were in

22 this holding cell.  What did you see?

23 A.      I saw a white cell phone laying on the counter across

24 from the holding cell where the suspect was put.

25 Q.      Okay.  Which suspect?  Because there's two of them,

1   right?

2   **A.**     Yes.  I'm sorry.

3   **Q.**     Okay.  Which suspect?

4   **A.**     The suspect sitting at the table.

5   **Q.**     Okay.  Do you see the person in the courtroom who you

6   saw in the holding cell on August 20th --

7   **A.**     Yes, I do.

8   **Q.**     -- August 30th, 2002?

9   **A.**     Yes.

10  **Q.**     Would you please point to that person and describe

11  that person by an article of clothing.

12  **A.**     He's wearing a blue suit with a blue tie, white

13  shirt.  BM with a bun on the top of his head.

14  **Q.**     Okay.  So black male?

15  **A.**     Yes.

16         MR. TALBOT:  Your Honor, would the record reflect

17  this witness has identified the defendant?

18         THE COURT:  Yes, sir.

19  BY MR. TALBOT:

20  **Q.**     Now, the first time you got a good look at Algie

21  Moore was at the police station; is that correct?

22  **A.**     Yes.

23  **Q.**     Okay.  Were you able to identify him from watching

24  him at the McDonald's parking lot?

25  **A.**     Yes.  After I saw him.  Yes.

1  Q.      Okay.  After you saw him at the police station?

2  A.      Yes.  Whenever I could get a better look at him.

3  Q.      Okay.  And he appeared to be the same person that you

4  had in the videotape?

5  A.      Yes.  He was still wearing the same clothes.

6  Q.      Now, you collected a cell phone?

7  A.      Yes, I did.

8  Q.      And where was that cell phone located when you first

9  saw it?

10 A.      It was laying on the counter across from where he was

11 at in the holding cell.

12 Q.      Okay.  And what did you do with the cell phone?

13 A.      I picked the cell phone up.  I checked the numbers on

14 the cell phone.  My cell phone number was in that cell

15 phone.

16 Q.      Okay.  Had you ever seen that cell phone before?

17 A.      No, I had not.

18 Q.      Okay.  And what did you do with it?

19 A.      After I checked the number I took the cell phone and

20 I placed it into evidence.

21 Q.      Okay.

22         MR. TALBOT:  Your Honor, may I approach the

23 witness?

24         THE COURT:  Yes, sir.

25 BY MR. TALBOT:

1  Q.     Detective Branscom, I'm going to show you what's been

2  marked as Government Exhibit No. 2.  If you would please

3  take a look at that.

4  A.     It's a white Nokia type cell phone.

5  Q.     Okay.  And how do you recognize it?

6  A.     This was the one -- this is the cell phone that I

7  picked up off the counter that night.

8  Q.     Okay.  And how do you know?

9  A.     I placed it into evidence and the bag was sealed with

10 my initials and my ID number on it.  My name and ID number

11 is on the front.  And that's my handwriting.

12 Q.     Okay.  Are you certain this is the same cell phone

13 that you picked up from the counter on August 30, 2002,

14 outside of Algie Moore's holding cell?

15 A.     Yes.

16 Q.     Okay.

17         MR. TALBOT:  Your Honor, I would offer Exhibit

18 No. 2 into evidence.

19         MR. MAKOFKA:  No objection, Your Honor.

20         THE COURT:  Be received.

21         (Government's Exhibit No. 2 was received into

22 evidence)

23 BY MR. TALBOT:

24 Q.     This McDonald's where this took place, where is that

25 located?

1  A.      It's on South 3rd Street, Jacksonville Beach.  I

2  can't remember the exact numerics of it.

3  Q.      Okay.  Is that within the jurisdiction of the

4  Jacksonville Beach Police Department?

5  A.      Yes, it is.

6  Q.      And what county is that in?

7  A.      Duval County.

8  Q.      The place where the traffic stop took place, you

9  drove by there?

10 A.      Yes, I did.

11 Q.      Did you stop?

12 A.      No, I did not.

13 Q.      Okay.  So where the traffic stop took place, you

14 didn't stop?

15 A.      No, I did not.

16 Q.      Where was the traffic stop in relationship to the

17 McDonald's?

18 A.      Approximately a mile away.

19 Q.      Okay.  And what county was that?

20 A.      In Duval County.

21         MR. TALBOT:  Your Honor, if I could have a minute.

22 BY MR. TALBOT:

23 Q.      Detective Branscom, you mentioned that the CI was

24 given $60 --

25 A.      Yes.

1   Q.      -- to make the purchase.

2   A.      Yes.

3   Q.      Did you search either Algie Moore or Marco Gaines for

4   that money --

5   A.      No.

6   Q.      -- after they were brought to the station?

7   A.      No, I did not.

8   Q.      Why not?

9   A.      Because we was going to have it a buy/walk initially.

10  That's why the money wasn't photographed or initialed to be

11  marked.  We were just going to do a buy/walk, have him ID'd,

12  and then be done.

13  Q.      So the idea of the traffic stop came up later?

14  A.      Yes.

15  Q.      Okay.  But even after the traffic stop was made, you

16  -- what I'm asking:  You didn't take any money from Algie

17  Moore --

18  A.      No.

19  Q.      -- on August 30, 2002?

20  A.      No, I did not.

21              MR. TALBOT:  Okay.  Thank you.

22              THE COURT:  Cross-examination?

23              MR. MAKOFKA:  Yes, Your Honor.  Thank you.

24                       **CROSS-EXAMINATION**

25  BY MR. MAKOFKA:

1  **Q.**    Detective, good afternoon.  Sir, let's go back over a

2  few things that were addressed on your direct testimony.

3  First of all, I'd like you to tell us whether or not on the

4  evening of August 30, 2002, you personally ever observed --

5  and by that I mean heard or saw any of the following.

6         Did you ever hear the defendant in this case,

7  Mr. Moore, agree to meet at the McDonald's to engage in a

8  drug transaction?

9  **A.**    No, I did not.

10 **Q.**    And you testified that you actually saw the

11 confidential informant in this case approach the vehicle

12 allegedly driven by my client; is that right?

13 **A.**    Yes.

14 **Q.**    And from your vantage point, I believe your testimony

15 was that there was one vehicle between yourself and where

16 the suspect vehicle was during the transaction.

17 **A.**    Yes.

18 **Q.**    Did you prepare a written report in this case?

19 **A.**    Yes, I did.

20 **Q.**    Do you have a copy of that here with you today?

21 **A.**    I don't have a copy with me.  No, I don't.

22 **Q.**    Okay.  I have a copy.

23         MR. MAKOFKA:  And, if I may, may I approach the

24 witness, Your Honor?

25         THE COURT:  Yes, sir.

BY MR. MAKOFKA:

Q.     Let me show you, sir, what purports to be a copy of a written report generated by you in this case.  Please feel free to take a moment to look it over.  I'd ask you to mark the page that I have for you there.  Do you recognize this as your written report in this case?

A.     Yes, I do.

Q.     In fact, as an attachment to the report, did you prepare some type of photographic illustration depicting the scene of the McDonald's that evening?

A.     It's a hand drawing.

Q.     Did you author that drawing?  Did you create that drawing?

A.     Yes, I did.

Q.     Let me ask you -- on the drawing it appears to have two boxed-looking symbols in between where the suspect vehicle is and where you indicate on the drawing your position was.  Do you see that there?

A.     Yes.

Q.     Are those vehicles that you're depicting there?

A.     No.  That's just where the curve circles as it comes into the parking lot.

Q.     So those are not vehicles there?

A.     No, they're not.

         MR. MAKOFKA:  Okay.  May I approach?

1                THE COURT:  Yes, sir.

2    BY MR. MAKOFKA:

3    Q.      And perhaps I should have left you with the diagram,

4    but we can move on.  It just shows that your vantage point,

5    though, is across the street from the McDonald's, but not

6    directly across the street; is that right?

7    A.      It is --

8    Q.      I can show it to you again if you'd like.

9    A.      Yeah.  It's directly across from McDonald's.  Yes, it

10   is.

11   Q.      Directly across from McDonald's?

12              MR. MAKOFKA:  May I approach again?

13              MR. TALBOT:  Objection, Your Honor.  I know what

14   he's -- he answered the question correctly.  You asked him

15   if he was across from the McDonald's.

16              THE COURT:  Well, let's don't debate each other.

17   Is there a legal objection?

18              MR. TALBOT:  Objection.  The question's asked and

19   answered.

20              THE COURT:  All right.  I'll overrule that

21   objection.  Go ahead, Mr. Makofka.  You may proceed, sir.

22              MR. MAKOFKA:  Thank you, Your Honor.

23   BY MR. MAKOFKA:

24   Q.      And let me go ahead and show you this drawing again

25   and ask you to take a good look at it.  The drawing doesn't

1   indicate that your vehicle was directly across from the

2   McDonald's, does it?  It shows it off to the side of the

3   McDonald's, across the street.

4   A.     Yes.  This drawing is not to scale, as it's stated

5   right here in the corner.  This is just a rough drawing out.

6   So that is a rough sketch of basically where -- where we

7   were positioned.

8   Q.     And based on your rough sketch, it doesn't appear

9   that your vehicle was directly across from the McDonald's,

10  on your rough sketch; is that right?

11  A.     On the rough sketch, no.

12  Q.     Okay.  Thank you.

13         MR. MAKOFKA:  May I approach?

14         THE COURT:  Yes, sir.  You have leave to approach

15  without requesting.

16         MR. MAKOFKA:  Thank you, Judge.

17  BY MR. MAKOFKA:

18  Q.     Detective, you indicated that you had personally

19  observed the confidential informant enter the maroon

20  four-dour vehicle; is that right?

21  A.     No.  I said he walked up beside the vehicle and I

22  could see the top of his head.

23  Q.     So you never saw him open a car door and get inside;

24  isn't that right?

25  A.     That's right.

1  Q.     Okay.  And you testified that you could not see

2  inside the vehicle; is that right?

3  A.     That's correct.

4  Q.     What assurances can you give us that you actually

5  saw this gentleman get inside of a four-door maroon Buick if

6  you couldn't see him opening a door, sir?

7  A.     Well, the only assurance I can give you is the CI

8  told me he got into the vehicle.

9           MR. MAKOFKA:  Objection, Your Honor.

10          THE COURT:  You need to answer the question

11 without talking about what the CI told you, sir.

12          THE WITNESS:  Okay.

13 A.     I did not see him get in the vehicle.

14 Q.     Okay.  So your knowledge about whose vehicle the CI

15 got into that evening is based on information you obtained

16 from the CI, correct?

17 A.     Yes.

18 Q.     And not on anything you personally observed; is that

19 right?

20 A.     No.  Because I could not see him actually get in the

21 vehicle from where I was sitting.

22 Q.     So that's a yes, right?

23 A.     Yes.

24 Q.     Yes, sir.  And let me ask you this.  Did you ever

25 personally happen to see how many persons might have been

1  inside the defendant's car during the alleged transaction?

2  A.     No.

3  Q.     Okay.   The windows were tinted dark; is that right?

4  A.     Yes.   The best I can remember they were tinted, yes.

5  Q.     And it was dark that evening, correct?

6  A.     Yes.

7  Q.     What were the weather conditions like?   Was it dry,

8  raining?

9  A.     Drizzling.   It had been raining.

10 Q.     And you also testified that you personally observed

11 Mr. Marco Gaines walking away from the suspect vehicle prior

12 to the CI ever approaching.   Do you recall that testimony?

13 A.     Yes.

14 Q.     And, in your mind, are you 100 percent certain that

15 that's what you observed that evening?

16 A.     Yes.

17 Q.     Are you aware of the fact that the CI in this case --

18        MR. TALBOT:   Objection, Your Honor.   Hearsay.

19        THE COURT:   I haven't heard the question yet.   So

20 I tell you what, go ahead and ask the question, Mr. Makofka.

21 And then don't answer it, please, until I hear the

22 objection.

23        Go ahead and finish your question, sir.

24        MR. MAKOFKA:   Sure.   I'll rephrase.

25 BY MR. MAKOFKA:

1  Q.     Do you know whether or not the confidential informant

2  in this case has a different version of events with regard

3  to how many persons were in the vehicle during the alleged

4  transaction?

5  A.     From what I understand, yes, there is a different

6  recall.

7  Q.     Different from your version; is that right?

8  A.     Yes.

9  Q.     Okay.  In fact, are you aware whether or not the CI

10 places two individuals in the vehicle?

11         MR. TALBOT:  Objection.  Improper impeachment.

12         THE COURT:  I'm going to sustain that,

13 Mr. Makofka.

14         MR. MAKOFKA:  Very well, sir.  Perhaps rephrasing

15 would be helpful.

16 BY MR. MAKOFKA:

17 Q.     Do you know how many individuals the CI --

18         MR. TALBOT:  Objection.  Improper impeachment.

19         THE COURT:  Well, let him finish his question and

20 then let me hear the objection.  Go ahead, sir.

21         MR. MAKOFKA:  Thank you, Your Honor.

22 BY MR. MAKOFKA:

23 Q.     Do you know how many individuals the CI places inside

24 the vehicle during the alleged transaction?

25         MR. TALBOT:  Objection.  Improper impeachment.

1          THE COURT:  I'll sustain it.

2    BY MR. MAKOFKA:

3    Q.     The CI in this case is named Joey Lynch, is that

4    right, Joel Lynch, Joey Lynch?

5    A.     Yes.

6    Q.     And you've used him before?

7    A.     Yes, I have.

8    Q.     And you testified on about how many, 10, 15, prior

9    occasions?

10   A.     Yes.

11   Q.     Are you still using him today for any purpose?

12   A.     No.

13   Q.     And why is that?

14   A.     Well, actually, we've been so busy at the Beach I

15   haven't been able to do any drug busts for several weeks

16   now.

17   Q.     Okay.  Have you used him since the evening of -- was

18   it August 30, 2002?

19   A.     No.  I think that was -- I don't think I've used him

20   since then.

21   Q.     Okay.  So this would have been the last case he was

22   involved with, to your knowledge, that you've been involved

23   with?

24   A.     Yes.

25   Q.     Okay.  Your testimony relating to the videotape in

1    this case is that the stops and starts that we see on the

2    video are the result of you hitting the stop button; is that

3    right?

4    A.    Yes.  It's a record button, which is a stop button

5    also.

6    Q.    And you testified that this was a Sony camcorder?

7    A.    Yes.

8    Q.    Is this something that the department has issued you

9    for the use of recording undercover drug busts?

10   A.    Yes, it is.

11   Q.    Okay.  It's not your personal camera or anything like

12   that?

13   A.    No, it's not.

14   Q.    Have you operated that camera on previous occasions

15   before August 30, 2002?

16   A.    Yes, I have.

17   Q.    Are you familiar with how it operates?

18   A.    Yes.

19   Q.    And at that time were you familiar with how it

20   operates?

21   A.    Yes, I was.

22   Q.    Okay.  And how much -- what was the length of the

23   videotape that you had in there that evening, if you can

24   recall?

25   A.    The total tape?

1  Q.     Yes.

2  A.     Normally it's 120 minutes.

3  Q.     I see.  And so you could have recorded the entire

4  transaction; is that right?

5  A.     Well, I was attempting to.  But because of the moving

6  around...

7  Q.     Well, have you had training on the use of the video

8  camera for the purposes of recording undercover drug busts?

9  A.     I've done several, but I have not had any -- actually

10  gone to school to use it.

11  Q.     All right.  But you'd agree with me, would you not,

12  it's important when you're conducting this type of

13  videotaping to make a continuous videotape?

14  A.     Yes.  It's very important.

15  Q.     Okay.  And your rationale or your reasoning behind

16  why the tape failed on those portions is that you were doing

17  too many things at once; is that right?

18  A.     Yes, it was.

19  Q.     Okay.  And you testified that after the suspects

20  exited the McDonald's together, they got back in the maroon

21  vehicle, correct, and drove off?

22  A.     Yes.

23  Q.     Is it your ordinary practice in a buy/walk situation

24  to take a suspect into custody immediately after the sale?

25  A.     No.  Not normally.  No.

1   Q.      You allow them to drive off?

2   A.      Well, we have them drive off and we'll have them ID'd

3   by having them stopped, and then --

4   Q.      I'm sorry.  Go ahead.  Do you particularly

5   participate in the ID yourself or have your CI do that

6   usually?

7   A.      If I have my CI do the ID, it's like what we done.

8   But normally when it's my case I'm handling the CI.  So I

9   don't go make the ID.

10  Q.      Okay.  And on this occasion Detectives Bacon and

11  Tator followed the vehicle out; is that right?

12  A.      Yes.

13  Q.      You didn't follow?

14  A.      No.

15  Q.      Okay.  And I just want to touch upon a few other

16  issues.  You testified there was a white cell phone on the

17  counter, right?

18  A.      Yes.

19  Q.      And that was across from the cell that Mr. Moore was

20  placed in after he was arrested that night; is that right?

21  A.      Yes.

22  Q.      What do you have available to you to suggest that it

23  was Mr. Moore who, in fact, possessed that cell phone that

24  evening, other than the proximity in relation to his cell

25  when you found it?

```
 1              MR. TALBOT:  Objection.  Calls for hearsay.

 2              THE COURT:  Overruled.

 3  BY MR. MAKOFKA:

 4  Q.     You can answer.

 5  A.     The police officer told me that it belonged to him.

 6  He took it off of him.

 7              MR. MAKOFKA:  Objection.  Move to strike, the

 8  police officer told him.

 9              THE COURT:  Well, Mr. Makofka, you asked the

10  question, and I overruled the objection.

11              MR. MAKOFKA:  That's fine.

12  BY MR. MAKOFKA:

13  Q.     Which police officer told you?

14  A.     Dziedzicki.

15  Q.     Okay.  Is he a Jacksonville Beach police officer?

16  A.     Yes, he is.

17  Q.     Okay.  And when did he tell you this?

18  A.     Whenever he was standing there at the counter,

19  whenever I walked in.  I asked him if that was the suspect's

20  cell phone.  He said yes.

21  Q.     Okay.  But you never saw Mr. Moore with the cell

22  phone; is that right?

23  A.     No, I did not.

24              MR. MAKOFKA:  I don't believe I have any further

25  questions.  Thank you.
```

1       THE COURT:  Okay.  Redirect?

2       MR. TALBOT:  Yes, Your Honor.

3                    **REDIRECT EXAMINATION**

4    BY MR. TALBOT:

5    Q.      Detective Branscom, you mentioned that you saw the CI

6    walk up toward the maroon vehicle.  How close did the CI get

7    to it, as you were able to see?

8    A.      From the way he appeared to me he was standing right

9    beside it.

10   Q.      You didn't -- did you see the door actually open to

11   that vehicle?

12   A.      No.

13   Q.      Okay.  What happened to the CI?

14   A.      Well, he was standing there one second.  The next

15   second his head was gone.

16   Q.      And how close was he to the maroon vehicle when it

17   happened?

18   A.      Appeared to me he was standing right beside it.

19   Q.      Were there any other people in the parking lot around

20   that area other than the CI?

21   A.      Not at that time.

22   Q.      Was there another vehicle that the CI was close to?

23   A.      Well, the one parked right beside it.

24   Q.      Okay.  Did that vehicle leave the parking lot or did

25   anybody get out of that vehicle, that you saw?

1  A.      No.  I didn't see nobody get out of that vehicle.

2  Q.      How many people did you see get out of the burgundy

3  vehicle?

4  A.      I saw the one black male walking away from it

5  and -- like I said, I saw the CI walk over to the side of

6  the car, his head disappeared.  A very short time later it

7  popped back up.  And then he walked back up to the -- into

8  the parking area.

9  Q.      Okay.  During this time frame did you see anybody

10  else other than the CI, the defendant, or Marco Gaines?

11  A.      No, I did not.

12  Q.      Okay.  Just those three?

13  A.      That was the only people I saw.

14  Q.      You said it was sort of drizzling out that night?

15  A.      Yeah.  Slightly.

16  Q.      Were there a lot of people hanging out in the parking

17  lot at McDonald's?

18  A.      No, there was not.

19  Q.      Could you tell which side of the maroon vehicle the

20  CI was closest to?

21  A.      The side closest to where I was sitting.

22  Q.      Okay.  And what side of the car, driver or passenger?

23  A.      Passenger.

24  Q.      You saw the maroon vehicle pulled over by law

25  enforcement later that evening?

1  A.      Yes, I did.

2  Q.      Okay.  After Detective Tator and Bacon followed,

3  right?

4  A.      Yes.

5  Q.      Was that the same maroon vehicle that you saw the CI

6  walk up next to?

7  A.      Yes, it is.

8  Q.      Was that the same maroon vehicle that you saw Algie

9  Moore and Marco Gaines get into in the McDonald's parking

10  lot?

11  A.      Yes, it is.

12          MR. TALBOT:  Nothing further.

13          THE COURT:  Recross?

14          MR. MAKOFKA:  No, Your Honor.  Thank you.

15          THE COURT:  All right.  Mr. Talbot, then is this

16  witness excused?

17          MR. TALBOT:  Yes, Your Honor.

18          THE COURT:  All right.  And, Mr. Makofka, is there

19  any reason to require Detective Branscom to remain?

20          MR. MAKOFKA:  No, Your Honor.

21          THE COURT:  All right.  Thank you, sir.  You may

22  be excused.  I would ask you not to discuss your testimony

23  with anybody during the course of the trial.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.

1          (Witness excused)

2          THE COURT:  Mr. Talbot, we got a little off kilter

3   with the timing and so forth.  And I think I am going to

4   give the jury another little bit of a break.  It's 3:30 in

5   the afternoon.  They've been here a good while today.

6          So, ladies and gentlemen, let's try to keep it as

7   close to five minutes as we can on a break.  And we'll come

8   back, and then the next time we break it will be for the

9   evening.  Be in recess.

10          COURT SECURITY OFFICER:  All rise.

11          (Recess, 3:30 p.m. to 3:40 p.m.)

12          COURT SECURITY OFFICER:  All rise.  This Honorable

13   Court is now in session.  Please be seated.

14          THE COURT:  Mr. Talbot, what are you expecting

15   this afternoon, so I can kind of see where we are?

16          MR. TALBOT:  Your Honor, I have Corporal Bacon and

17   Detective Tator ready to go outside.  And I have other

18   officers I can get to.

19          THE COURT:  Well, that will probably -- I'm

20   guessing that will be probably about it, if we even get that

21   far.  I'm not going to keep them real late because they have

22   to get here early on the day they come in for jury

23   selection.

24          MR. TALBOT:  Yes, sir.

25          THE COURT:  Okay.  Let's go ahead and get the

1    jury, please.

2              COURT SECURITY OFFICER:  All rise for the jury.

3              (Jury in, 3:42 p.m.)

4              COURT SECURITY OFFICER:  All rise.  Please be

5    seated.

6              THE COURT:  All right, ladies and gentlemen.

7    We're going to resume testimony.

8              Mr. Talbot, who's your next witness?

9              MR. TALBOT:  Robby Bacon.

10             THE CLERK:  Raise your right hand, please.  Do you

11   solemnly swear to tell the truth, the whole truth, and

12   nothing but the truth, so help you God?

13             THE WITNESS:  Yes, ma'am.

14             THE CLERK:  Please have a seat.  And state your

15   name and spell your last name, please.

16             THE WITNESS:  It's Robby Bacon, B-a-c-o-n.

17             THE CLERK:  Thank you.

18                         **ROBBY BACON,**

19   having been produced and first duly sworn as a witness,

20   testified as follows:

21                     **DIRECT EXAMINATION**

22   BY MR. TALBOT:

23   **Q.**     Corporal Bacon, how are you employed?

24   **A.**     I work for the Jacksonville Beach Police Department.

25   **Q.**     How long have you been with that agency?

```
 1  A.      I've been there 14 and a half years.

 2  Q.      Any prior law enforcement experience?

 3  A.      No, sir.

 4  Q.      What's your current assignment with the Jacksonville

 5  Beach Police Department?

 6  A.      Currently I'm a corporal with the community response

 7  team.  I've been assigned to that position for three years.

 8  Q.      All right.  I want to direct your attention back to

 9  August 30th, 2002.  Were you working that evening?

10  A.      Yes, sir, I was.

11  Q.      Okay.  And did you have an occasion to work a case

12  with Detective Branscom?

13  A.      Yes, I did.

14  Q.      Okay.  And what was the case that you were working

15  that evening?

16  A.      We were working a drug investigation.  And we were

17  conducting an operation in the parking lot at McDonald's.

18  Q.      And what was your duty or responsibility there at the

19  parking lot?

20          THE COURT:  Excuse me, Mr. Talbot, one second.

21  Would you just pull that microphone just a -- thank you,

22  sir.  Go ahead.

23  BY MR. TALBOT:

24  Q.      What was your responsibility that evening?

25  A.      Basically, we were -- I was overall supervisor, but I
```

1  was also acting primarily as cover officer.

2  Q.     What is that?

3  A.     We stand by for when the delivery is made.  We

4  usually follow the person or we conduct the take-down.

5  Q.     Okay.  And was anybody with you?

6  A.     Detective Tator was riding in the vehicle with me.

7  Q.     Okay.  What type of vehicle were you in?

8  A.     I was in a blue Chevy Lumina with dark tinted

9  windows.

10 Q.     Was this a marked or unmarked car?

11 A.     It is an unmarked car.

12 Q.     And where were you parked?

13 A.     McDonald's is located on 3rd Street, between 2nd and

14 3rd.  We were actually parked on the east side of 2nd Street

15 in a parking lot of an office building, which is about

16 probably 50 yards -- approximately 50 yards away from where

17 the defendant was parked.

18 Q.     Okay.  And did you know what type of vehicle to look

19 for?

20 A.     I -- we had a vague vehicle description, just a

21 maroon vehicle.  That's pretty much all we had.  We didn't

22 have the make or model at that particular time.

23 Q.     Okay.  And did you know who the CI was --

24 A.     Yes, sir.

25 Q.     -- identified as Joey Lynch?

1  A.      Yes.  I know the CI.

2  Q.      And let me -- well, let's start out -- you're parked

3  in the office parking lot; is that correct?

4  A.      That is correct.  It's just due east of McDonald's.

5  Q.      Who is the first -- well, what's the first thing that

6  you see going on in the parking lot?

7  A.      Well, there was a lot of vehicles parked in the

8  parking lot at that particular time of night.  It was just

9  before nine.  So it was -- it was quite active.

10          There were numerous cars parked in the parking

11 area along the south side of the parking lot.  So there was

12 traffic going in and out.  And that's pretty much what we

13 had the view of.

14 Q.      Okay.  Did you see the CI in the parking lot?

15 A.      Yes.  He was standing up by the actual pay phone area

16 just outside of McDonald's.

17 Q.      Okay.  And what did you see the CI do?

18 A.      Basically, he was waiting on the defendant -- the

19 person that was going to deliver to us to show up.

20 Q.      And you didn't know who that person was going to be?

21 A.      No, I did not.

22 Q.      Did you see that person -- well, let me back up.

23 What did you see the CI doing?

24 A.      Basically, he was hanging around the pay phone for --

25 it was probably about three or four minutes before he

 1  actually went over and got into a vehicle.

 2  Q.    Okay.  What vehicle did he go get into?

 3  A.    He went in and got into the defendant's vehicle.

 4  Q.    Okay.  How do you know it was the defendant's

 5  vehicle?

 6  A.    Because Detective Branscom was on the radio or --

 7  either the radio or the Nextel telling us that he was

 8  getting in the car.  I saw him duck down between two

 9  vehicles.  And I could only assume that he was getting into

10  the vehicle belonging to the defendant.

11  Q.    Okay.  And did you see this vehicle pull into the

12  parking lot?

13  A.    I don't remember if I saw it pull into the parking

14  lot or not.

15  Q.    Okay.  So the first time you -- well, you don't know

16  whether you saw it pull into the parking lot or not.  You

17  remember the CI walking up close to it?

18  A.    Yes.  Correct.

19  Q.    And what did the vehicle look like?

20  A.    I could only see part of the vehicle.  I could tell

21  that it was a full-size car.  I couldn't tell exactly what

22  the model was at that particular time from where we were

23  located.

24  Q.    Okay.  How close did the CI get to the vehicle?

25  A.    He went in -- I would say he went right to where the

1 vehicle was parked.  And I could see him go in between the

2 two cars and then ducked down.  And it appeared to me he was

3 getting in the car.

4 Q.     Okay.  Even though you didn't actually physically see

5 him get into the car, based on what you observed, that's

6 what it looked like he was doing?

7 A.     That's correct.

8 Q.     How long was the CI out of sight?

9 A.     It was less than a minute.  It wasn't very long at

10 all.  And he -- he reemerged and started walking towards

11 Officer -- or Detective Branscom's vehicle.

12 Q.     Did you see any other activity around that vehicle

13 that you -- that the CI appeared to get into?

14 A.     Shortly after the -- shortly after the CI emerged and

15 started to walk off, I said something to Detective Tator.  I

16 don't remember what we were talking about.  I looked back

17 and I saw the defendant get out of -- well, I didn't see him

18 open the door and get out, of course, but I saw him stand up

19 and walk into the McDonald's.

20 Q.     Did you see anybody else walking into the McDonald?

21 A.     There was another black male walking with him just a

22 little behind him.  They were maybe 12, 15 feet apart.  I'm

23 not sure.  Walking in behind him.  And they both walked in

24 the McDonald's together.

25 Q.     Did you see the other black male get out of the

1  burgundy car?

2  **A.**     He came from the vehicle.  I didn't see him actually

3  get out of the car.  But I saw him come from the area of the

4  vehicle.

5  **Q.**     So he was in the area of the vehicle?

6  **A.**     Yes.

7  **Q.**     Okay.  Do you know whether he had gotten out of the

8  car or whether he had walked up to the car?

9  **A.**     I don't remember.  I really -- I just saw him coming

10 from the area of the car.

11 **Q.**     Okay.

12 **A.**     We were in a very poor vantage point, because, like I

13 said, we were at least 50 yards away.  And then from our

14 angle it was very difficult to see straight on to the

15 vehicle.

16 **Q.**     Where did -- now, there appeared to be two people

17 that were at least associated with this burgundy vehicle.

18 What did those people do?

19 **A.**     They went in the McDonald's.  They weren't in there

20 very long at all.  I would say it was less than probably

21 five minutes that they were in there.  And then they came

22 back out.  They got in the vehicle and started to pull out.

23 **Q.**     Okay.  Which vehicle did they get into?

24 **A.**     They got into the maroon four-door car.

25 **Q.**     Was this the same four-door car that the CI had

1  walked up to?

2  A.      Yes, it was.

3  Q.      And what happened after that?

4  A.      They started to pull out.  We started to pull out.

5  We started following them.  They actually pulled out onto

6  3rd Street headed northbound.  We got in behind them.

7         We were about a car -- there was a car between us.

8  And then they were in front of that car.  And we started

9  following them.  I immediately got on the radio and started

10 calling for a marked unit.  And Mike had called me on the

11 radio and told me that the deal was done, so we were going

12 to do a traffic stop.

13        As they turned on to Beach Boulevard there was a

14 couple of officers that we had standing by in close

15 location -- in close proximity to us.

16        Matter of fact, they were probably less than two

17 blocks away.  And they were in marked units.

18        We started going west on Beach Boulevard.  The

19 marked units got there.  We started calling in the traffic

20 stop, like we would on any traffic stop, call, running the

21 tag and everything.

22        Officer Dorough was the marked unit that we were

23 using.  Got in behind him and we actually conducted a

24 traffic stop at Beach Boulevard and Penman Road.

25 Q.      Okay.  From the -- how many people did you see get

1 into this maroon car at the McDonald's parking lot?

2 A.     Just the two -- just the two individuals that emerged

3 from the car originally.  I saw those two get back in.

4 Q.     Did anybody -- from the time they got into the car,

5 did anybody get out of the car that you could see?

6 A.     No, they did not.

7 Q.     Okay.  Would you have been able to see if somebody

8 had gotten in or out of that car?

9 A.     After they came out of McDonald's, yes, we would,

10 because we had gotten into a better position to see.

11 Q.     Okay.  And did you see Officer Dorough conduct the

12 traffic stop?

13 A.     Yes, I did.

14 Q.     And where were you when that was taking place?

15 A.     I was probably -- I was directly behind Dorough as he

16 was pulling the vehicle over.  But because of where the

17 traffic stop took place, there was no way that we could have

18 pulled over directly behind him and not stuck out in

19 traffic.

20          Since I'm not in a marked car, I didn't really

21 want to park there.  So I went around the vehicle and pulled

22 into the parking lot directly next to the defendant and

23 shined my headlights on the defendant's vehicle.

24 Q.     Did you see anybody get out of the vehicle

25 before -- well, let me stop.  What happened after you pulled

1  around?

2  A.     After I pulled around Dorough was approaching the

3  driver's side.  Algie was driving the car.  He got out --

4  Dorough got him out of the driver's seat.  There was another

5  subject -- I couldn't see really good because the windows

6  were tinted very dark and they weren't down quite all the

7  way yet.  There was another guy sitting in the passenger's

8  seat, which we later identified as Marco Gaines.  And those

9  were the only two that were in the car at the time that we

10  stopped them.

11  Q.     Okay.  The two people that were in the car, were

12  those the same two people you had seen getting in the car at

13  the McDonald's?

14  A.     Yes, they were.

15  Q.     And you mentioned that Algie Moore was the driver.

16  How do you know that?

17  A.     I saw him -- I saw Dorough take him out of the

18  driver's seat.

19  Q.     Okay.  And how was Algie Moore dressed?

20  A.     He had on a baggy -- it was a white shirt.  And I

21  don't remember what kind of pants he had on.

22  Q.     Okay.  What about Marco Gaines, the passenger?

23  A.     He had a -- some type of sports jersey on.  I don't

24  really remember, but I think it was like an orangish color.

25  And I -- that's about all I really remember, because it was

1    so long ago.

2    Q.     From the McDonald's to the traffic stop, how long did

3    that take?

4    A.     It wasn't very long at all.  Like I said, we didn't

5    stop anywhere between McDonald's and Beach Boulevard and

6    Penman Road.  I would say it took us probably less than

7    three minutes to travel that distance.

8    Q.     And what was the distance, roughly, that you

9    traveled?

10   A.     Well, from McDonald's to Beach Boulevard and Penman

11   is probably right at a mile, just under a mile.

12   Q.     Did you see the burgundy vehicle you were following

13   make any stops after it left the McDonald's?

14   A.     It did not make any stops.

15   Q.     Did you get out of your car there at the traffic

16   stop?

17   A.     Yes, I did.

18   Q.     Okay.  And what did you do at the traffic stop?

19   A.     The passenger of the vehicle was being very -- for

20   lack of a better word, he was obstructing our investigation.

21   He was being very loud and belligerent towards one of the

22   officers that was working.

23          The officer happened to be a trainee.  He was

24   still in training.  And he was basically kind of defying

25   everything we were asking -- we asked him for ID.  He said,

1   You don't need my ID.  And some other things like that.  So

2   I walked up and kind of intervened.  And he knew me.

3           So at that point he did -- we got him out of the

4   car and I patted him down for any weapons he may have had on

5   him.  And, of course, he started to comply at that point.

6   Q.     Okay.  And who was that person?

7   A.     It was Marco Gaines.

8   Q.     Okay.  And where was that person in the vehicle?

9   A.     He was the -- in the front passenger seat.

10  Q.     Okay.  I think you've already told us.  But just so

11  I'm clear, what was he wearing?

12  A.     He had on the football-type, sports-type jersey.

13  There were numbers on it.

14  Q.     Okay.  Did you search the burgundy vehicle, you

15  personally?

16  A.     I didn't search it, per se.  I looked in and I

17  scanned it.  But I didn't actually conduct a normal search

18  like I would do if it were actually a case that I were going

19  to search the vehicle on.

20  Q.     Okay.  Well, what type of search did you do?

21  A.     I just looked in the passenger compartment for

22  anything in plain view.  There were a couple of -- there

23  were bills, one dollar bills, that had been altered.  It had

24  the corners cut off.

25           MR. MAKOFKA:  I object to the relevance of that,

1  Judge.

2        MR. TALBOT:   That's fine.   We'll stay away from

3  that.

4  BY MR. TALBOT:

5  Q.      Did you see anything else inside the vehicle?

6  A.      Not at that particular time.   No.

7  Q.      Okay.   Did you look under seats, pull up floor mats,

8  or anything like that?

9  A.      No.   I didn't do that.

10 Q.      It wasn't that extensive a search?

11 A.      No.   I didn't actually -- like I said, I didn't

12 actually conduct the physical search of the car.

13 Q.      Did you seize any items of evidence?

14 A.      I just took the -- the bills were in plain view on

15 the dashboard.   So I took those.

16        MR. MAKOFKA:   Same objection, Judge, relevance as

17 to the bills on the dashboard.

18        THE COURT:   Why don't you just move along,

19 Mr. Talbot.

20 BY MR. TALBOT:

21 Q.      You didn't seize any narcotics?

22 A.      No, I did not.

23 Q.      And you didn't seize -- did you see the firearm?

24 A.      No, I did not.

25 Q.      Okay.   When did you -- well, what else did you do at

1  the scene?  You didn't search the vehicle, other than just

2  quickly looking in it.  What else did you do?

3  A.      That's pretty much all I did.  I talked to him in the

4  back seat of the car briefly.  Again, it was about the same

5  subject that we're moving on from, and had a few questions

6  about that.

7  Q.      Okay.  You didn't do anything else, other than that?

8  A.      No.

9  Q.      You didn't transport anybody?

10 A.      No, I did not transport.

11 Q.      Okay.  And did you go to the station after this?

12 A.      Yes, we did.

13 Q.      Okay.  Did you do anything at the station as to

14 gathering evidence or anything like that?

15 A.      No.  The only thing that I really remember at the

16 station was Tony was -- or Officer Dziedzicki was the

17 transporting officer.  And I believe we still had him in the

18 back seat of the car when I got there.  And Algie was on the

19 telephone talking on the cell phone in the back seat of the

20 car and Tony went and took his phone away from him.

21         And I said, Was he talking on it?  And Tony told

22 me, Yeah, he was talking on it, and brought it into the

23 station and sat it on the booking area at the desk.

24 Q.      And you saw that take place?

25 A.      Yes, I did.

1  Q.     Just so I'm clear, the person that you saw taken out
2  of the driver's seat of this burgundy car, do you see that
3  person in the courtroom today?

4  A.     Yes, I do.

5  Q.     Would you please point to that person and describe
6  that person by an article of clothing.

7  A.     It's Algie Moore.  He's got the blue suit with the
8  dark blue tie and he's got a bun in the back of his hair.

9          MR. TALBOT:  Your Honor, will the record reflect
10 this witness has identified the defendant?

11         THE COURT:  Yes, sir.

12 BY MR. TALBOT:

13 Q.     Corporal Bacon, what time did this take place,
14 roughly?

15 A.     It was right -- I'm not sure exactly of the time, but
16 it was right around 9 o'clock at night.

17 Q.     It was dark outside?

18 A.     Oh, yes, sir, it was dark outside.  And it was
19 drizzling rain.

20 Q.     Is Officer Dorough a K-9 officer?

21 A.     Yes, sir, he is.

22 Q.     Did he use his dog to search this vehicle?

23 A.     Not while I was there he did not.  No.

24 Q.     Did you leave the scene before the gun was found?

25 A.     Yes, sir, I did.

1  Q.      Okay.   Did you leave the scene before the drugs were

2  found?

3  A.      Yes, sir, I did.

4  Q.      Did you return to the scene later or...

5  A.      I didn't go to the scene.  I saw the pictures that

6  they had taken from the scene.  I -- typically in the role

7  that I play as a supervisor, I usually go with the prisoners

8  and I stay with the prisoners during the booking process to

9  help oversee the booking and the evidence processing, so to

10  speak, just to make sure everybody has access to the stuff

11  that they need.

12  Q.      Okay.  So you stopped at the scene and then left

13  before the evidence in this case was found.  I guess

14  that's --

15  A.      Yes, sir.  I stopped at the scene before they ever

16  finished searching the vehicle.  I'm sorry.  I mean I left

17  before they ever finished searching the vehicle.

18  Q.      Okay.  I'm just making sure you didn't leave and then

19  come back to the scene of the traffic stop.

20  A.      I did not come back to the traffic stop, no.

21              MR. TALBOT:  If I could have a moment, Your Honor.

22              THE COURT:  Yes, sir.

23              MR. TALBOT:  Thank you.  No further questions.

24              THE COURT:  Cross-examination?

25              MR. MAKOFKA:  Thank you.

1                    **CROSS-EXAMINATION**

2    BY MR. MAKOFKA:

3    **Q.**      Corporal Bacon, good afternoon.   Sir, let me ask you

4    this.   You indicated on your direct testimony that your

5    vehicle and the vehicle in which Detective -- I believe it's

6    Tator was positioned was about 50 yards away from the

7    McDonald's restaurant; is that right?

8    **A.**      Roughly.   I mean, it's approximate.   I mean, I didn't

9    get out with a tape measurer and measure it.

10   **Q.**      And were you watching the alleged transaction from

11   inside the vehicle or outside the vehicle?

12   **A.**      We were in the driver's seat.   I was in the driver's

13   seat and Detective Tator was in the passenger's seat.

14   **Q.**      Okay.   And by your own testimony, your vantage point

15   was pretty poor?

16   **A.**      Yes, it was.

17   **Q.**      Weren't you concerned at that point in time during

18   the transaction of possibly repositioning your vehicle so

19   you could get a better look and see what was going on there?

20   **A.**      Typically, once something has started to take place

21   and events are unfolding, it's unfolding very rapidly.   If

22   you move a Chevrolet Lumina with dark tinted windows on it

23   anywhere near a drug transaction, the people involved are

24   pretty much going to know that it's a police car.

25              So we thought it was in our best interest to stay

1  right where we are at, because Detective Branscom had a

2  better vantage point.  And he could relay that information

3  to us over the radio.

4  Q.     Okay.  And you testified earlier that you observed

5  the confidential informant duck down between two vehicles,

6  correct?

7  A.     It appeared as though he was getting in two cars,

8  yes, sir.

9  Q.     And did you testify that when you saw the CI duck

10 down between two vehicles you could only assume that the CI

11 got into the defendant's car?

12 A.     That is correct.  He was in the same general area.

13 Q.     Okay.  But you couldn't also assume that he got in

14 the car next to the defendant's car?

15 A.     I wouldn't say that.  No, sir.

16 Q.     When you're making an assumption like that, what are

17 you basing it on?

18 A.     I'm basing it on my years of experience and nobody

19 else being in the car next to the defendant's vehicle.

20 Q.     Okay.  You could see that clearly from 50 yards away?

21 A.     I could see pretty clearly there was nobody else in

22 this car.

23 Q.     What did that car look like?

24 A.     It was a light colored vehicle, rather large.

25 Q.     Did it have any tinted windows?

1  A.     I couldn't tell you that.

2  Q.     But you can't say for certain which vehicle he got

3  into; is that right?

4  A.     I saw him get down between the two cars.  Yes, sir.

5  Q.     Okay.  But you didn't see which car he got into?

6  A.     No.

7  Q.     And you also testified that when the CI sort of came

8  up to the general vicinity in which the defendant's car was

9  parked that you saw -- and I don't want to put words in your

10 mouth.  It looked like two individuals outside the vehicle?

11 A.     I don't believe I said that.

12 Q.     After the transaction you saw two individuals maybe

13 12 to 15 feet apart walking?  Is that...

14 A.     I saw two people emerge from the area of the vehicle

15 and start walking towards McDonald's at different rates of

16 speed.

17 Q.     After the transaction?

18 A.     That is correct.

19 Q.     And can you say with any certainty whether or not

20 those two individuals were Mr. Gaines and Mr. Moore?

21 A.     I'm certain that Algie was the one in front.  I could

22 see him plainly.  Yes, sir.

23 Q.     Could the other have been Marco Gaines?

24 A.     The other one was Marco Gaines.

25 Q.     Okay.  And so he could have been in the general

1  vicinity of Mr. Moore's car during the alleged transaction,

2  but you're not certain?

3  A.      I'm not certain.

4  Q.      Okay.  And --

5          THE COURT:  Detective Bacon, if you'll do me a

6  favor.  We refer to people by their last names in this

7  Court.  So if you'll refer to him as Mr. Moore instead.

8          THE WITNESS:  Okay.

9          THE COURT:  Thank you, sir.

10          MR. MAKOFKA:  I'd thank the Court for that,

11  because that prompts my next question.

12  BY MR. MAKOFKA:

13  Q.      You've referred to Mr. Moore as Algie on a couple of

14  occasions.  And I just want to know is there some reason why

15  you know him in a familiar way?  Have you had dealings with

16  Mr. Moore in the past?

17  A.      Yes, I have.

18  Q.      Okay.  And so you've -- you find it appropriate to

19  call him Algie, because you've talked to him in a

20  conversation in a way before?  Is that a fair statement?

21  A.      They hang out in a certain area that I patrol on a

22  regular basis.

23  Q.      They meaning who?

24  A.      Algie Moore, Marco Gaines, and -- I work in a high

25  crime area in the South Jax Beach area.  And that's -- it's

1  not uncommon for me to walk that area, that neighborhood.

2  Q.    Okay.  And so you've had interaction with my client

3  in the past; is that right?

4  A.    Yes.

5  Q.    Okay.  And you knew who he was when you were there

6  that evening, correct?

7  A.    That's correct.

8  Q.    And did you know who he was before you arrived that

9  evening?

10 A.    I didn't know who we were going to be dealing with

11 until after he got out of the car on the traffic stop.

12 Q.    And I phrased that question poorly.  I was going to

13 ask you:  Did you have any advance knowledge that it was, in

14 fact, Mr. Moore that was to be the subject of that drug

15 investigation before you ever got to the McDonald's?

16 A.    No, I did not.

17 Q.    When did you first learn that it was, in fact,

18 Mr. Moore that was being investigated?

19 A.    When Officer Dorough got behind the defendant's

20 vehicle, he said, That's Algie Moore's car.  And after we

21 conducted the traffic stop and I saw him get out of the car,

22 then I realized who it was.

23 Q.    You heard him say that on the radio; is that right?

24 A.    That's correct.

25 Q.    Okay.  Let's go now to the McDonald's parking lot to

1  when you actually drove by and parked your vehicle in the

2  vicinity of the traffic stop.  Okay?

3  **A.**     Okay.

4  **Q.**     You indicated, first of all, that it was muddy and

5  raining around the vicinity of the stop and you didn't park

6  over there for some reason.

7  **A.**     No.  I didn't park behind Officer Dorough's car

8  because he has a marked police car.  We were in the middle

9  of a very high traffic intersection.  And I have very poor

10 blue lights on my car.  I just have two strobes.  That's it.

11 **Q.**     How far away did you park from the stop?

12 **A.**     My best guess is probably three car lengths away.

13 **Q.**     And you approached -- you were still with Detective

14 Tator?

15 **A.**     That's correct.

16 **Q.**     The two of you went and approached the vehicle at

17 that point?

18 **A.**     I'm not sure what she did.  I know I got out and

19 approached the vehicle.  I didn't see, really, what she was

20 doing at that particular time.

21 **Q.**     And when you approached the vehicle Officer Dorough

22 was standing there by Mr. Moore; is that right?

23 **A.**     He was on the driver's side and he had already taken

24 him out of the car.

25 **Q.**     Did you see Officer David McMinn there at that time?

1  A.      Yes, I did.

2  Q.      Did you see any other officers there other than

3  McMinn and Dorough at that initial --

4  A.      Officer Zdunkiewcz was there.

5  Q.      The name again?  I'm sorry?

6  A.      Zdunkiewcz.

7  Q.      Okay.  And where was he positioned relative to

8  the --

9  A.      He was by the passenger door.

10  Q.      What did he appear to be doing to you?

11  A.      He was talking to Mr. Gaines.

12  Q.      Okay.  And could you tell at that point whether the

13  Officers Dorough and McMinn were conducting a search of the

14  defendant's vehicle?

15  A.      They were not conducting a search at that particular

16  time.

17  Q.      Do you know what they were doing when you first

18  arrived?

19  A.      I was paying attention to Mr. Gaines.

20  Q.      Okay.  Because he was being loud, boisterous, what

21  have you?

22  A.      Very much so.

23  Q.      How was Mr. Moore's demeanor?

24  A.      He was not in my line of sight at that particular

25  time.  I was dealing with Mr. Gaines and a trainee.  So I

1  was trying to focus on that and what was going on.

2  Q.     And when did your focus shift from that to looking

3  inside the defendant's vehicle?

4  A.     It was after we got Mr. Gaines out and took control

5  of him.

6  Q.     Okay.  And was the defendant under arrest at that

7  point in time, to your knowledge, before you initiated the

8  look around the vehicle?

9  A.     He had a suspended driver's license.  So, yes, he was

10 under arrest for that.  And he was also under arrest

11 for -- on charges of sale of cocaine.

12 Q.     And who actually made the call from a detective

13 standpoint or a CRT standpoint to actually go ahead and

14 arrest Mr. Moore at the traffic stop for the drug sale?

15 A.     It was actually kind of a joint decision with all of

16 us.

17 Q.     Meaning who?

18 A.     Meaning the lead investigator, which would be

19 Detective Branscom and Detective Tator and I and another

20 detective discussed it.

21 Q.     At some point in time, though, you did look inside

22 the vehicle; is that right?

23 A.     Yes, sir.

24 Q.     Okay.  And when you were doing that, were any other

25 officers looking in the vehicle?

1  A.     I really don't remember.

2  Q.     Okay.  Do you recall which side of the vehicle you

3  looked in?

4  A.     I was on the passenger side.

5  Q.     Okay.  Did you ever go in the driver's side at all?

6  A.     I don't recall.

7  Q.     Do you recall whether or not it was dark inside the

8  vehicle when you were looking around?

9  A.     It was lit up by the take-down lights from the patrol

10  car.

11  Q.     So you could see inside the vehicle?

12  A.     Not very well, but, yes.

13  Q.     Did you have a flashlight that you were using?

14  A.     I probably borrowed one.

15  Q.     So probably -- do you recall specifically if you, in

16  fact, had a flashlight?

17  A.     I don't recall specifically.  No.  I was in plain

18  clothes that night.

19  Q.     And how long were you looking around in the vehicle

20  there?

21  A.     Very briefly.  Couple of seconds.

22  Q.     Couple of seconds.  Stuck your head in, looked

23  around, and pulled your head back out, like that?

24  A.     Yes.

25  Q.     Did you ever see a firearm in the vehicle that

1  evening?

2  **A.**      No, I did not.

3  **Q.**      Did you ever see any drugs in the vehicle that

4  evening?

5  **A.**      Not from my vantage point.  No.

6          MR. MAKOFKA:  I have no further questions.  Thank

7  you.

8          THE COURT:  Redirect?

9                  **REDIRECT EXAMINATION**

10 BY MR. TALBOT:

11 **Q.**      Corporal Bacon, did you -- the CI that walked up to

12 what appeared to you to be the burgundy vehicle --

13         MR. MAKOFKA:  I'm going to object, Your Honor.

14 May we approach?

15         THE COURT:  Yes, sir.

16         (Sidebar conference)

17         MR. MAKOFKA:  Your Honor, I believe that that's

18 misstating the testimony.  I know we keep going around and

19 around about did you approach the maroon vehicle, did you

20 approach two vehicles.  But I think when the government

21 brings into question when you approached --

22         THE COURT:  All right.  If your objection is as to

23 leading, I'll sustain it and ask Mr. Talbot to rephrase his

24 question.

25         MR. MAKOFKA:  It is as to leading.  Thank you,

1    Judge.

2              (The following proceedings occurred in open court)

3              THE COURT:  Hold on one second, please, Mr.

4    Talbot.

5    BY MR. TALBOT:

6    Q.     Did you see the CI in the McDonald's parking lot

7    approach any vehicles?

8    A.     Yes, sir.

9    Q.     What type of vehicle did he appear to approach?

10   A.     He appeared to approach the defendant's vehicle.

11   Q.     And what type of vehicle was that?

12   A.     It was a large four-door maroon car.

13   Q.     Were there any other vehicles in the vicinity of that

14   maroon vehicle?

15   A.     Yes, there were.

16   Q.     And how many?

17   A.     I don't recall exactly.  There were a few vehicles in

18   the parking lot, though.

19   Q.     Was there one -- could you tell which side of

20   the -- you call it the defendant's vehicle.  How do you know

21   it's the defendant's vehicle?

22   A.     There wasn't a lot of pedestrian activity where the

23   vehicles were at.  And he went to the area where the maroon

24   car was.  Between that car -- and then there was a lighter

25   colored vehicle that -- he went between that car and the

1  maroon color vehicle.  And he appeared to me to be sitting

2  down in the vehicle, the way you would open the car door and

3  pull your head to the side and sit down in the car.

4  Q.    Could you tell -- now, I'm picturing two vehicles

5  right beside each other.  One belongs -- is maroon.  And you

6  eventually find out it belongs to the defendant.  The other

7  one is another vehicle?

8  A.    Right.

9  Q.    How could you tell which one -- or could you tell

10 which one the CI got in?

11 A.    I couldn't exactly tell you that he -- which side of

12 the CI's -- I mean, which side of the defendant's vehicle he

13 got in on.  But it appeared to me as though he got into that

14 vehicle.

15 Q.    Okay.  Why that one and not the other one?

16 A.    Because that one was between us.  And I could -- I

17 would have been able to see into that vehicle if he had got

18 into that car.  There would have been a light come on inside

19 of it or something that would indicate to me that he got

20 into that car.

21 Q.    So the two vehicles -- did you see any activity

22 around what I'll call the other vehicle?

23 A.    No.

24 Q.    The one next to the maroon car?

25 A.    No, I did not.

1  Q.    Did you see anybody getting in or out of that?

2  A.    No, I did not.

3  Q.    Did you see that vehicle leave the parking lot?

4  A.    No, I did not.

5  Q.    Did you see any activity around the maroon vehicle?

6  A.    Yes, sir, I did.

7  Q.    And what activity did you see around the maroon

8  vehicle?

9  A.    That was the -- our informant going over to the

10 vehicle and getting into it and, shall I say -- I mean, I

11 can't tell you exactly that I saw him open the door and get

12 in.  I just saw him duck down like he was getting into a

13 vehicle.

14 Q.    Okay.  Did you see anybody else in the area of that

15 maroon vehicle?

16 A.    I saw the defendant and Mr. Gaines come from the area

17 of that vehicle and walk into the McDonald's.  Yes.

18 Q.    Did you see that maroon vehicle leave the parking

19 lot?

20 A.    Yes, sir, I did.

21 Q.    Did you follow that maroon vehicle?

22 A.    Yes, we did.

23 Q.    And is that the maroon vehicle that you directed

24 Officer Dorough to stop?

25 A.    Yes, it is.

1      MR. TALBOT:  No further questions.

2      THE COURT:  Recross?

3      MR. MAKOFKA:  Very briefly.

4                    **RECROSS-EXAMINATION**

5  BY MR. MAKOFKA:

6  Q.     You can't say with any specificity as to which

7  vehicle the CI got into that evening without guessing; isn't

8  that right?

9  A.     No, that's not correct.

10 Q.     That's not right?  You didn't see a light come on in

11 the white vehicle, did you?

12 A.     No, I did not.

13 Q.     But you didn't see it come on in the maroon vehicle,

14 did you?

15 A.     No, sir, I did not.

16 Q.     And earlier when you testified you were assuming he

17 got in the defendant's vehicle, you didn't mean that you

18 were assuming?  In fact, now that you've had a few moments

19 here to consider it, you're certain he got into the

20 defendant's vehicle?

21 A.     Unless he was sitting down on the ground, yes, sir,

22 I'm certain.

23 Q.     Well, is that a possibility?

24 A.     I don't believe so.  No.

25 Q.     No?  People can't sit down on the ground?

1  A.     Not based on what my other detective was telling me

2  at the time when he saw what was going on.

3  Q.     I'm asking you what you observed.

4  A.     I did not observe him do anything other than get into

5  the car.

6  Q.     So now you see him get into the defendant's car?

7  A.     No.  I saw him duck down next to it like he was

8  getting into the car.

9          MR. MAKOFKA:  No further questions.

10          THE COURT:  Anything else?

11          MR. TALBOT:  No, Your Honor.

12          THE COURT:  All right.  May this witness be

13  excused, Counsel?

14          MR. TALBOT:  No objection.

15          MR. MAKOFKA:  Yes, Your Honor.

16          THE COURT:  Thank you, sir.  You may be excused.

17  The only thing I would ask you is not to discuss your

18  testimony with anyone until the case is over.  Thank you.

19          THE WITNESS:  Thank you, sir.

20          (Witness excused)

21          THE COURT:  Mr. Talbot, who is your next witness?

22          MR. TALBOT:  Tonya Tator.

23          THE COURT:  If you could -- thank you.

24          THE CLERK:  Raise your right hand, please.  Do you

25  solemnly swear to tell the truth, the whole truth, and

1   nothing but the truth, so help you God?

2          THE WITNESS:  Yes, I do.

3          THE CLERK:  Please have a seat.  And, if you

4   could, state your name and spell your last name for the

5   record.

6          THE WITNESS:  Detective Tonya Tator, T-a-t-o-r.

7          THE COURT:  All right.  Before you proceed, if

8   you'll turn that a little.  Thank you.  Appreciate it.  You

9   may proceed, Mr. Talbot.

10                    **TONYA TATOR,**

11  having been produced and first duly sworn as a witness,

12  testified as follows:

13                  **DIRECT EXAMINATION**

14  BY MR. TALBOT:

15  **Q.**     Detective Tator, how are you employed?

16  **A.**     I am employed as a detective with the Jacksonville

17  Beach Police Department.

18  **Q.**     How long have you been with the Jacksonville Beach

19  Police Department?

20  **A.**     Approximately six years.

21  **Q.**     Any prior law enforcement experience?

22  **A.**     No, sir.

23  **Q.**     And what's your current assignment with Jacksonville

24  Beach?

25  **A.**     I'm a detective with the CRT unit, which is community

1  response team.

2  Q.     And how long have you been with that unit?

3  A.     Approximately -- a little over three years.

4  Q.     I want to direct your attention to August 30, 2002.

5  Were you working that evening?

6  A.     Yes, sir, I was.

7  Q.     Did you have occasion to work a case with Detective

8  Branscom and Corporal Bacon?

9  A.     Yes.

10  Q.     And what was your responsibility as to this case?

11  A.     I was doing surveillance.  And I was as a back-up

12  unit in case something went wrong, to assist other officers.

13  Q.     Okay.  Were you with anybody else, as far as -- well,

14  let me back up.  Where did the surveillance take place?

15  A.     The surveillance took place east of McDonald's.

16  Q.     Okay.  And were you watching -- what were you

17  watching from that location?

18  A.     I was watching the McDonald's parking lot.

19  Q.     All right.  Was there a person you were watching in

20  the parking lot?

21  A.     Yes, sir.

22  Q.     And who was that?

23  A.     We had a -- Detective Branscom was using a CI that he

24  was using to purchase some narcotics.  And that's who we

25  were keeping an eye on, to see who was going to be

1  delivering to him.

2  Q.     Were you on foot or in a car or building?  How were

3  you --

4  A.     I was in a car.

5  Q.     And were you in a car by yourself or with anybody

6  else?

7  A.     No, sir.  I was with Corporal Bacon.

8  Q.     Okay.  And what type of vehicle were you in?

9  A.     I don't recall.

10 Q.     Was it your car?

11 A.     No, sir, it was not.

12 Q.     Okay.  Whose car was it?

13 A.     Corporal Bacon's.

14 Q.     All right.  Were you the driver or passenger?

15 A.     Passenger.

16 Q.     And tell us what you saw the CI doing in the parking

17 lot at McDonald's.

18 A.     I don't understand the question.  What do you mean

19 what he was doing?

20 Q.     How long -- well, how long -- what time did you get

21 to the surveillance spot where you were parked with Corporal

22 Bacon?

23 A.     I don't recall the time.  I'd have to look at the

24 records.

25 Q.     Okay.  Was it dark outside?

1  A.     I don't recall what -- if it was exactly -- around

2  dusk, I believe.  But I don't know if it was completely

3  dark.

4  Q.     Okay.  At some point did you see Detective Branscom's

5  CI in the parking lot?

6  A.     Yes, I did.

7  Q.     Okay.  What's the first thing you saw the CI doing in

8  the parking lot at McDonald's?

9  A.     He was standing up by the pay phones.  And then he

10 walked to the vehicle.

11 Q.     Okay.  The vehicle that the CI walked up to, how long

12 was the CI in the parking lot before he walked up to the

13 vehicle?

14 A.     Well, he -- the CI would have gotten there prior to.

15 I couldn't give you an exact time.

16 Q.     Was it longer than a minute?

17 A.     Maybe just over a minute.  It wasn't --

18 Q.     Shorter than ten minutes?

19 A.     Shorter than ten, yes, sir.

20 Q.     So it wasn't -- I'm talking about hours.

21 A.     No, sir.  It was not hours.

22 Q.     You weren't actually sitting out there for hours?

23 A.     It was within a few minutes.

24 Q.     Now, specifically, what did you see the CI do?

25 A.     He walked from the pay phone over to the vehicle in

1  question and appeared to get into the vehicle, was there a

2  short time, got out of the vehicle, and then walked away

3  from it to Detective Branscom.

4  Q.     You said he appeared to get into the vehicle.  What

5  do you mean by that?

6  A.     He walked over to the vehicle.  I saw him go down

7  like he was getting into a vehicle.  And I didn't see him at

8  that point.  And then I saw him -- that same location, I saw

9  him reappear and then walk away from that same location.

10 Q.     Okay.  Was there anything obstructing your view of

11 the CI?

12 A.     There was some vehicles in the parking lot.

13 Q.     Was there a vehicle in between -- you mentioned

14 a -- a vehicle that he walked up to.  Was there anything

15 between that vehicle and your surveillance location?

16 A.     Yes, sir.  There was a vehicle.

17 Q.     Okay.  Do you remember what type of vehicle it was?

18 A.     No, I don't.

19 Q.     How do you know which vehicle the CI walked up to?

20 A.     The vehicle was described as it was coming into the

21 parking lot.  Detective Branscom was relaying to us on the

22 radio that that was the suspect that was coming in.  And we

23 saw the location it actually pulled into.

24 Q.     Did you see this suspect vehicle actually pull into a

25 parking spot?

1  A.     Yes.

2  Q.     And you've already testified there's another car

3  between you and that car?

4  A.     Yes, sir.

5  Q.     Did you see -- now, I'm talking about the car that

6  was blocking your view.  Did you see any activity inside

7  that car?

8  A.     No, sir, I did not.

9  Q.     Did you see anybody get in or out of that car?

10  A.     I don't recall seeing anybody in that area.  No.

11  Q.     Now, you've mentioned the CI.  The vehicle that you

12  believe the CI walked up to, did you see anybody get in or

13  out of that car?

14  A.     There was someone that came from the passenger's side

15  that walked into the McDonald's.

16  Q.     When did that happen?

17  A.     The vehicle pulled into the parking lot, somebody

18  exited from that vehicle, or the vehicle had pulled into,

19  walked into the McDonald's, and that's when the CI

20  approached the vehicle.

21  Q.     Okay.  The person that walked into the McDonald's,

22  what did that person look like?

23  A.     It was a shorter black male wearing a jersey.

24  Q.     Okay.  Do you remember what kind of jersey?

25  A.     No, sir, I don't.

1  Q.    Did you see anybody -- now, that was before the CI

2  walked up toward this vehicle?

3  A.    Yes.

4  Q.    Is that -- that is what your testimony was?

5  A.    (Nods head affirmatively)

6  Q.    Did you see anybody else other than that person

7  either get in or out of this vehicle, this -- what you

8  called a suspect vehicle?

9  A.    No, sir, I did not.

10  Q.    At any point in time?

11  A.    In that particular vehicle?

12  Q.    Yes.

13  A.    Just the passenger that I just mentioned --

14  Q.    Okay.

15  A.    -- and the CI that walked over there.

16  Q.    Okay.  Did you -- all right.  How long was the CI at

17  that vehicle or, you know -- I know you're assuming that he

18  got in it.  How long before -- from the time he disappeared

19  to the time he reappeared?

20  A.    Maybe two, three minutes, tops.  Just long enough

21  to -- what appeared to me to get in, sit down, exchange, and

22  get out.

23  Q.    Okay.  You didn't see the exchange?

24  A.    No, sir, I did not.

25  Q.    Could it have been less than a minute that this took

1  place?

2  **A.**      Yes.  It could have.

3  **Q.**      Where did the CI go after he reappeared?

4  **A.**      After he reappeared from that location he walked over

5  to Detective Branscom's location --

6  **Q.**      Okay.

7  **A.**      -- to meet with him.

8  **Q.**      When that happened, did you see anybody getting out

9  of the suspect vehicle?

10 **A.**      Yes, sir, I did.

11 **Q.**      Who was that?

12 **A.**      The driver.

13 **Q.**      How could you tell they were the driver?

14 **A.**      Because it was on the opposite side of where I'd seen

15 the CI approach the vehicle.  And that's what appeared to be

16 the driver.

17 **Q.**      What side of the vehicle did the CI approach?

18 **A.**      The CI approached from where the vehicle was parked,

19 would have been the passenger side.

20 **Q.**      Okay.  Could you see that it was the passenger side?

21 **A.**      From the way the vehicle pulled in originally, yes,

22 sir.

23 **Q.**      Okay.  So you saw somebody get out on the -- what

24 appeared to be the driver's side, from your vantage point?

25 **A.**      Yes, sir.

1   Q.      You were not able to see inside the vehicle, though?

2   A.      No.

3   Q.      Well, what happened to this person who you saw get

4   out of the driver's side?  Where did they go?

5   A.      Went inside the McDonald's.

6   Q.      Did you see anybody else going into the McDonald's

7   that appeared to be with them?

8   A.      There were -- as far as when -- when the CI exited

9   the vehicle, the passenger -- or I assume to be the

10  passenger that came from that area had reapproached the

11  vehicle, and they both went inside.

12  Q.      Okay.  What was the driver wearing?

13  A.      The driver was wearing a white T-shirt.

14  Q.      Did this driver and apparent passenger, did they

15  leave McDonald's?

16  A.      Yes, sir, they did.

17  Q.      How long were they inside McDonald's?

18  A.      Just long enough to get an order.

19  Q.      Did you see them ordering food, or are you just

20  assuming?

21  A.      I just assumed they were ordering.  They went in and

22  came back out and...

23  Q.      But you didn't see where they went inside the

24  McDonald's?

25  A.      No, sir, I did not.

1  Q.      When they came back out, what happened?

2  A.      They got in the vehicle and then the vehicle went

3  westbound on Beach Boulevard.

4  Q.      Okay.  And what did you do?

5  A.      Corporal Bacon and myself followed the vehicle until

6  Officer Dorough could approach the vehicle to stop it.

7  Q.      Okay.  And did you ever lose sight of this vehicle?

8  A.      No, sir.

9  Q.      Other than the people you've mentioned at the

10 McDonald's parking lot, did you see anybody else get into

11 that vehicle?

12 A.      No, sir.

13 Q.      Did you see anybody else get out of that vehicle?

14 A.      No, sir.

15 Q.      From the time that vehicle left the McDonald's

16 parking lot, were you in a position to see if anybody else

17 could have gotten in or out of that vehicle?

18 A.      After they backed out of the parking spot, yes, we

19 had a view of the vehicle.

20 Q.      Okay.  So you would have been in a position to see

21 people coming and going out of that vehicle?

22 A.      Yes.

23 Q.      Now, what did you do after the vehicle left the

24 parking lot?

25 A.      After the vehicle left the parking lot --

1  Q.     Left the parking lot.

2  A.     -- is at the time that Corporal Bacon and myself

3  followed the vehicle.

4  Q.     Okay.  Did you conduct a traffic stop?

5  A.     No, sir, we did not.

6  Q.     Okay.

7  A.     Officer Dorough did.

8  Q.     All right.  Did you see Officer Dorough conduct the

9  traffic stop?

10  A.     Yes.

11  Q.     And how is it that you were able to see that?

12  A.     Because we were following the vehicle until he came

13  to do the traffic stop.  So we were right there.

14  Q.     From the time the vehicle left the McDonald's parking

15  lot until the time of the traffic stop, how long did that

16  take?

17  A.     Just a few minutes.

18  Q.     Can you give me an approximation?  Was it more than

19  ten minutes, less than ten minutes?

20  A.     Less than ten minutes.

21  Q.     Was it more than five minutes, less than five

22  minutes?

23  A.     Probably less than five minutes.

24  Q.     And how far did the vehicle travel from the

25  McDonald's parking lot until it was stopped by Officer

1  Dorough?

2  A.      Probably about just under a mile.

3  Q.      And, now, you're a passenger while this was taking

4  place, right?

5  A.      Yes.

6  Q.      Corporal Bacon is still driving the car you're in.

7  Where did you park -- or did you -- did you stop there at

8  the scene of the traffic stop?

9  A.      We did stop.  We pulled into the parking lot of a car

10 wash that was right there.

11 Q.      Okay.  Did you get out of the car you were riding in?

12 A.      Yes, I did.

13 Q.      And what did you do?

14 A.      I approached the suspect vehicle.

15 Q.      Did you see anybody exiting the suspect vehicle?

16 A.      I saw the driver being taken out of the vehicle and

17 placed in a patrol vehicle.  And I also saw the passenger

18 being placed into the patrol vehicle.

19 Q.      How did you know who was the driver and who was the

20 passenger?

21 A.      The driver had a white T-shirt on and the passenger

22 had a jersey-type shirt on.

23 Q.      Okay.  And I guess, more specifically, other than

24 that clothing description, did you see them -- did you see

25 them physically removed from the car?

1    A.    Yes.

2    Q.    Okay.  And what did you see?

3    A.    I saw the driver being removed from the vehicle and

4    placed in a patrol vehicle that was behind, and then the

5    passenger placed in a separate patrol vehicle.

6    Q.    And when you say driver, why do you say that he was

7    the driver?

8    A.    Because I saw him taken out of the driver's side of

9    the vehicle.

10   Q.    Okay.  And the same thing with the passenger.  Why do

11   you say that person was the passenger?

12   A.    Because he was taken out of the front passenger seat

13   and placed in the patrol vehicle.

14   Q.    The person that was taken out of the driver's seat,

15   did you get a good look at that person?

16   A.    Yes, sir, I did.

17   Q.    Okay.  Do you see that person in the courtroom today?

18   A.    Yes, I do.

19   Q.    Would you please point to that person and describe

20   that person by an article of clothing?

21   A.    The subject is sitting right there.  And he's in a

22   seat next to the defense attorney.

23   Q.    Okay.  He's fartherest away from you?

24   A.    He's sitting right there in the blue suit, blue tie,

25   white shirt.  His hair is up.

1          MR. TALBOT:  Your Honor, would the record reflect

2   this witness has identified the defendant?

3          THE COURT:  Yes, sir.

4   BY MR. TALBOT:

5   Q.     What did you do there at the scene of the traffic

6   stop?

7   A.     I took photographs of the evidence that was found in

8   the vehicle.

9   Q.     Okay.  Well, let me back you up a little bit.  What's

10  the first thing you did?  I mean, this traffic stop has just

11  happened.  Are you taking anybody in custody?  Or what are

12  you doing at that point?

13  A.     No, I did not.  I actually -- upon approaching the

14  vehicle on the passenger side there was some altered money.

15  And that was it.

16  Q.     Okay.  We're not interested in that.  As far as

17  Mr. Gaines goes, did you have any dealings with him?  Did

18  you take him into custody?

19  A.     No, sir.

20  Q.     Were you more sort of standing by this extra -- an

21  extra person there to help out?

22  A.     Yes, sir.  Yes.

23  Q.     Were you in plain clothes?

24  A.     Yes, I was.

25  Q.     Now, at some point you do take some photographs?

1  A.     Yes, sir.

2  Q.     Okay.  And what is it that you took a photograph of?

3  A.     I took a photograph of a gun and some crack cocaine

4  that was found in the vehicle.

5  Q.     Were you present when that -- when the gun was found

6  in the vehicle?

7  A.     No, I was not.  It was brought to my attention.

8  Q.     Okay.  Where were you when that was brought to your

9  attention.

10  A.     I would have been -- I was not directly at the

11  vehicle.  I would have been around the area of where the

12  vehicle was stopped.

13  Q.     Okay.  Well, had you gotten in a car and left the

14  scene and then come back?  Or were you still standing around

15  when that -- I know you didn't find it.

16  A.     Okay.

17  Q.     Well, let me see if I can clarify this.  What were

18  you doing when you first found out that there was something

19  to take a picture of?

20  A.     I had left to go get -- they said they had found some

21  stuff.  And I had left to go get my camera and to come back

22  and take the picture.

23  Q.     Where were you -- do you remember where --

24         THE COURT:  Mr. Talbot, could I see counsel at

25  sidebar for a minute, please?

1          (Sidebar conference)

2          THE COURT:  One of the members of my staff -- my

3   chambers is right adjacent to the courtroom -- is reporting

4   that it appears that one of the witnesses -- I don't know

5   who it is -- is listening in to the testimony at the door

6   and actually reporting what's going on to other people.

7          I don't know who it is, but, obviously, we

8   shouldn't be having that.  And so I don't know who's out

9   there or who isn't, but -- who has witnesses outside?

10          MR. TALBOT:  I probably do.

11          THE COURT:  Okay.  Do you have any?

12          MR. MAKOFKA:  No, Your Honor.  She's gone home for

13   the afternoon.  Would it be possible to inquire on the

14   record as to what the member of your staff has seen so we

15   could get to the bottom of this?  Because if they're

16   listening to the testimony, we're going to have problems.

17          THE COURT:  Okay.  Well, I'm not really inclined

18   to -- I mean, I think all -- I mean, this happens to us all

19   the time, because our door is -- you can hear what's being

20   said in the hallway.  So I'm sure she's not out there

21   looking or seeing who it is, but I think that it probably --

22          MR. TALBOT:  I can do this.  I could ask Tonya to

23   step outside and send all my witnesses downstairs.  I mean,

24   that's --

25          THE COURT:  Well, Mr. Makofka is requesting that

1  we inquire as to what's going on.

2          MR. TALBOT:  I mean, I could have them brought

3  back up after -- I'm just trying to come up with an

4  immediate solution.

5          THE COURT:  Is there -- this is going be the last

6  witness for the day?

7          MR. TALBOT:  Unless you would like me to call

8  somebody else.

9          THE COURT:  How much more do you have with her?

10         MR. TALBOT:  I've got some photographs to

11 introduce and we're real close to being done.

12         THE COURT:  How much have you got?

13         MR. MAKOFKA:  Brief cross.

14         THE COURT:  All right.  Well, what I think --

15         MR. TALBOT:  Or I can step out and see who it is.

16         THE COURT:  I think you ought to step out and make

17 sure your witnesses understand the situation.  But then ask

18 them to remain afterwards so that we can make whatever

19 inquiries.

20         MR. TALBOT:  Would you like me to send them

21 downstairs and then retrieve them and tell them --

22         THE COURT:  No.  I think you need to tell them

23 that the rule has been invoked and that they're not supposed

24 to be listening to the testimony and, certainly, not

25 supposed to be discussing it.

1           And then we'll -- but then that they ought to

2    remain available for any inquiry that needs to made

3    afterwards.  And we'll just resume.

4           MR. TALBOT:  Okay.

5           (The following proceedings occurred in open court)

6           THE COURT:  Excuse us one second.  Ladies and

7    gentlemen, Mr. Talbot just has to attend to something.

8    He'll be right back.

9           By the way, just for your knowledge, ladies and

10   gentlemen, this will be the final witness of today.  So once

11   this witness' testimony is complete, that will be our day.

12   So...

13          MR. TALBOT:  Thank you, Your Honor.

14          THE COURT:  All right.  Mr. Talbot, you ready to

15   proceed, sir?

16          MR. TALBOT:  Yes, sir.

17   BY MR. TALBOT:

18   Q.     Okay.  Detective Tator, I think I was trying to

19   figure out exactly where you were physically located when

20   you found out somebody wanted you to take pictures.  Do you

21   remember where you were?

22   A.     No, I don't.

23   Q.     Were you -- do you know if you were still at the

24   scene or if you had left the scene?

25   A.     I honestly couldn't answer that, because I know at

1   one point I left to go to the station to complete paperwork.

2   Q.      Okay.   How long -- well, let me ask you this.   How

3   long were you at the scene before you left to go complete

4   paperwork?

5   A.      I really couldn't give you a time.

6   Q.      Okay.   More than ten minutes, less than ten minutes?

7   A.      More than ten minutes.

8   Q.      Okay.   More than 30 minutes, less than 30 minutes?

9   A.      Less than 30 minutes.

10  Q.      Somebody asked you to come back and take pictures; is

11  that correct?

12  A.      Yes, sir.

13  Q.      All right.   When you got back to the scene, what did

14  you see?

15  A.      I was directed to where the gun was located and,

16  also, where the -- the drugs were located and asked to take

17  photos.

18  Q.      Okay.   And did you take photographs?

19  A.      Yes, sir, I did.

20          MR. TALBOT:   Your Honor, may I approach?

21          THE COURT:   Yes, sir.

22  BY MR. TALBOT:

23  Q.      I'm going to show you what's been marked as Composite

24  Exhibit 4A through 4F.   If you would take a look at that,

25  please.   Do you recognize those?

1  A.      Yes, sir, I do.

2  Q.      And how do you recognize them?

3  A.      Those are the photographs I took.

4  Q.      Okay.  Have they been -- other than put on this

5  little laminate board, have they been altered in any way?

6  A.      No, sir.

7  Q.      Do they accurately depict what you took a photograph

8  of on August 30, 2002?

9  A.      Yes, sir.

10          MR. TALBOT:  Your Honor, I would offer Exhibit 4A

11 through F into evidence.

12          MR. MAKOFKA:  No objection, Your Honor.

13          THE COURT:  All right.  4A through F will be

14 received.  Just so I'm clear, Mr. Talbot, there were other

15 potential, but you're not moving those in at this time; is

16 that correct?

17          MR. TALBOT:  They're coming very shortly.

18          THE COURT:  Okay.  That's fine.

19          MR. TALBOT:  I was just trying to keep them

20 separate.

21          THE COURT:  That's fine.

22          MR. TALBOT:  Your Honor, may I publish just one or

23 two of these?

24          THE COURT:  Yes, sir.  And, ladies and gentlemen,

25 since they are going to be in evidence, you will have these

1  photos back in the jury room.  So if you don't get to see

2  them all right now, you'll have your chance to see them in

3  the jury room.

4  BY MR. TALBOT:

5  Q.     Okay.  I'm going to show you what's been marked as

6  Exhibit 4D.  What is that a picture of?

7  A.     That's a picture of the gun that was located.

8  Q.     Okay.  And where was it located?

9  A.     On the driver's side, on the floorboard.

10 Q.     Okay.  There's a -- what is that -- there appears to

11 be a pedal right there.

12 A.     Yes, sir.

13 Q.     What is that?

14 A.     That would be the emergency brake.

15 Q.     Okay.  And this edge right here, what is that?

16 A.     That is the driver's side -- the door.

17 Q.     Okay.  That's the edge of the driver's --

18 A.     Yeah.  I don't know the technical term for it.

19 Q.     Okay.  And this fabric right here, what is that?

20 A.     That would be some of the carpet that was on the

21 floorboard.

22 Q.     Okay.  When you saw it, had the carpet been pulled

23 back?

24 A.     Yes, sir.

25 Q.     Okay.  And I'm going to show you what's been marked

1  as Exhibit 4E.  Are you able to see the firearm in this

2  picture?

3  A.      Yes.

4  Q.      Okay.  And where is it?

5  A.      You want me to stand up and point to it or...

6  Q.      If you wouldn't mind, if you could point to it.

7  A.      It's right here.

8  Q.      Okay.  And there -- again, there's some pedals in

9  here.  Can you identify those?

10 A.      This would be the emergency brake, your brake, and

11 your gas pedal.

12 Q.      So this is all on the driver's side?

13 A.      Yes, sir.

14 Q.      Okay.  You took some other photographs that evening;

15 is that correct?

16 A.      Yes, sir.

17 Q.      And what else did you take a photograph of?

18 A.      The drugs that were located in the vehicle.

19 Q.      Okay.  I'm going to show you what's been marked as

20 Composite Exhibit 4G and 4H.  Actually, I'll throw in 4I

21 while we're at it.  If you would take a look at those

22 photographs, please.  Do you recognize those items?

23 A.      Yes, sir.

24 Q.      And what are those items?

25 A.      They are photographs of the drugs located in the

1  vehicle, where they were located in the vehicle, and the tag

2  on the vehicle.

3  Q.     Okay.  If you'll take the -- well, let me just ask

4  you in general.  Are these accurate photographs of the

5  things you saw on the evening of August 30th, 2002?

6  A.     Yes, sir.

7  Q.     Okay.  Have they been altered in any way?

8  A.     No, sir.

9           MR. TALBOT:  Your Honor, I would offer 4G, H, and

10  I.

11          MR. MAKOFKA:  No objection.

12          THE COURT:  Be received.

13          MR. TALBOT:  Okay.

14          MR. TALBOT:  Your Honor, may I publish?

15          THE COURT:  Yes, sir.

16          (Government's Exhibit Nos. 4G, 4H, and 4I were

17  received into evidence)

18  BY MR. TALBOT:

19  Q.     I show you what's been marked as Exhibit 4G.  What is

20  that a photograph of?

21  A.     That is a black film cannister with pieces of crack

22  cocaine.

23  Q.     Okay.  Where was that taken?

24  A.     That right there was taken at the police department.

25  Q.     Okay.  So that was after this item had already been

```
 1   transported to the police station --
 2   A.     Yes, sir.
 3   Q.     -- you took a picture of it?  Okay.  And let me show
 4   you what's been marked as Exhibit 4H.  Do you recognize
 5   that?
 6   A.     Yes.
 7   Q.     And what is that?
 8   A.     That is the armrest where they took the drugs out of.
 9   Q.     Okay.  And --
10            MR. TALBOT:  Could I ask her to step down?
11            THE COURT:  Sure.
12   BY MR. TALBOT:
13   Q.     If you would point to the armrest, because it's a
14   little hard to see on this.
15   A.     This is the armrest here.  It goes this way.  And
16   that's the edge, the back side.
17   Q.     Had the back side of the armrest been damaged?
18   A.     That's how it appeared when I was there to take
19   pictures.
20   Q.     Okay.  Did it look like it had been damaged?
21   A.     Yes, sir.
22   Q.     Okay.  And the photograph looks like there's a hole
23   cut out.
24   A.     Yes, sir.
25   Q.     Is that what it looked like to you?
```

1   A.      Yeah.

2   Q.      Is that what you were taking a photograph of?

3   A.      Well, that's where it was located, but it also looked

4   like that at the time.

5   Q.      Okay.  But you were specifically taking a picture of

6   this whole armrest?

7   A.      Yes, sir.

8   Q.      What part of the armrest was the hole in?

9   A.      It would have been the rear part of the armrest.

10  Your armrest lays flat, like this, and it would have been

11  this part, down this way.

12  Q.      Further to the -- I guess if my arm is on the armrest

13  --

14  A.      The back of -- yeah, if your arm is laying like this,

15  it's going to be to the back.

16  Q.      Closer to the elbow?

17  A.      Yes.

18  Q.      Okay.  And then Exhibit 4I -- let me see if I can get

19  the glare out of there.  Okay.  What's this a photograph of?

20  A.      That is the tag that was on the vehicle.

21  Q.      Okay.  That's the tag on the vehicle that the

22  defendant was driving?

23  A.      Yes, sir.

24  Q.      Okay.  And you took a picture of it?

25  A.      Yes, sir.

1  Q.      Okay.

2          MR. TALBOT:  Your Honor, if I could have a moment?

3          THE COURT:  Yes, sir.

4          MR. TALBOT:  Thank you.  No further questions.

5          THE COURT:  Cross-examination?

6          MR. MAKOFKA:  Thank you, Your Honor.

7                        **CROSS-EXAMINATION**

8  BY MR. MAKOFKA:

9  Q.      And I'll be brief.  We're late in the day.  And I'll

10 work backwards from the traffic stop.  When you arrived out

11 there after Officer Dorough had this gentleman at the

12 roadside, did you see Officer Dorough and Officer McMinn

13 conducting a search of the defendant's vehicle?

14 A.      Yes, I did.

15 Q.      Were you present when these items of evidence were

16 recovered from the vehicle?

17 A.      No.

18 Q.      Okay.  So when you tell this jury that drugs were

19 located in the armrest of this defendant's vehicle, that's

20 based on information that somebody else would have provided

21 to you; isn't that right?

22 A.      Yes, sir.

23 Q.      And when you testified that you photographed a pistol

24 that was recovered from the defendant's vehicle, that's

25 based on information that someone else provided to you;

1  isn't that right?

2  **A.**     Yes, sir.

3  **Q.**     You never saw drugs in the car, you never saw a gun

4  in the car, right?

5  **A.**     I did see the gun in the car.  That's why I --

6  **Q.**     Did you see where they were located in the car?

7  **A.**     I did not see where it was located.

8  **Q.**     In fact, you were gone for 15 to 30 minutes during

9  the time of the search before you came back and took those

10  photos; isn't that right?

11  **A.**     I didn't give the length of how long I was gone, but,

12  yes, I did leave the scene and come back.

13  **Q.**     And how long were you gone?

14  **A.**     I couldn't answer that at this time.

15  **Q.**     You don't remember?

16  **A.**     I wasn't keeping track.

17  **Q.**     Okay.  Well, was it more than ten minutes?

18  **A.**     It's a possibility.  I can't give you a for sure.

19  **Q.**     And when you were back at the McDonald's, just a few

20  questions, you're sitting down in a vehicle, right, with

21  Detective -- or, excuse me, Corporal Bacon, right?

22  **A.**     Yes, sir.

23  **Q.**     You're seated the whole time --

24  **A.**     Yes, sir.

25  **Q.**     -- that you're observing this; is that right?

1   A.      Yes, sir.

2   Q.      And your testimony is that there was a vehicle,

3   possibly more than one vehicle, between your location and

4   the location of the suspect vehicle during the transaction;

5   is that right?

6   A.      Yes.

7   Q.      And what type of vehicles were those, to the best of

8   your recollection?  Were they real low vehicles?  Were they

9   pickup trucks?  What were they?

10  A.      I don't recall the exact models.

11  Q.      Okay.  And how were they obstructing your view,

12  partially obstructing your view, completely obstructing your

13  view?

14  A.      Partially.

15  Q.      Okay.  What part was obstructing your view?  Describe

16  that for us, please.

17  A.      What do you want me to describe?

18  Q.      I want you to describe how the vehicles that were

19  obstructing your view partially were obstructing your view

20  of the suspect vehicle.

21  A.      I could see a portion of the vehicle.

22  Q.      Which portion?

23  A.      I could see the portion as far as a little bit of the

24  front, a little bit of the back.  I knew where the vehicle

25  was parked.

1  Q.    You could see the front?

2  A.    I could see someone approaching it.

3  Q.    Okay.  We're getting ahead of ourselves here.  You

4  could see the front of the vehicle and you could see the

5  back, but you couldn't see the middle, right?

6  A.    No.

7  Q.    Okay.  The middle is where the door is, right?

8  A.    Yes.

9  Q.    Okay.  And so when you testified earlier that you saw

10  the CI clearly get into the four-door maroon Buick --

11  A.    I didn't say I saw him get into it.  It appeared he

12  got into it.

13  Q.    Well, did you see him get into the four-door Buick or

14  not?

15  A.    Sir, he approached the vehicle and it appeared that

16  he got into it.

17  Q.    Well, did you see him get into it or did you see him

18  duck down between two vehicles?

19  A.    I can't answer that.

20  Q.    Because you didn't see it, right?

21  A.    (Witness shrugged shoulders)

22        MR. MAKOFKA:  No further questions, Your Honor.

23        THE COURT:  Redirect?

24        MR. TALBOT:  No redirect, Your Honor.

25        THE COURT:  All right.  Is this witness excused

1  then, Counsel?

2         MR. TALBOT:  Yes, sir.

3         MR. MAKOFKA:  Yes, Your Honor.

4         THE COURT:  Okay.  Thank you.  You may be excused,

5  ma'am.  I would ask you not to discuss your testimony with

6  anyone until the case is over, please.

7         THE WITNESS:  Yes, sir.

8         THE COURT:  Thank you.

9         (Witness excused)

10        THE COURT:  All right.  Mr. Talbot, given the hour

11 and the fact that these folks had to come in early this

12 morning to get ready for jury selection, I think we ought to

13 suspend for today.  I assume you'll be calling additional

14 witnesses in the morning?

15        MR. TALBOT:  Yes, Your Honor.

16        THE COURT:  Okay.  All right.  Ladies and

17 gentlemen, what we're going to do is to stop for today.  I'm

18 going to ask you to make sure your name is on the front of

19 your note pad there.  And if you'll pass that note pad down

20 so that we can collect them, we'll appreciate that.

21        Also, I'm going to remind you that during the

22 overnight recess I'll ask you not to discuss the case with

23 anybody or permit anybody to discuss it with you.  And I

24 don't expect it to be on TV or radio or in the newspaper,

25 but if, by chance, it is, I'd ask you to avoid looking at

 1  any articles or seeing any media about the case.

 2        And I will ask you to be back here at 8:45 in the

 3  jury room so that we can start -- try to start right at

 4  9 o'clock as best we can.  It may be a couple of minutes.

 5        But if you're here on time, then it will help us

 6  to get started on time.  And then we'll have testimony again

 7  tomorrow.  So with all of that, I will wish you all a good

 8  evening and ask you to retire to the jury room.

 9        COURT SECURITY OFFICER:  All rise for the jury.

10        (Jury out, 4:50 p.m.)

11        THE COURT:  All right.  Everybody be seated,

12  please.

13        Mr. Talbot, in your instructions to the folks

14  outside, did you get any information on what, if anything,

15  had been occurring, or not?

16        MR. TALBOT:  I didn't delve into it too directly.

17  I was rather probably blunt and to the point to get away

18  from the door, don't listen at the door.  I did get one

19  response that, you know -- of, We weren't listening.

20        I didn't go into it any further than that.  I'm

21  happy to bring those people in the courtroom for questioning

22  on the topic, or I can inquire further outside the Court's

23  presence and report back.  Whatever you'd like me to do.

24        THE COURT:  Mr. Makofka, what is your position,

25  sir?

 1          MR. MAKOFKA:  Your Honor, I don't want to prolong

 2   something unnecessarily, but it seems to me that if somebody

 3   from your staff is indicating that she's seeing individuals

 4   coming to the door and presumably listen in and report back,

 5   I think we ought to bring these individuals in and ask them

 6   what they were doing.

 7          THE COURT:  All right.  Well, I'm not certain that

 8   my staff member who reported was actually seeing anything.

 9   I think she was probably hearing it.  Because that's what --

10   unfortunately, our chambers door is right out in the

11   hallway.  And so we're able to hear conversations.  And

12   that's why we're always careful about what we're saying,

13   because we figure the opposite is true as well.

14          MR. MAKOFKA:  I misunderstood.  I apologize.

15          THE COURT:  How many folks are out there?

16          MR. TALBOT:  There were -- there were three

17   witnesses waiting and Detective Branscom was still out

18   there.  I think he was somebody's ride.

19          MR. MAKOFKA:  Your Honor, if I could just ask:

20   Are these witnesses that have yet to testify?  Are these --

21   because if they're folks that have already testified --

22          MR. TALBOT:  Well, three of them are waiting to

23   testify.  And then, of course, Detective Branscom, who's

24   already testified.

25          THE COURT:  All right.  I'm not going to make a

1   bigger deal out of this than there is.  But if nothing else

2   comes of it, I certainly want to impress upon all of them

3   the importance of following the rule.

4           And so I think I will -- I think I will ask them

5   to come in.  And my proposal would be to ask them whether

6   any of them were, in fact, listening in and relaying

7   testimony.

8           If the answer is -- we'll see what the answer is.

9   But at any event, even if it turns out that that's not what

10  was occurring, I certainly don't think it's -- it would be a

11  problem for me to remind them of the importance of following

12  the instruction regarding the rules.  So I think that's what

13  we'll do.  If you'll just ask the folks to come in and we'll

14  have them right here.  Thanks.

15          MR. MAKOFKA:  Thank you, Your Honor.

16          (Michael Branscom, Shannon Desmond, Tony

17  Dziedzicki, and Keith Dorough entered courtroom, 4:53 p.m.)

18          THE COURT:  Hi.  If you gentlemen would just stand

19  there for a second.  It won't take very long.  I guess we

20  have gentlemen and gentlelady.

21          Okay.  We had received a report that somebody was

22  in the hallway listening to testimony and then relaying that

23  testimony to others who are waiting to testify.  And so I

24  wanted to ask you all about that.

25          I don't know who it might have been or who it

1  wasn't, or if it even was occurring.  But are any of you

2  aware of any of that?

3          SPECIAL AGENT DESMOND:  No, sir.

4          OFFICER DOROUGH:  No, sir.

5          OFFICER DZIEDZICKI:  No, sir.

6          DETECTIVE BRANSCOM:  No, sir.

7          THE COURT:  All right.  So nobody is aware that

8  that was occurring?

9          SPECIAL AGENT DESMOND:  No, sir.

10          OFFICER DOROUGH:  No, sir.

11          OFFICER DZIEDZICKI:  No, sir.

12          DETECTIVE BRANSCOM:  No, sir.

13          THE COURT:  Okay.  All right.  Then I'm going to

14  just take you at your word on that.  The only thing that I

15  will do is, since I think some of you -- I know one of you

16  has already testified, but the others are yet to testify.

17          We have a rule in the court that I think

18  Mr. Talbot has told you about that no one who has yet to

19  testify is permitted to be in the courtroom.

20          And the reason for that rule is so that you're not

21  able to hear others' testimony.  And then we also have a

22  rule that anybody that's already testified is not supposed

23  to talk about it with people who haven't testified yet or

24  with anybody else.

25          And so I'm going to emphasize to you how important

1  that rule is and that I expect it to be followed

2  scrupulously.

3          And so if you haven't testified yet, it would be

4  the same thing if you're sitting in here and somebody's

5  telling you what's going on.  So we can't have that.

6          And if you're waiting to testify, you shouldn't be

7  talking to anybody who has already testified or finding out

8  anything about what's going on in the trial.

9          If you've already testified, you shouldn't be

10 talking about it until the trial is over, which is the

11 instruction I've been giving everybody.  So I just wanted to

12 make sure.  Is everybody clear on that?

13         SPECIAL AGENT DESMOND:  Yes, sir.

14         OFFICER DOROUGH:  Yes, sir.

15         OFFICER DZIEDZICKI:  Yes, sir.

16         DETECTIVE BRANSCOM:  Yes, sir.

17         THE COURT:  Okay.  Good.

18         Mr. Makofka, is there any further inquiry or

19 matter that we should undertake in your view, sir?

20         MR. MAKOFKA:  No, Your Honor.  I would ask the

21 Court to consider asking the gentleman who's already

22 testified whether or not he's related the substance of his

23 testimony to any witness who's yet to testify?

24         THE COURT:  All right.  I will ask you that, sir.

25 I think you may have already answered that.  But have you

 1  discussed your testimony that you gave here today with

 2  anybody?

 3          DETECTIVE BRANSCOM:  No, Your Honor.

 4          MR. MAKOFKA:  Thank you, Your Honor.

 5          THE COURT:  Anything else, sir?

 6          MR. MAKOFKA:  No, sir.  Thank you.

 7          THE COURT:  Mr. Talbot, are you satisfied with the

 8  Court's inquiry?

 9          MR. TALBOT:  Yes, sir.

10          THE COURT:  All right.  Well, ladies and

11  gentlemen, thank you very much.  And I'm sure we'll see some

12  of you tomorrow.  Thank you.

13          (Witnesses excused)

14          THE COURT:  All right.  Are there any other --

15  y'all can have a seat.  We're almost done.  Is there any

16  other matter we need to take up outside the presence of the

17  jury before we resume testimony tomorrow, Mr. Talbot?

18          MR. TALBOT:  Your Honor, I was just going to bring

19  to the Court's attention that we will take custody of the

20  narcotics and the firearm and take them with us.

21          I know that -- an exhibit's already been

22  introduced, but I just want to make sure that was acceptable

23  to the Court.  We'll, obviously, have that under lock and

24  key.

25          THE COURT:  Yes, sir.  As long as you maintain

1  custody of it or somebody under your control, that will be

2  fine.  And, actually, much preferable to us having it.  And

3  then the firearm as well.

4          MR. TALBOT:  Yes.  I will leave, obviously, the

5  photographs and the tape, things that are not narcotics or

6  firearms.

7          THE COURT:  I agree.  Anything else, sir?

8          MR. TALBOT:  No, sir.  That's it.

9          THE COURT:  Mr. Makofka, is there any other matter

10 that we need to take up at this time?

11         MR. MAKOFKA:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  Now, we will, in the

13 morning, briefly, I'm sure, I hope, talk about this issue of

14 the potential impeachment material.  And so I will ask

15 counsel to be ready to discuss that.

16         I'm trying to think when -- because of the

17 logistics here, I have trouble convening court with the

18 defendant present while we're still waiting for the jury to

19 show up because of the potential of them crossing paths.

20 And so it creates a little bit of a logistical issue.

21         What I'm going to do, though, is -- I don't think

22 that any matter we have will take very long.  So I'm going

23 to convene court at quarter to nine in the hope that the

24 jury panel will be in the -- in the jury room, as they're

25 supposed to be, and that we can bring Mr. Moore up and be

1  ready to proceed.

2          If we can't, we'll wait until the CSO gives us the

3  clear.  We'll bring Mr. Moore up.  And then we'll have our

4  discussion.  But I would like to start as close to nine as

5  we can, as we promised the jury.

6          So what I'm intending to do is convene court with

7  counsel and Mr. Moore at 8:45, or as soon thereafter as

8  Mr. Moore can be escorted up without having him run into the

9  jury.

10         And we'll talk about the impeachment issue and

11 make a final decision how we're going to approach that and

12 any other matters and then we'll be prepared to go forward

13 with testimony.

14         Mr. Talbot, can you estimate for me, sir -- based

15 on how things are going today, can you estimate for me where

16 you think we'll be going tomorrow?  And can you give

17 Mr. Makofka your lineup so that we -- we know what we're

18 doing?

19         MR. TALBOT:  Yes, Your Honor.

20         THE COURT:  And, Mr. Makofka, you'll need to be --

21 when your case is going forward, you'll need to be prepared

22 to do the same for Mr. Talbot.  But what's the lineup for

23 tomorrow and what's your estimate of time?

24         MR. TALBOT:  Okay.  Your Honor, I've got some

25 expert witnesses that will -- we're going to shift from the

1  morning to the afternoon.

2          My lineup will -- I can give you the exact order.

3  I believe Officer McMinn -- I've got Officer McMinn, Tony

4  Dziedzicki, Shannon -- or Matt Robinson, then Shannon

5  Desmond.  I've got Keith Dorough.

6          THE COURT:  And this is the relative order that

7  you're expecting to call them at this time?

8          MR. TALBOT:  Yes.  This is the relative order.

9  Some of those may get moved around a little bit.  But that's

10 generally the order.

11         THE COURT:  All right.

12         MR. TALBOT:  I'll have Charles Fisette, who's a

13 records custodian witness.  And then I start into my two

14 chemists, ballistics or -- or firearm expert and

15 fingerprints.  And then we've got Nick Cheremeta with ATF,

16 who's our interstate nexus.

17         THE COURT:  Well, I would guess those last groups,

18 the experts and Cheremeta, would be pretty brief.

19         MR. TALBOT:  They should be relatively short, Your

20 Honor.  I don't think we're really dealing with a contested

21 issue there.

22         So I think I'll probably start a little slow.  I'm

23 sure Dorough will take a little time.  And then I'll

24 probably end pretty quick.

25         THE COURT:  Okay.  But probably certainly not

1  before lunchtime, it doesn't sound like?  But maybe early to

2  mid-afternoon?

3          MR. TALBOT:  No, Your Honor.  What I intend to do

4  with -- if it's all right with the Court, is to ask my FDLE

5  witnesses to be here promptly at 1 o'clock --

6          THE COURT:  Okay.

7          MR. TALBOT:  -- anticipating that the rest of the

8  officers will take us the bulk of the morning, if not into

9  the afternoon.  I -- just trying to limit them.

10          THE COURT:  All right.  Then, Mr. Makofka, it

11  sounds to me like you need to be prepared to deal with the

12  rest of Mr. Talbot's case and then, also, be potentially

13  prepared to offer witnesses in the mid-to-late afternoon

14  tomorrow.  It's not for sure we'll do that, but it sounds

15  like we may.

16          Also, what we'll do in the morning is give you

17  some proposed jury instructions that we've put together

18  based on what you-all gave us, so that you can at least be

19  looking at those so that when we do get to a charge

20  conference we'll be ready to proceed.  I expect a lot of

21  them in this case will be fairly noncontroversial, I would

22  think.  So...

23          All right.  Is there anything else we can do?

24          MR. MAKOFKA:  No thank you, Your Honor.  I think

25  that's it.

MR. TALBOT:  No, sir.

THE COURT:  Well, thank you all.  We'll see you at a quarter to nine in the morning.

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in recess.

(The proceedings adjourned at 5:02 p.m.)

- - -

## CERTIFICATE

UNITED STATES DISTRICT COURT )
                             )
MIDDLE DISTRICT OF FLORIDA   )


I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


DATED this 21st day of July 2003.


Shannon M. Bishop, RMR, CRR